IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

LAMAR FIELDS,

Defendant.

CRIMINAL ACTION
NO. 15-129

## OPINION

**Slomsky, J.**                                                    **December 15, 2017**

## I.   INTRODUCTION

Before the Court are two Motions to Suppress filed by pro se Defendant Lamar Fields: (1) a Motion to Suppress Evidence Obtained on March 29, 2013 (Doc. No. 149); and (2) a Motion to Suppress Blank Prescription Pads (Doc. No. 163).

In his first Motion to Suppress (Doc. No. 149), Defendant asserts that items obtained from a March 29, 2013 traffic stop of a rental vehicle which Defendant was driving should be suppressed because the evidence resulted from an unlawful search and seizure of the vehicle. Defendant was not an authorized driver listed on the rental agreement.  (Id. at 1.)  In his second Motion to Suppress (Doc. No. 163), Defendant moves to suppress blank prescription pads seized by Philadelphia Detective Thomas DiLauro on March 29, 2013 during the execution of a search warrant for a room occupied by Defendant at the North American Motor Lodge.[1]

The Government filed two separate Responses in Opposition to both Motions to Suppress.  (Doc. Nos. 155, 167.)  The Court held hearings on the Motions on October 6, 16, and

---

[1] Defendant also seeks to suppress any laptop computers seized in the room at the North American Motor Lodge.  The Government has stated that it does not intend to introduce any evidence from or concerning the laptop computers [Doc. No. 170 at 2] and did not do so at trial.  Accordingly, the Court need not address this claim.

30, 2017.  For reasons that follow, the Court finds that the seizure of items from both March 29, 2013 searches were lawful.  Accordingly, Defendant's Motions to Suppress (Doc. Nos. 149, 163) will be denied.

## II.    FACTUAL FINDINGS

Defendant Lamar Fields is charged with one count of conspiring to knowingly and intentionally distribute oxycodone, six counts of knowingly and intentionally distributing and aiding and abetting the distribution of oxycodone,[2]  and six counts of knowingly and intentionally acquiring and aiding and abetting the acquisition of oxycodone by fraud, in violation of 21 U.S.C. §§ 846, 841(a), and 842(a) and 18 U.S.C. § 2.  (Doc. No. 134.)  As part of its case-in-chief, the Government sought to admit evidence obtained from the search and seizure of a vehicle and motel on March 29, 2013.  At the hearings held on the Motions to Suppress, the Government presented the testimony of Philadelphia Police Officers Michael Haas and Kevin Palmer.  In addition, Detective Thomas DiLauro of the Philadelphia Police Department, Officer David LaRosa of the Lower Merion Township Police Department, and Detective Bryn Garner of the Lower Merion Police Department also testified.

### A.    March 29, 2013 Traffic Stop

Officer Michael Haas testified that on March 29, 2013, at approximately 11:15 a.m., he and Officer Kevin Palmer observed a gray or silver Ford Taurus vehicle driving southbound on 66th Street, approaching Lansdowne Avenue in Philadelphia, Pennsylvania.  (Doc. No. 206 at 17.)  Both officers testified that from their marked police vehicle, they observed the Ford Taurus make a right-hand turn without signaling before heading westbound on 6600 Lansdowne Avenue.  (Id. at 18.)  When the Taurus entered the 6800 block of Lansdowne Avenue, it crossed

_____

[2] At the time of trial, the Government withdrew the six distribution counts.

over the yellow lines on the street, in violation of 75 Pa. Cons. Stat. § 3309(1).[3]  (Id.)  At this point, the officers turned on their car lights and siren to signal the Taurus to stop.  (Id.)  The Taurus then stopped.  (Id. at 19.)

The officers approached the vehicle, with Officer Haas going toward the driver's side and Officer Palmer the passenger's side.  (Id.)  Officer Haas testified that Defendant was the only occupant of the vehicle.  (Id.)  Officer Haas asked him for his driver's license, registration, and insurance.  (Id. at 20, 50.)  Defendant gave him a driver's license with the name, "Lamar Cooper," and car rental agreement from Budget, a rental car company.  (Id.)  Defendant's name was not listed on the rental agreement.[4]  (Id. at 21.)  Meanwhile, Officer Palmer looked around the vehicle for any suspicious items in plain view.  (Id. at 50.)  Officer Haas then asked Defendant his date of birth or his age.  (Id. at 21.)  Defendant's response, however, did not match the date of birth listed on the driver's license he produced.  (Id. at 21, 51.)  At this time, both officers noticed that Defendant was nervous and shaking.  (Id. at 22, 52.)  Defendant was also wearing sunglasses, which he did not remove while speaking with Officer Haas.  (Id. at 22-23.)

After reviewing the rental agreement, the officers notified Budget that an unauthorized person was driving its rented vehicle.  (Id. at 23.)  Budget requested that they seize the vehicle so

---

[3] 75 Pa. Cons. Stat. § 3309(1) provides as follows:

Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others not inconsistent therewith shall apply:

(1) Driving within single lane.—A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety.

[4] The agreement stated that that the vehicle was rented to Nyema Fuller.  Defendant identified her at the time as his girlfriend.  (Doc. No. 206 at 21, 99.)

that a representative of the company could later repossess it. (Id. at 25, 53.) For this reason, the officers seized the vehicle. They also seized the car because Defendant was an unauthorized driver of the vehicle pursuant to 75 Pa. Cons. Stat. § 1574(a).[5] (Id. at 23, 25.) In compliance with Philadelphia police procedures following such a seizure, the officers conducted an inventory search of the car to ensure there were no weapons or contraband inside. (Id. at 23-24, 54-55.) Before the search commenced, Defendant was frisked by Officer Haas, who did not find anything on Defendant's person. (Doc. No. 206 at 32; Doc. No. 207 at 128.) During the search of the Taurus, Defendant remained either outside of the vehicle or in the police car. (Id.)

Inside the glove box of the vehicle, a large sum of money was located by the officers. (Doc. No. 206 at 24.) The cash was loosely contained inside a purple Crown Royal liquor bag. (Id. at 28, 55.) There were no receipts or vouchers accounting for, or otherwise accompanying, the money. (Id. at 28.) When Officer Haas asked how much money was inside the bag, Defendant replied that it was approximately $7,000. (Id.) Because of the considerable value of cash involved, Officer Haas contacted his supervisor, Sergeant Marlana Caprara, to come to the scene in order to have an additional witness view the money seized. (Id. at 24, 57-58; Doc. No. 207 at 116.)

Next, the officers prepared a property receipt for the money which stated the following:

Below recovered from Lamar Cooper during a vehicle investigation at 6600 Landsdown [sic] Street, taken 20 $100 bills totaling $2,000; six $50 bills totaling $300; 346 $20 bills totaling $6,920; fourteen $10 bills totaling $140; fourteen $5 bills totaling $70; and seven $1 bills totaling $7 for a total of $9,437.

(Id. at 28.)

---

[5] 75 Pa. Cons. Stat. § 1574(a) provides as follows:

No person shall authorize or permit a motor vehicle owned by him or under his control to be driven upon any highway by any person who is not authorized under this chapter or who is not licensed for the type or class of vehicle to be driven.

After Sergeant Caprara arrived at the scene, the officers continued to search the vehicle.[6] (Id. at 29.) In the trunk, they discovered several items of designer clothing, all of which appeared new. (Id. at 29, 31.) Officer Palmer testified that some of the clothing still had tags on them. (Id. at 56.) He prepared another property receipt to catalog the clothing. (Id.) The receipt stated as follows:

> Eleven Nike shoe boxes, . . . one pair of Puma shoes with box, . . . three Gucci shoes with box, two Addidas [sic] shoes with box, three leather belts, one Gucci belt, five True Religion shorts, seven multi-colored Polo shorts, four cargo shorts and five pairs of Polo socks.

> (Id. at 30.)

Officer Palmer testified that Defendant had told the officers that the money was from a stand he had on 52nd or 57th Street in Philadelphia, and that the clothing items were for a friend who owned a store. (Id. at 55.) Officers Haas and Palmer also testified that Sergeant Caprara, speculating about the source of the items, told the officers that there were recent burglaries in Lower Merion Township, Pennsylvania, which borders the district in which the officers were assigned that day. (Id. at 31, 60-61.) The burglaries involved high-end clothing and jewelry. (Id.)

After completing the search of the vehicle at approximately 12:30 p.m., Officer Haas told Defendant that the officers were going to retain his money and take it back to the Nineteenth District's station. (Id. at 33.) Officer Haas further informed Defendant that if he wanted to receive his money and the property receipt, he should come to the station. (Id.) Defendant obliged and voluntarily accompanied Officer Haas in the police vehicle back to the station. (Id.; Doc. No. 207 at 121.) Meanwhile, Officer Palmer drove the Taurus back to the station. (Id.)

---

[6] At the October 30, 2017 hearing, Defendant called Sergeant Marlana Caprara to testify about the events which took place on March 29, 2013. Sergeant Caprara said that she did not recall any of the events. (See Tr. of Pretrial Mot. Hr'g, 5:2-20, Oct. 30, 2017.)

Defendant was never handcuffed and was never ordered to go to the police station. (Doc. No. 206 at 33, 35, 62.)

## B. Events at the Nineteenth District Police Station

After they arrived at the station, the officers counted the money in front of Defendant in an open area. (Id. at 34-35.) Though the officers did not place Defendant under arrest, Officer Haas instructed him to stay close to the money to ensure that it was being counted accurately. (Id. at 36.) Defendant complied. (Id. at 37.) As the officers counted the money, Defendant remained quiet and kept his sunglasses on. (Id. at 36, 64.) The officers typed up the property receipts they had prepared at the scene, as well as a report of the vehicle search. (Id. at 34.) The receipt then was signed by Defendant as the person from whom the property was taken, by Officer Haas as the preparer of the receipt, and by Officer Palmer as a witness. (Id. at 38, 39.) Officer Haas also testified that Defendant was told several times that he could leave and pick up the receipt later. (Doc. No. 207 at 120.)

Next, the officers contacted Detective Larry Fong of the forfeiture unit because they had seized money without making an arrest. (Doc. No. 206 at 34.) Sergeant Caprara also contacted the Philadelphia Police Department's Major Crimes Unit to have the clothing items found in the rental car examined. (Id. at 31, 61.) The Major Crimes Unit then contacted Lower Merion police to view the items.[7] (Id.)

---

[7] The testimony of various police officers and detectives of the Philadelphia Police Department and the Lower Merion Township Police Department during hearings on the Motion reveals that, after Sergeant Caprara examined the clothing found in the rental vehicle, she contacted the Major Crimes Unit of the Philadelphia Police Department. Then, an individual or individuals from this Unit contacted Lower Merion Township authorities to alert them to the discovered clothing items.

Based upon the testimony of the officers and detectives, however, the specific identity of the contact person(s) from the Major Crimes Unit was not identified. At the October 30, 2017 hearing, the Court ordered the parties to locate a log of on-duty officers at the Major Crimes

Detective David LaRosa of Lower Merion testified that he, along with Detective Bryn Garner and Detective William Lane,[8] arrived at the Nineteenth District station in order to meet Defendant to determine whether he "had any involvement in the series of thefts in [Lower Merion] at the time." (Doc. No. 207 at 6-7.) Detectives LaRosa, Garner, and Lane spoke with Defendant in a small office for approximately half an hour. (Id. at 7, 16.) Defendant was not placed in handcuffs nor was he ordered not to leave, and he never attempted to do so. (Id. at 8.)

At some point, the detectives learned that Defendant was occupying a room at the North American Motor Lodge. (Id. at 16.) Detective LaRosa testified that he and the other detectives believed that the room where Defendant was staying could be used to store stolen merchandise from the thefts which had taken place in Lower Merion Township. (Id. at 24.) They relied on the information provided to them by the Philadelphia police officers, who had stopped Defendant in close proximity to the location where the thefts occurred and had uncovered the large amounts of cash and brand new clothing. (Id.) Detective LaRosa prepared and gave to Defendant a "consent to search" form, which stated:

> I, Lamar Cooper, do hereby authorize Detectives LaRosa, Garner, and Lane to conduct a complete search of my hotel room, Room Number 317, located at North American Motor Lodge, 4444 City Avenue, Bala Cynwyd, Philadelphia, Pennsylvania.

***

---

Unit for March 29, 2013. (Tr. of Pretrial Mot. Hr'g, 26:14-20, Oct. 30, 2017.) On November 1, 2017, Government's counsel submitted a status letter to report that the Major Crimes Unit no longer has the sign-in log from March 29, 2013. (Doc. No. 195.) Therefore, no person from the Major Crimes Unit involved in the events taking place on March 29, 2013 has been identified.

[8] Detectives Bryn Garner and Detective William Lane were also called by Defendant to testify at the hearings on the Motion to Suppress. They did not recall the events taking place on March 29, 2013. (Doc. No. 207 at 83-89; Tr. Of Pretrial Mot. Hr'g 7:2-15, Oct. 30, 2017.)

I have been informed of my constitutional rights not to have these premises searched without a Search Warrant, and then my right to refuse to consent to such a search. I nevertheless authorize the police officer(s) named in Section A of this consent form to conduct a complete search of the premise.

I hereby authorize the above-named police officer(s) to take from my: Hotel room #317 @ 4444 City Ave, any letters, papers, materials, or other property which they may desire.

I give permission voluntarily and without threats or promises of any kind and after being informed of my constitutional rights under <u>Miranda v. Arizona</u>. I have been informed that I have: (1) a right to remain silent and do not have to say anything at all; (2) anything I say can and will be used against me in Court; (3) I have a right to talk to a lawyer of my own choice before questions are asked of me; (4) if I cannot afford to hire a lawyer and I want one, a lawyer will be obtained for me free of charge before any questions are asked of me; and (5) if I am willing to give a statement, I have a right to stop at any time I wish.

(Gov't Ex. 5.) Detective LaRosa testified that Defendant appeared to understand the contents of the form. The detective did not recall whether Defendant expressed any objections. (Id. at 11-12.) If Defendant had raised any objections, however, those would have been noted in the form. (<u>Id.</u> at 12.) The "consent to search" form was signed by Defendant. (<u>Id.</u> at 10, 26.) The form was also signed by Detective LaRosa and Detective Bryn Garner as witnesses and was eventually transmitted to the Philadelphia Police. (<u>Id.</u> at 11, 14.)

### C.     Search of Defendant's Room at the North American Motor Lodge

Officers Haas and Palmer became aware that the Lower Merion officers obtained Defendant's consent to search the room he was occupying at the North American Motor Lodge which was located in Philadelphia, Pennsylvania.[9] (Doc. No. 206 at 42, 65.) Officer Palmer

---

[9] At the October 30, 2017 hearing on the Motion, the Court asked the parties whether there was a key to Defendant's room at the North American Lodge that was used to conduct the search. (Tr. of Pretrial Mot. Hr'g 20:16-22:21, Oct. 30, 2017.) Both Defendant and the Government agreed that there was no specific testimony regarding the room key. (<u>Id.</u> at 22.) However, in the affidavit of probable cause supplementing the application for a search warrant, which was admitted in evidence at the hearing, Detective Thomas DiLauro stated:

accompanied Detective LaRosa and the Lower Merion Township officers to the motel to provide Philadelphia police presence and because the search had originated from his and Officer Haas' traffic stop. (Id. at 65; Doc. No. 207 at 112.) Officer Haas remained at the station with Defendant. (Id. at 40-41.)

When Officer Palmer arrived at the North American Motor Lodge motel room, he found either a Pennsylvania identification card or driver's license in plain view on a dresser. (Id. at 66.) The card or license displayed Defendant's actual name: Lamar Fields. (Id.) Officer Palmer also observed piles of folded new clothing with tags in the room. (Id.) He then called Officer Haas to tell him that he had found an identification card, which he thought to be legitimate. It led him to believe that the driver's license Defendant produced earlier at the traffic stop was fraudulent. (Id. at 68.) Meanwhile, Detective LaRosa contacted his sergeant and informed him that there was nothing in the room linking Defendant to the Lower Merion Township thefts and that no charges would be filed by Lower Merion Township authorities. (Doc. No. 207 at 12.)

### D.    Defendant's Arrest

At approximately 3:00 p.m., Officer Haas, still at the police station with Defendant, received Officer Palmer's call, who, as mentioned above, told him that he found Defendant's legitimate identification card. (Id. at 42.) When Officer Haas asked Officer Palmer over the phone, in Defendant's presence, "what is his name?", Defendant rose and sprinted out of the station. (Id. at 42-43.) Other police officers chased Defendant and he was apprehended on

---

Due to the fact that Lower Merion Township has recently had numerous burglaries in the township, Lower Merion Police came to the 19th District and spoke to the [Defendant] about the items found in the vehicle he was operating. Upon further investigation, the Defendant was in possession of a hotel room key for the North American Motor Lodge located at 4444 City Ave Room #317. At that time, the [Defendant] gave permission to Lower Merion Police to search his room.

(Gov't Ex. 6.)

Haverford Avenue, placed in handcuffs, and put in the back of a police vehicle. (Doc. No. 206 at 104; Doc. No. 207 at 44, 69.) Officer Haas or another officer then checked the name Lamar Fields in the Philadelphia Police Department's database. (Id.) The database revealed that Defendant was wanted for a probation violation. (Id.)

By the time Officer Palmer returned to the station from the North American Motor Lodge, Defendant had been arrested. (Id. at 69.) Officer Palmer then filled out a property receipt for the clothing seized from the Ford Taurus that Defendant was driving earlier and placed the items into police custody. (Doc. No. 207 at 122.) He also prepared a police report, which included the fact that Defendant had granted consent to search the motel room and that Officer Palmer observed the Pennsylvania identification card with Defendant's name on it. (Id. at 127.)

### E. Seizure of Items from Defendant's Motel Room

At approximately 3:45 p.m., after the Lower Merion Township detectives searched the motel room, Detective Thomas DiLauro of the Philadelphia Police Department arrived at the North American Motor Lodge.[10] (Gov't Ex. 6.) By this time, the Philadelphia police had

---

[10] Government Exhibit 6, which was admitted into evidence, is Detective Thomas DiLauro's application for a search warrant and affidavit of probable cause to search Defendant's room at the North American Lodge and to seize the clothing, and other items, including prescription pads, credit cards, and proof of occupancy. From the fax confirmations on the top of the document, it appears that on March 29, 2013 at 5:30 p.m, the application was transmitted via fax from Southwest Detectives, which is where Detective DiLauro is assigned. There is no indication to whom the fax was sent to, although there is a handwritten notation on the application which states, "Approved by ADA Brown 3/29/13 6:48 p.m." There is another fax confirmation, which appears to indicate that the search warrant application was again transmitted via fax from the DA Charging Unit at 6:52 p.m. on March 29, 2013. Presumably, this outgoing fax with the approval of ADA Brown was faxed back to Southwest Detectives for submission to a magistrate judge for authorization to conduct the search.

The sequence of events gleaned from Detective DiLauro's testimony and Government Exhibit 6 appears to be as follows: Detective DiLauro entered Defendant's motel room after the Lower

secured the room, by having an officer sit outside or inside the room to avoid contamination of the scene.  (Doc. No. 207 at 37.)  As soon as he entered the room, Detective DiLauro observed a "large amount of new designer clothing" as well as "several blank prescription pads" and "[n]umerous new credit cards in various names other than [Defendant's.]"  (Id.)   He then prepared an application for a search warrant for Defendant's room at the North American Motor Lodge.  (Id. at 32.)  On the application, Detective DiLauro listed "new designer clothing, blank prescription pads, credit cards, and proof of occupancy" as items to be seized from the room.  (Id. at 33.)  The application for the search warrant was approved by a bail commissioner or bail magistrate in Philadelphia.  (Id. at 33.)

Sometime after 9:00 p.m., Detective DiLauro returned to the North American Motor Lodge to seize the items listed in the warrant.  (Id. at 38, 44.)  He also found mail addressed to Defendant, as proof of occupancy.  (Id. at 45.)  Later on, he also contacted Dr. William Burch, whose prescription pads were found in Defendant's room, in order to determine whether Defendant was allowed to have those prescription slips and/or if they had been stolen.[11]   (Id. at 46.)  Dr. Burch told Detective DiLauro that he had been part of an ongoing investigation involving stolen prescription pads.  (Id. at 47.)

III.     **CONCLUSIONS OF LAW**

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and

---

Merion Township officers obtained consent and searched the room.  Thereafter, he prepared the application for the search warrant, obtained the necessary approval, and then returned to the room to seize the items noted above.

[11] The Indictment alleges that prescription pads of Dr. William Burch were used by Defendant to acquire the oxycodone pills from various pharmacies.

no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "It must always be remembered that what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (quoting Elkins v. United States, 364 U.S. 206, 222 (1960)).

In the seminal case Terry v. Ohio, 392 U.S. 1 (1968), the United States Supreme Court created an exception to the Fourth Amendment warrant requirement. Under the Terry exception, a police officer may conduct a brief investigatory stop when the officer has a reasonable suspicion based on articulable facts that a crime has been committed. Id. at 21-22. "Any evidence obtained pursuant to an investigatory stop (also known as a 'Terry stop' or a 'stop and frisk') that does not meet this exception must be suppressed as 'fruit of the poisonous tree.'" United States v. Torres, 534 F.3d 207, 210 (3d Cir. 2009) (quoting United States v. Brown, 448 F.3d 239, 244 (3d Cir. 2006)). A Terry stop is a seizure under the Fourth Amendment.

A. **The Traffic Stop Was Lawful Because Police Officers Had Reasonable Suspicion to Believe That Defendant Violated Provisions of the Motor Vehicle Code**

An investigatory traffic stop is analyzed under the Terry framework. United States v. Delfin-Colina, 464 F.3d 392, 396 (3d Cir. 2006). The Third Circuit has held that it is permissible for a police officer to conduct a brief investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity has occurred or is in the process of occurring. Id. (citing United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (citations omitted)). A reasonable, articulable suspicion is a standard that requires a lesser showing than the preponderance of the evidence, with only a minimal level of objective justification to be set forth by the officer. United States v. Crooks, 337 F. App'x 159, 162 (3d Cir. 2009) (citing Delfin-

<u>Colina</u>, 464 F.3d at 396).  Here, the Government argues, and the Court agrees that, with respect to the traffic stop, "the police had both reasonable suspicion and probable cause to detain him while they confirmed or dispelled their suspicions about his activities."  (Doc. No. 155 at 15.)

Philadelphia Police officers Michael Haas and Kevin Palmer observed Defendant commit a traffic violation—turning without signaling first and driving across marked lanes—which reasonably prompted them to stop and question him.  Officer Haas asked Defendant to produce his driver's license, registration for the vehicle, and proof of insurance.  Defendant provided a driver's license and a Budget rental agreement.  When the officers discovered that he was not on the rental agreement for the vehicle, the officers contacted the owner, Budget Rental Company.  A representative of Budget as the owner of the vehicle informed the officers that Defendant was not authorized to possess the vehicle, and requested that the officers seize the vehicle.  They did so pursuant to this request and because Defendant was not an authorized driver, and thereafter conducted an inventory search of the vehicle.

### B.    Inventory Search of the Vehicle Was Lawful

Police officers are permitted to conduct inventory searches of lawfully seized vehicles without a warrant.  <u>United States v. Mundy</u>, 621 F.3d 283, 287 (3d Cir. 2010) (citing <u>Colorado v. Bertine</u>, 479 U.S. 367, 371 (1987)).  Three objectives are served when conducting an inventory search: "(i) the protection of the owner's property while it remains in police custody; (ii) the protection of the police against claims or disputes over lost or stolen property; and (iii) the protection of the police from potential danger."  <u>Id.</u> (citing <u>South Dakota v. Opperman</u>, 428 U.S. 364, 368 (1976)). A caveat to this directive, however, is that the search must be conducted in accordance with some established standard or routine consistent with a purpose that is non-investigative.  <u>Mundy</u>, 621 F.3d at 288 (3d Cir. 2010) (citing <u>United States v. Salmon</u>, 944 F.2d 1106 at 1120-21 (3d Cir. 1991) (citations omitted)).  This ensures that officers are "not [ ]

allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime." Id. (brackets in original) (citing Florida v. Wells, 495 U.S. 1, 4 (1990)).

Officer Haas testified that when he and Officer Palmer stopped Defendant for a traffic violation, they seized the vehicle Defendant was driving because he was an unauthorized driver under 75 Pa. Cons. Stat. § 1574(a). (Doc. No. 206 at 23.) A representative of Budget, as the owner of the vehicle, informed them that Defendant was not the lawful owner of the car and was not authorized to drive it. After seizing the car, the officers conducted an inventory search of the vehicle. In deciding to conduct an inventory search, Officer Haas stated that he relied upon the Philadelphia Police Department's routine procedures when taking one's property:

> Any time that you are taking somebody's property you're going to search and make sure that - - you're going to search the property and make sure that you're not missing anything. You don't want to have a person make an allegation that you took something of theirs from their property that will later come down. And we want to document everything that is in the vehicle.

(Id. at 24.) He further explained that they conducted the search of the vehicle "to make sure there weren't any weapons or any other kind of contraband." (Id. at 23.) Officer Haas also said that in an unrelated case, he received a verbal reprimand for failure to voucher an item of property after a vehicle search. (Id. at 26.) Additionally, Officer Palmer stated that he received training on inventory searches and followed routine procedures that he was trained on while he conducted the search of the Ford Taurus Defendant had been driving. (Id. at 54.)

The officers did the inventory search not only to ensure that Defendant would not accuse them later on of theft or tampering with his property, but also to protect themselves in case they uncovered any weapons or dangerous items. Based on the officers' testimony, it is clear that at the time of the search and seizure of the Ford Taurus, there were established procedures within

the Philadelphia Police Department on when and how to conduct inventory searches. The officers acted in accordance with these procedures and did not exceed their authority when they conducted the inventory search. Thus, the inventory search was lawful and items recovered from that search will not be suppressed.

### C. The Police Search of Defendant's Motel Room Was Lawful Because Defendant Consented to the Search and the Search Warrant Obtained by Detective DiLauro Authorized the Seizures

Defendant contends that he did not voluntarily consent to the search of the motel room at the North American Motor Lodge because he was subjected to unlawful detention and custodial interrogation by detectives from Lower Merion Township, who first searched the motel seeking items stolen during burglaries in the Township. He also claims that Detective DiLauro, who thereafter obtained a search warrant before taking any items in the motel room, submitted an affidavit to a magistrate judge which lacked probable cause. (Doc. No. 163.)

The Government asserts to the contrary that Defendant gave his consent to the Lower Merion Township detectives to search his room and that there was probable cause set forth in the search warrant affidavit. The Government also argues that the search warrant was prepared and approved based on articulable facts that a crime had been committed. The Court agrees with the Government.

### 1. Lower Merion Detectives Lawfully Obtained Defendant's Consent to Search His Motel Room

Defendant argues that his custodial questioning by Lower Merion Township detectives while he was unlawfully detained vitiated any consent he may have given to search the motel room. (Doc. 149 at 7.) He further asserts that in the absence of probable cause, a "consent to search" form provided after the unlawful detention was ineffective to justify the search.

Consent is an exception to the warrant requirement before conducting a search. United States v. Price, 558 F.3d 270, 277 (3d Cir. 2009) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). To demonstrate the validity of consent, the Government must prove that the consent was freely and voluntarily given. Id. (citing Bumper v. North Carolina, 391 U.S. 543, 548 (1968)). The Third Circuit examines the voluntariness of the consent by examining the totality of the circumstances, including analyzing the "characteristics of the accused and the details of the interrogation." Id. (citing Schneckloth, 412 U.S. at 226).

When Officers Haas and Palmer uncovered the large sum of money and items of expensive clothing in the seized vehicle during the inventory search, they alerted their supervisor who, in turn, notified the Major Crimes Unit. Members of this Unit then informed Lower Merion Township detectives, who had knowledge of burglaries in their Township, about the clothing. Relying on the information provided by the Philadelphia police, Lower Merion Township Detective David LaRosa and his colleagues came to the police station and questioned Defendant to determine whether he was involved in the burglaries. Given the fact that the traffic stop occurred within close proximity to Lower Merion Township, Defendant's anxious behavior during the stop, and the discovery of items in the car Defendant was driving that were similar to those stolen in Lower Merion Township, the police had reasonable suspicion to question Defendant. He voluntarily spoke to them and was not in custody at this point.

During the questioning, Defendant provided the detectives with consent to search his motel room by signing a "consent to search" form. (Gov't Ex. 5.) The form acknowledged that he was informed of his constitutional rights and that he consented voluntarily. (Id.) Detective LaRosa testified that whenever he presents to a person a "consent to search" form, he tells the individual from whom he is seeking consent what he is searching for and the reasons why. (Doc.

No. 207 at 6.)  The form includes the name and address of the motel at which Defendant was staying, including the room number, which could only have been ascertained from Defendant himself.  It also includes a section where Defendant affirms that he has been informed of his right to refuse to consent to the search.  Detective LaRosa testified that neither he nor his Lower Merion Township colleagues placed Defendant in handcuffs and they did not order him to stay.  (Id. at 8.)  Defendant never tried to leave or end the meeting.  (Id.)  And as discussed above, the "consent to search" form gave the police permission to conduct a "complete search" of his room at the North American Motor Lodge.

Defendant has not presented any evidence to dispute the voluntariness of his signing the "consent to search" form.  Defendant acknowledged his rights under Miranda v. Arizona, 384 U.S. 436 (1966), even though he was not in custody, and spoke with the Lower Merion Township detectives, who presumably had been informed that Defendant was occupying a room at the North American Motor Lodge.  Detective LaRosa explained to Defendant why he wanted to search the room.  By the end of this brief meeting, Defendant signed the "consent to search" form, granting permission to the detectives to search his room and seize certain items.  The signing was witnessed by two Lower Merion Township detectives.  There is no evidence in the record that Defendant did not understand Detective LaRosa's requests or the content of the consent form.  Thus, the record reflects that Defendant's consent was made knowingly and voluntarily and was not the result of an unlawful detention and interrogation.

### 2. Philadelphia Police Obtained a Valid Search Warrant to Seize Items from Defendant's Motel Room

Lower Merion Township Detective LaRosa faxed the "consent to search" form signed by Defendant to Detective DiLauro of the Philadelphia Police Department.  (Gov't Ex. 5.)  Upon receiving the consent form, Detective DiLauro went to the North American Motor Lodge located

in Philadelphia and arrived at Defendant's room, which was secured by Philadelphia police. (Doc. No. 207 at 38.) He reasonably believed at that time he could lawfully access the room. (Id.) There, Detective DiLauro observed blank prescription pads, designer clothing, and credit cards in plain view, (Id. at 38-39), prompting him to prepare and obtain a search warrant to seize the items which appeared to be instruments of illegal activity.

Defendant contends that if the consent obtained by Lower Merion Township had been valid, then Philadelphia Detective DiLauro did not have to obtain a search warrant to confiscate the items. (Doc. No. 149 at 9.) He apparently asserts that Detective DiLauro knew that the consent to search was invalid and therefore obtained the warrant to legitimize the search. He further claims that probable cause was lacking because it was based in part on items observed during the search conducted pursuant to the invalid consent. These arguments are unavailing.

Consent to search is not confined to the sole officer who obtained the consent, for once it has been obtained from one authority, any expectation of privacy has been lost. United States v. Pelle, 2006 WL 436920 at *3 (D.N.J. Feb. 17, 2006) (citing United States v. Rubio, 727 F.2d 786, 797 (9th Cir. 1983)). Thus, even though the consent form was sought and obtained by Lower Merion Township officers, Philadelphia Detective DiLauro properly relied upon the consent to enter and peruse Defendant's motel room and the items at issue. The purpose of obtaining the search warrant was to seize the designer clothing, blank prescription pads, credit cards, and proof of occupancy observed in the room. It was not to legitimize an allegedly invalid consent to search, which has not been shown.

In addition to relying on the valid consent provided by Defendant, Detective DiLauro also had probable cause to obtain the search warrant. The probable cause resulted from what Officers Haas and Palmer observed at the time of Defendant's traffic stop, the contents revealed

during the inventory search, and the items in the motel room, including the prescription pads in Dr. Burch's name.[12]  Therefore, the items from Defendant's motel room were properly seized and could be used by the Government at the trial.

---

12

Detective DiLauro's Affidavit of Probable Cause attached to the search warrant states as follows:

On 3-29-13 at approximately 11:13AM, Officers Haas #3235 and Palmer #6983 from the 19th District conducted a vehicle investigation at 6600 Lansdowne Ave.  At that time, the Officers stopped a Grey Ford Taurus PA Tag# FDL-8043 for 3309-1.  Upon investigation, the Officers came into contact with the driver of the vehicle who was later identified as the Offender (Lamar Fields B/M/1-5-80).  At that time, the Offender produced a PA OLN 24270066 in the name of Lamar Cooper and was visibly nervous.  The Officers ascertained that the vehicle was a rental from Budget car rental and the Offender was not on the lease agreement of the vehicle.  At that time, the Officers contacted Budget and arranged to have Budget repossess the vehicle.  The Officers conducted an inventory of any property in the vehicle and upon opening the trunk of the vehicle found a large amount of new high end clothing.  Upon further investigation, the Officers found $9, 437 in USC in the glove compartment of the vehicle. At that time, Major crimes was notified and the Offender was transported to the 19th District for investigation and money forfeiture.  Due to the fact that Lower Merion Township has recently had numerous burglaries in the township, Lower Merion Police came to the 19th District and spoke to the Offender about the items found in the vehicle he was operating.  Upon further investigation, the Defendant was in possession of a hotel room key for the North American Motor Lodge located at 4444 City Ave Room #317.  At that time, the Offender gave permission to Lower Merion Police to search his room.  Upon investigation, more new designer clothing was found in room #317 by Lower Merion Police.  Officer Palmer #6983 also went to the hotel with Lower Merion Police and observed the clothing. The Offender was cleared by investigation for any involvement in the Lower Merion Burglaries by Lower Merion Police.  While inside room #317, the real name of the Offender was obtained and was found to be Lamar Fields DOB 1-5-80.

On 3-29-13 at approximately 3:45PM, the Assigned proceeded to the North American Motor Lodge Room #317.  At that time, the large amount of new designer clothing was observed in the room along with several blank prescription pads.  Numerous new credit cards in various names other than the Offender['s] were also observed.

### D. Police Officers Did Not Seize Defendant Until He Fled the Police Station

Finally, Defendant contends he was illegally detained from the moment he was stopped and driven to the police station. There must be either the application of physical force, or a submission to a show of authority, for there to be a seizure of a person under the Fourth Amendment. California v. Hodari D., 499 U.S. at 626 (1991). Here, in the absence of either physical force or submission to a show of authority, no seizure has occurred.

Defendant was not arrested during the traffic stop and voluntarily accompanied the officers to the police station. The officers never handcuffed Defendant, never applied any other form of physical force towards him, never demanded him to stay with them, and never brandished their weapons. (Doc. No. 206 at 32.) Defendant went to the police station with the officers in order to witness the counting of the seized money to be placed on a property receipt, and because at that point he had no readily available means of transportation to take him there.

---

**This Affiant respectfully requests a search warrant for 4444 City Ave, Phila PA 19131 Room #317. This warrant will be used to recover the blank prescription pads, credit cards, and clothing. At this time, it is believed that the Offender is fraudulently using the credit cards to obtain the designer clothing.**

(Gov't Ex 7.)

Although the affidavit states that "the Offender was transported to the 19th District for investigation and money forfeiture," this description does not appear to be in accord with the testimony of Philadelphia Police Officers Haas and Palmer. They testified that Defendant voluntarily returned with them to the police station in a police vehicle only because he had no other form of transportation. (See Doc. Nos. 206 at 33; 207 at 15-17, 102, 125.) In addition, the cash seized from the Ford Taurus would be inventoried back at the police station and Defendant would be given a property receipt. He returned to the police station to obtain the receipt and watch the money being counted. No decisions had been made on whether the money would be forfeited. Despite Detective DiLauro's seemingly inaccurate statement that the "Offender was transported to the 19th District for investigation and money forfeiture," this statement, even if excised from the affidavit, does not detract from the fact that the balance of the affidavit still establishes probable cause to search and seize the items in the motel room.

He was not seized by the police until he fled the station after Officer Haas received a call from Officer Palmer, who was at the motel room, confirming Defendant's true identity.

Defendant suggests that the traffic stop was unlawful because it was prolonged beyond the time reasonably required to complete the traffic investigation. (Doc. No. 149 at 4.) Defendant has not established that the stop was unduly prolonged. While it is true that what started out as a traffic stop was extended by further questioning and the investigation, as extensively noted above, the events after the stop were all part of a natural sequence of events that warranted the police activity. Any evidence obtained during the post-traffic stop through the search of the motel room was lawful.

## IV.    CONCLUSION

For the foregoing reasons, the Court will deny Defendant's Motions to Suppress. (Doc. Nos. 149, 163.) An appropriate Order follows.