IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

LAMAR FIELDS,

Defendant.

CRIMINAL ACTION
NO. 15-129

### OPINION

Slomsky, J.                                                     August 31, 2021

### TABLE OF CONTENTS

I.   **INTRODUCTION** ............................................................................................. **3**

II.  **BACKGROUND** ............................................................................................... **4**

III. **DEFENDANT'S POST-TRIAL MOTIONS** ................................................. **15**

    A.  **Defendant's Motions for a New Trial** ................................................. **15**

        1.  The Government Did Not Violate Brady and its Progeny ................................. **16**

            a.  Khalia Landers's PSI Regarding Her Mental Health ................................. **19**

            b.  Impeachment Evidence Regarding Shante Watson ................................. **22**

            c.  Evidence on False Accusations and Identifications by Landers
               and Harrison and "Unfounded Leads" ................................. **22**

            d.  Immunity Agreements for Pseudo-Patient Witnesses ................................. **25**

            e.  Copies of Defendant's Phone Records and the Back Side
               of Prescriptions ................................. **26**

        2.  The Court's Jury Instructions Do Not Warrant Granting a New Trial ............... **27**

        3.  Defendant Will Not Be Granted a New Trial Based on his Purported
           Unknowing Waiver of His Right to Counsel ................................. **29**

**4.** The Superseding Indictment Was Not Constructively Amended....................... **40**

**5.** Defendant Will Not Be Granted a New Trial Based on Purported Newly Discovered Evidence ................................................... **43**

**B.** **Defendant's Motions for Reconsideration Will Be Denied**.................................... **45**

**C.** **Defendant's Motions for a Judgment of Acquittal Will Be Denied** ..................... **51**

**1.** Defendant's First and Third Motions for a Judgment of Acquittal ................... **51**

**2.** Defendant's Second Motion for a Judgment of Acquittal................................... **54**

**D.** **Defendant's Motion to Compel Will Be Denied** ...................................................... **57**

**E.** **Defendant's Motion to Dismiss Will Be Denied** ...................................................... **60**

**F.** **Defendant's Request for a Post-Trial Evidentiary Hearing Will Bbe Denied** ..... **61**

**IV.** **CONCLUSION** ...................................................................................................................... **62**

## I.   INTRODUCTION

This case is the result of criminal opportunity, activity, and continuity.  For nearly two years Defendant Lamar Fields operated a scheme to purchase oxycodone using fraudulent prescriptions, recruiting others to fill the prescriptions at pharmacies in the Philadelphia area, and then selling the pills obtained.  (See Doc. No. 374 at 1.)  During the conspiracy he used eleven individuals— who were either indigent, addicted to oxycodone, or both—to obtain at least 8,310 oxycodone pills, with a street value of over $100,000.  (See id. at 3-6.)

On April 1, 2015, a grand jury returned a sixty-three count Indictment charging Defendant Lamar Fields with the following offenses:  conspiracy to knowingly and intentionally distribute oxycodone (Count 1);  knowingly and intentionally distributing, and aiding and abetting the distribution of, oxycodone (Counts 2 to 32);  and knowingly and intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge (Counts 33 to 63).  (See Doc. No. 1 at 1.)  On April 12, 2017, the Indictment was superseded, charging the same offenses, but in fewer counts:  conspiracy to knowingly and intentionally distribute oxycodone (Count 1);  knowingly and intentionally distributing, and aiding and abetting the distribution of, oxycodone (Counts 2 to 7);  and knowingly and intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge (Counts 8 to 13).  (Doc. No. 134.)  At trial, the Government proceeded only on the charges of conspiracy (Count 1) and acquiring a controlled substance by fraud (Counts 8 to 13).  (See Doc. No. 310 at 2.)

After a nine-day trial at which Defendant represented himself, with the assistance of standby counsel, a jury acquitted Defendant on several acquisition charges (Counts 10 to 13), but convicted him on the conspiracy count and two acquisition counts (Counts 1, 8, and 9).  (See Doc. No. 250 at 1-3.)

Since his trial ended on December 8, 2017, Defendant has filed a plethora of post-trial Motions, contending that his convictions should be overturned.  (Doc. Nos. 359-69, 373, 376, 395-96, 405, 418, 423-24.)  For all the reasons that follow, Defendant's Post-Trial Motions will be denied.  Moreover, Defendant's request for a hearing on his Motions also will be denied.

## II.    BACKGROUND

To begin, on October 2, 2015, before his trial, Defendant requested that he be permitted to represent himself pro se.  (See Doc. No. 285 at 4 ¶ 20.)  In response, the Court performed a detailed colloquy to ensure Defendant understood the nature of his request.  (See id. at 5 ¶¶ 5-6, 14-16, 6 ¶ 24 to 7 ¶ 7.)[1]  See also United States v. Booker, 684 F.3d 421 (3d Cir. 2012).  At the colloquy hearing, the Court found that Defendant knowingly and voluntarily waived his right to counsel and permitted him to represent himself, but appointed standby counsel for assistance.  (See Doc. No. 285 at 26 ¶¶ 6-8, 27 ¶¶ 14-15.)  Thereafter, over a nine-day trial, the Government presented evidence showing that Defendant used eleven individuals, as well as himself, to obtain at least 8,310 oxycodone pills,[2] containing approximately 147,800 milligrams of oxycodone, with a street value of over $100,000.  (See Doc. No. 374 at 3-6.)

As noted, a jury convicted Defendant of conspiring to distribute oxycodone and acquiring oxycodone by fraud.  (See id. at 1.)  To challenge his convictions, Defendant has filed nineteen post-trial Motions.  (Doc. Nos. 359-69, 373, 376, 395-96, 405, 418, 423-24.)  Resolving these Motions necessitates recounting the scheme Defendant put in place to obtain the oxycodone, the role played by numerous individuals in the scheme, and his ensuing trial.

---

[1]  A detailed description of the colloquy is set forth in Section III.A.2 infra.

[2]  Some of the fraudulent prescriptions used by Defendant were for the brand-name pill Endocet, which is a combination of oxycodone and acetaminophen.  (See Doc. No. 374 at 4-6.)

From 2011 through 2013, Defendant used fraudulent prescriptions to obtain oxycodone pills and sell them to others.  (See Doc. No. 374 at 1.)  Initially, Defendant obtained prescription pads from coconspirator Monica Harrison, a medical assistant employed by Dr. William Burch, M.D.[3]  (See id. at 2.)  For a fee, Harrison would steal blank prescriptions from Dr. Burch's office without his knowledge.  (See id.; Doc. No. 267 at 170 ¶¶ 3-10.)  She then would fill out the prescriptions with information needed to obtain the pills at a pharmacy, such as:  the quantity and dosage of oxycodone pills to be obtained;  Dr. Burch's forged signature and his Drug Enforcement Administration ("DEA") number;  and identifying information for "pseudo-patients," a term used to describe individuals who would be filling the prescription.  (See Doc. Nos. 267 at 174 ¶¶ 21-23, 175 ¶¶ 11-15; 374 at 2.)  The pseudo-patients were neither Dr. Burch's patients nor prescribed the medicine by him.  (See Doc. No. 374 at 2.)  At times, Defendant and coconspirator Khalia Landers, his wife, also posed as pseudo-patients.  (See id.)

Harrison, however, did not work alone in misusing Dr. Burch's prescription pads.  Two other Dr. Burch employees, Ramera Williams and Marquita Fields, Defendant's sister, aided her.  (See Doc. No. 267 at 170 ¶¶ 20-22.)  According to Harrison:

> We would take [prescriptions] out of the book and [write] whatever medication that [Defendant] wanted . . . Ramera would sign it.  Again, I would fill the prescription out for the medical dosage, I would write the name, date of birth, and also the DEA number.

(Id. at 175 ¶¶ 11-15.)  Marquita Fields answered telephone calls from pharmacies seeking verification of the prescription, a process discussed in more detail below.  (See id. at 174 ¶¶ 24-25, 178 ¶ 23 to 179 ¶ 3.)  The identifying information written on the prescription was provided by Defendant to Harrison.  (See id.)  Written on the prescription was the name of the person who

---

[3]   As will be discussed in more detail below, at some point in 2012 Defendant created his own fraudulent prescriptions without Harrison.  (See Doc. No. 374 at 3.)

would fill the prescription and the drug type and quantity to be filled.  (See id.)  Once the fraudulent

prescriptions were prepared with Defendant's specifications, he would obtain the prescriptions at

various locations around Philadelphia or at Dr. Burch's office.  (See id. at 181 ¶¶ 11-13.)

Once in receipt of the false prescriptions, Defendant and Khalia Landers, his wife, would

recruit individuals to serve as pseudo-patients to fill the prescriptions.  (See Doc. No. 374 at 2.)

Overall, they recruited eleven individuals to serve as pseudo-patients, six of whom testified at

Defendant's trial.  (See, e.g., Doc. No. 267 at 141 ¶ 23 to 143 ¶ 4.)  For instance, pseudo-patient

Aisha Patton testified that Defendant told her she could "make some extra money by filling some"

illegitimate prescriptions for him.  (Doc. No. 268 at 21 ¶¶ 10-11; see also id. at 36 ¶¶ 11-15.)  She

described how she and Defendant filled the prescriptions:

> [H]e would meet me, bring me the prescriptions, we would then drive to the
> pharmacy . . . .  [H]e would drive. . . .  I would then get out with the prescriptions,
> a certain amount of money, go into the pharmacy and get it filled. . . .  At that time
> I knew his sister was working [for Dr. Burch].  And he would . . . call her to say
> that we were about to go into the pharmacy and then the pharmacy w[ould] call the
> doctor and I believe his sister would be the one that would answer the phone. . . .
> He told me his sister worked there. . . .  [I paid with m]oney that [Defendant] gave
> me. . . .  I would bring [the filled prescription] back out, give it to [Defendant]. . . .
> [In return I would get] two bottles or two hundred dollars. . . .  Oxycontin was the
> . . . [first prescription].  I don't remember the second one. . . .  [He would] put [the
> pills] in the glove compartment. . . .  Sometimes he would come past my house,
> sometimes he would call me by phone. . . .  [I would provide the pharmacies with]
> my name, my address and telephone number. . . .

(Id. at 21 ¶¶ 16-17, 19, 22-23; 22 ¶¶ 5-10, 12, 23; 23 ¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24.)

According to Patton and Harrison, pharmacies engaged in different prescription

verification measures when an individual was trying to fill a prescription.  (See Doc. Nos. 267 at

176 ¶¶ 23-25; 268 at 22 ¶¶ 3-18.)  Generally, the process involved calling the prescribing

physician's office to confirm "the name and the date of birth [of the person filling the prescription]

and the dosage that was on the prescription . . . that they were taking into the pharmacy . . .

matched." (Doc. No. 267 at 176 ¶¶ 23-25.) Attempting to evade these protective measures, Defendant would tell Harrison and his sister via text message what time a pseudo-patient was going to fill a prescription so one of them could answer a call from a pharmacy and falsely confirm the prescription's validity. (See id. at 185 ¶¶ 12-15; see also Doc. Nos. 268 at 22 ¶¶ 3-12; 374 at 2.)

Patton testified that she filled prescriptions for Defendant "[a]bout seven [or] eight times," based on when Defendant asked her for help. (Doc. No. 267 at 24; see also id. at 5-7.) She stated that others were in the car twice when she went to pharmacies with Defendant. (See id. at 26 ¶¶ 2-7.) One time she was with Kaleana Harvey, another pseudo-patient who also was filling a prescription for Defendant, and once with Khalia Landers. (See id.; id. at 27 ¶ 22 to 28 ¶15.) Each time, except for the final time, Defendant followed the same routine. (See id. at 25 ¶ 23 to 26 ¶ 1.) According to Patton, however, the final time did not go according to plan:

> The last time I went to go fill it . . . I took my two daughters. . . .  I don't never take them with me. And I had no one to watch them when I went to the pharmacy, but I needed the money at that time. So I took my two youngest daughters with me. . . . I took them out the car, cause my daughter started crying, so they went into the pharmacy with me. And I handed [the prescription] over to the pharmacist like I do any other time. And he asked my daughters, do they love me and do I love them, and we both replied, yes. And he said well, grab a hold of them and just hug them . . . and he put a big X on the prescription and told me to get . . . out of his pharmacy. . . . I ran out the pharmacy. . . . [Defendant] laughed.

(Id. at 34 ¶¶ 3-7, 12-18, 24, 35 ¶ 6.) After this incident, Patton ceased filling prescriptions for Defendant. (See id. at 35 ¶¶ 9-10.)[4]

---

[4] Patton later received a letter from the Government stating she was a target of an investigation, and Defendant suggested that she could "fix this . . . . [b]y coming up with a story about some lady named Monica." (Doc. No. 268 at 35 ¶¶ 20, 22.) Defendant suggested that Patton lie about Monica Harrison working as "a therapist or something of that nature and . . . that she came to [Patton] with the proposition" of providing Patton with legitimate prescriptions. (Id. at 36 ¶¶ 5-7; see also id. ¶¶ 8-10.)

At trial, five other pseudo-patients—Alana Russell, Shante Watson, Kaleana Harvey, Mario Mazziotti, and Ronald Knopman—testified about their participation in the scheme at Defendant's direction.  (See id. at 53 ¶ 10 to 62 ¶ 8, 71 ¶ 20 to 81 ¶ 16, 105 ¶ 21 to 116 ¶ 20; see also Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15.)  This included recruiting them with Khalia Landers's help, asking them to fill prescriptions that contained the pseudo-patients' identifying information, picking them up and driving them to a pharmacy, giving them money to fill the prescription, obtaining the pills, and paying them in cash and/or pills for their services.[5]  (See ids.)  Several pseudo-patients noted Defendant filled out these prescriptions while they were in his car.  (See Doc. Nos. 268 at 55 ¶¶ 12-15, 23-25; 269 at 81 ¶¶ 14-20.)

In late 2011, Defendant's scheme began to unravel.  (See Doc. No. 267 at 188 ¶¶ 16-17.) Harrison informed Defendant that she no longer had scripts to give him, and he became enraged. (See id. at 188 ¶¶ 10-25.)  According to Harrison:

> He was very angry.  I had went to the house where his mother and sister dwell . . . .  And I was talking to his sister.  We were talking about this is the end, we were going to stop.  [Defendant] came in ranting and raving, calling me, his mother, sister are full of [expletive], and asking where his money was, one of us stole it.  He also was saying that . . . we owed him 10 more people he had to do.[6] We didn't fulfill our end of the bargain with filling the rest of his scripts.  And he didn't care.  He said [expletive] me, pulled out a gun—well, showed it, and said that he didn't care about me.  He cared more about his sister because she has a daughter, so [expletive] me, and when he got to that point, I just left.

(Id. at 188 ¶ 25 to 189 ¶ 12.)  Harrison also testified that the following day Marquita Fields, Defendant's sister, told her that the fight continued after she left, and "it got physical in front of

---

[5]  Only pseudo-patient Patton testified that Defendant placed calls to Dr. Burch employees to state that they were about to fill a prescription at a pharmacy.  (See Doc. No. 268 at 22 ¶¶ 3-18.) Coconspirators Harrison and Landers, however, confirmed Patton's testimony.  (See Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 152 ¶¶ 7-15.)

[6]  Harrison understood owing 10 more people to mean that "[Defendant] wanted 10 more people to go into the pharmacy to fill the fake scripts."  (Doc. No. 267 ¶¶ 1-2.)

[Marquita Fields's] daughter. . . .  She showed me bruises that was on her arms."  (Id. at 190 ¶ 24, 191 ¶¶ 7-8.)  Defendant overcame the prescription shortage by making his own, photocopying blank prescriptions belonging to Dr. Burch.[7]  (See id. at 191 ¶ 21 to 192 ¶ 5.)

In addition to testimony from Harrison and six pseudo-patients, Khalia Landers, Defendant's wife and a pseudo-patient, testified as a Government witness.  (See Doc. No. 268 at 140 ¶ 4 to 181 ¶ 13.)  She testified that Defendant asked her to fill prescriptions for him.  (See id. at 146 ¶¶ 16-22, 147 ¶¶ 1-5.)  She affirmed that he drove her to the pharmacy, gave her money and a prescription with her personal information on it, and took the pills Landers had received.  (See id. at 147 ¶ 14 to 150 ¶ 25.)  Corroborating the testimony of Harrison and Patton, Landers said that Defendant would call Harrison or his sister at Dr. Burch's office before she entered the pharmacies.[8]  (See Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 22 ¶¶ 3-18, 151 ¶¶ 19-25, 152 at ¶¶ 20-25.)  According to Landers, she eventually learned that Defendant "was selling [the pills] to people wholesale."  (Id. at 151 ¶ 18.)

---

[7]  Khalia Landers testified that Defendant drove to a photocopy store in the Cheltenham Mall in Philadelphia, Pennsylvania and "presented a . . . blank prescription to [a worker] and asked him [if] he could make some prescription papers like that."  (Doc. No. 268 at 170 ¶¶ 16-18.) Additionally, Dr. Burch affirmed that some of the filled fraudulent prescriptions were not his because they were a different color.  (See Doc. No. 267 at 158 ¶ 1 to 159 ¶ 14.)

[8]  Landers stated that she often overheard Defendant's conversations with Harrison and described them as follows:

> [S]he would be the one that picked up the phone in case whoever was at the pharmacy called and wanted to know like, did this doctor write the prescription, and she would say yeah, such and such, like got approved of it.

> So in case it was me, for instance, and I was the one that wanted the prescription filled, then she would say Khalia Landers, birthday 7/31/78, or whatever, like that was the one time was okay to get the prescription filled.  She verified them.

(Doc. No. 268 at 152 ¶¶ 7-15.)

Landers not only filled prescriptions but also recommended potential pseudo-patients to Defendant.  She testified:

> I knew a lot of times like my friends was always like struggling or going through things.  I mean, my brother [Jamar Cook] was always like back and forth between like different girls['] houses, or like moving around a lot and stuff like that, so I knew right off the top of my head that I can count at least like three people that . . . wouldn't mind . . . doing something like that. . . . [f]illing prescriptions for money. . . . Shante Watson, Kieania Phillips, and my brother Jamar Cook. . . . [W]hen we drove up on them and I was trying to talk to Shante, [Defendant] told me I ain't know like how to say it or whatever, and he was like you don't know how to talk to people.  He was like, let me talk to them.  So she got in the car and he started . . . talking to her about how he want her to do it and stuff.  And one of the things that struck out the most to me was, when he was like, when you go to these places, the pharmacies and stuff, he was like, you can't be dressed like that, like you a street-walker or out in the street.  Like you got to [dress] more appropriate, like cover your body more, cause she liked to dress like revealing her body and stuff like that.  So that was like one of the main things that stuck out to me.

(Id. at 155 ¶¶ 5-11, 14, 16-17, 22-25, 156 ¶¶ 1-10.)  Landers also said that she was with Defendant when he drove Watson, Phillips, Cook, and other pseudo-patients to pharmacies to fill prescriptions.  (See id. at 156 ¶¶ 11-15, 159 ¶¶ 22-24, 164 at ¶¶ 3-10.)

Eventually, Landers told Defendant that she no longer wished to participate in his scheme.  (See id. at 176 ¶¶ 17-25.)  According to her, Defendant responded in a manner similar to his response when Harrison said she wished to withdraw:

> He was angry.  He ended up taking my driver's license and said he was going to get somebody else to start doing it . . . .  I know he was angry . . . .  And we would like fight and stuff like that. . . .  He said he was going to kill me and if he couldn't have me, nobody could have me.

(Id. at 177 ¶¶ 2-10, 14-15.)  She added that Defendant hit her more than once, and in response she received a separation order.[9]  (See id. ¶¶ 16-24.)

---

[9]   Defendant's standby counsel notes, however, that the parties' separation order has been lifted and Defendant and Landers "have been communicating . . . ."  (Doc. No. 415 at 1 n.2.)

Defendant engaged in this scheme undetected by law enforcement for nearly two years. (See Doc. No. 374 at 1.)  However, in March 2013, Philadelphia police conducted a traffic stop of a rental car Defendant was driving, and Defendant gave them a false name and driver's license.[10] (See id. at 3.)  After a search of the vehicle uncovered over $9,000 in cash in the glove compartment, Defendant accompanied the police to their station and also permitted them to search the hotel room where he was staying.  (See id.)  Upon entering the room, police found and seized items suggesting Defendant's true identity, Defendant's driver's license, a piece of paper with Defendant's name written on it, and other items suggesting Defendant was staying in the room. (See id.)  They also seized hundreds of fraudulent prescription slips.  (See id.)  Once Defendant learned the officers knew his real name, he fled the police station.  (See id.)  He was apprehended, placed in handcuffs, and put in the back of a police vehicle.  (See Doc. Nos. 206 at 104; 207 at 44, 69; 255 at 9-10.)

Thereafter, on May 15, 2015, federal agents arrested Defendant on the charges filed in this case.  (See Doc. No. 374 at 7.)  One of the agents, DEA Special Agent Gerald Gobin, advised Defendant of his Miranda rights.  (See Doc. No. 268 at 121 ¶¶ 18-19.)  After waiving his rights, Defendant proceeded to discuss his scheme with Gobin, which Gobin recounted at trial:

> I then spoke with [Defendant] and told him I would explain everything to him and if he wants to talk to me he can, if he does not, he doesn't have to.  And I said . . . I just wanted to get an idea . . . of what his position was right now. . . .
>
> I explained that this investigation has been going on a long time.  I'm aware of prescriptions being written, fake prescriptions being used in the name of Dr. Burch, they're being passed at multiple pharmacies by multiple individuals, and we've been, again, conducting this investigation for quite some time.
>
> I asked [Defendant] . . . if he wants [to] talk to me, tell me about the prescriptions

---

[10]  The Court has discussed the March 2013 traffic stop at length in an Opinion dated December 18, 2017.  (See Doc. No. 255); United States v. Fields, No. 15-129, 2017 WL 6450605 (E.D. Pa. Dec. 18, 2017).

that he's getting from Monica [Harrison], and he explained that he's getting prescriptions from [Harrison], who worked at Dr. Burch's office, for 200 to $250. I then asked him, were they filled out by [Harrison] or did someone else fill them out?  [Defendant] explained to me that he—or [Harrison] would fill out these prescriptions, sometimes before she met with him, and then there were occasions where she was in his presence and would write names and fill them out in his presence.  And I said, did you actually see her write on the prescriptions, and he told [me] he did.

I then said, well, then what happened next with the prescriptions?  How were they passed?  [Defendant] told me that he recruited several individuals to go to various locations, various pharmacies, to hand off these prescriptions and collect the pills. And we continued on back and forth, and I . . . asked him, what people passed the prescriptions?  He said these were people he recruited.  He didn't give any names of who he recruited.  And I said, well, where did they go?  And two of the pharmacies he told me right off the top of his head . . . .  I then said, well, what happens with the pills after they're collected from the pharmacy?  He told me that he would use some of them, he would also party with females and he would give them some of the pills.  And at that point I asked him, what would he do with the pills that were left?  And he informed me that he would sell them.

And then we continued on.  I asked him, who were his customers, if he could think of any, or who were his big customers?  He told me Mario Mazziotti and a male of Chinese [descent] named Dave, and that was the two customers he gave me.

I then went into more of the investigation.  I let him know I had seen evidence that was collected by the Philadelphia Police Department resulting from [the March 2013] traffic stop and a search at a hotel room and there were prescriptions found in Dr. Burch's name.  [Defendant] told me that these were prescriptions he had gotten from [Harrison].

(Id. at 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5.)

The Government also corroborated these transactions with testimony from, inter alia, two DEA Special Agents, Dr. William Burch, and pharmacist Paul Scota.  (See generally Doc. Nos. 267-70.)  Of note, Dr. Burch testified that Defendant, Landers, and the other pseudo-patients were never his patients and were not prescribed the medications in the fraudulent prescriptions.  (See Doc. No. 267 at 142 ¶ 2 to 143 ¶ 4, 145 ¶¶ 15-18.)  He also described discrepancies in the fraudulent prescriptions that showed they were not written by him, such as formatting errors and misuse of medical terminology.  (See id. at 146 ¶ 20 to 148 ¶ 22.)

Paul Scota, a pharmacist and owner of Lehigh Pharmacy, one of the pharmacies where Defendant obtained oxycodone, testified at trial and explained his process of verifying prescriptions, which included: checking government-issued identification for the patient and the person picking up the prescription, verifying personal identifying information on the prescriptions, calling the prescribing physician's office, and recording that the prescription was verified in a computer system.  (See id. at 101 ¶¶ 2-4, 17-20, 112 ¶¶ 12-16, 114 ¶¶ 11-21.)  Further, Scota described an additional verification measure he used.  (See id. at 112 ¶¶ 12-21.)  He would place a sticker on the back of the prescription to identify what drug had been filled and who verified the prescription and also write other notes.  (See id.)

Further, DEA Special Agent Jeremy Smith testified about Defendant's pharmacy transactions.  (See Doc. Nos. 268 at 119; 270 at 3.)  Agent Smith reviewed summary charts he prepared that compiled pharmacy records for the filled fraudulent prescriptions, which showed the number of prescriptions filled by each pseudo-patient and Defendant.[11]  (See Doc. No. 270 at 24 ¶¶ 2-25.)  Additionally, Smith explained Defendant's phone records, which showed that he was in contact with Harrison, his sister, and the other pseudo-patients while filling the fraudulent prescriptions.  (See id. at 35 ¶ 25 to 37 ¶ 10, 42 ¶ 17 to 58 ¶ 1.)  The transactions by pseudo-patients are summarized in the following chart:

---

[11]  Defendant also stipulated that his fingerprint was found on a fraudulent prescription filled by non-witness pseudo-patient Jamar Cook.  (See Doc. No. 270 at 131 ¶¶ 14-16.)

| Name of Pseudo-Patient | Number of Overt Acts[12] | Total mg of Oxycodone Obtained | Total Number of Pills Obtained |
|---|---|---|---|
| Gena Baity/Chandler | 1 | 1200 mg | 120 |
| Terrance Carter | 11 | 20100 mg | 990 |
| Jamar Cook | 18 | 31800 mg | 1860 |
| Lamar Fields | 2[13] | 3000 mg | 180 |
| Kaleana Harvey | 7 | 17400 mg | 1200 |
| Ronald Knopman | 2 | 6300 mg | 210 |
| Kahlia Landers | 3 | 8700 mg | 450 |
| Mario Mazziotti | 2 | 6200 mg | 330 |
| Aisha Patton | 7 | 29100 mg | 1290 |
| Kieania Phillips | 10 | 13800 mg | 1020 |
| Alana Russell | 2 | 3000 mg | 180 |
| Shante Watson | 5 | 7200 mg | 480 |
| **TOTAL** | 70 Overt Acts | 147800 mg | 8310 Pills |

(See Doc. No. 374 at 3-6.)

Following the nine-day trial, a jury convicted Defendant of one charge of conspiracy to knowingly and intentionally distribute oxycodone "from in or around April 2011 to in or around March 29, 2013" (Count 1) and two acquisition charges occurring "on or about June 4, 2011" (Count 8) and "on or about July 1, 2011" (Count 9). (Doc. No. 250 at 1-2.) The jury acquitted Defendant of four acquisition charges occurring "on or about September 24, 2011, . . . October 1, 2011, . . . October 24, 2011, . . . [and] November 2, 2011" (Counts 10-13). (Id. at 2-3.) The six acquisition charges (Counts 8-13) refer to occasions where Defendant himself attempted to fill a

---

[12] Each overt act refers to a separate date when Defendant and the pseudo-patient filled a prescription together. (See Doc. No. 374 at 4-6.)

[13] In the Superseding Indictment, the Government lists six overt acts involving when Defendant allegedly acquired oxycodone with a fraudulent prescription in his own name. (See Doc. No. 374 at 4-6.) The above chart, however, only includes two of these overt acts. The six overt acts correspond to the six acquisition counts in the Superseding Indictment. (See Doc. No. 250 at 2-3.) The jury found Defendant guilty of acquiring oxycodone on only two of the six occasions, and for this reason the Court includes only the two incidents in the chart. (See id.)

fraudulent prescription in his own name.  (See id.; Doc. No. 374 at 4-6.)  Thus, the jury found that Defendant twice posed as a pseudo-patient.  (See ids.)

Since his trial's conclusion, Defendant has filed a bevy of post-trial Motions.  (Doc. Nos. 359-69, 373, 376, 395-96, 405, 418, 423-24.)  On December 9, 2019, the Government filed an Omnibus Response to Defendant's Post-Trial Motions.  (Doc. No. 374.)  Thereafter, Defendant filed additional post-trial Motions, and the Government filed corresponding Responses.  (Doc. Nos. 406, 410, 430.)  Defendant also has filed various Replies to the Government's Responses. (Doc. Nos. 403, 412-13, 419.)  Finally, during a May 24, 2021 hearing, the Court permitted Defendant and the Government to file supplemental memoranda on Defendant's Motion to Compel the Government to submit documents for an in camera review (Doc. No. 405), and both parties filed separate memoranda.  (Doc. Nos. 422, 427.)

For reasons discussed below, all of Defendant's Motions will be denied.

## III.   DEFENDANT'S POST-TRIAL MOTIONS

Defendant's nineteen post-trial Motions can be grouped as follows:  (1) Motions for a new trial based on alleged Brady violations, an improper jury instruction, invalid waiver of counsel, constructive amendment of Defendant's Superseding Indictment, and newly discovered evidence (Doc. Nos. 359, 361-365, 369, 376, 395-96, 424);  (2) Motions for Reconsideration of denials of the Motion to Suppress and Motion to Dismiss (Doc. No. 360, 366, 418);  (3) Motions for Acquittal (Doc. Nos. 367-68, 373);  (4) a Motion to Compel the Government to submit documents for in camera review (Doc. No. 405); and (5) a Motion to Dismiss for Government interference with a defense witness (Doc. No. 423).

### A.   Defendant's Motions for a New Trial

In ten of his post-trial Motions, Defendant avers that he should be granted a new trial based on the following errors at his trial:  (1) alleged Brady violations by the Government (Doc. Nos.

359, 363-65, 395);  (2) an improper jury instruction on the Government's burden of proof (Doc. No. 361);  (3) an unknowing waiver of his right to counsel (Doc. No. 362);  (4) a constructive amendment of the Superseding Indictment (Doc. No. 369);  and (5) newly discovered evidence regarding alleged pseudo-patient Gena Baity/Chandler[14]  and witness Khalia Landers (Doc. Nos. 376, 396, 424).  None of these arguments warrant granting Defendant a new trial.

### 1.      The Government Did Not Violate <u>Brady</u> and its Progeny

Defendant claims the Government committed a number of <u>Brady</u> violations.  First, he asserts that the Government did not provide him with Khalia Landers's Presentence Investigation Report ("PSI") that recounts her mental health disorders.  (<u>See</u> Doc. No. 359 at 4.)  Defendant claims he was unaware of her mental health conditions and corresponding treatments and therefore was unable to fully challenge their effects on Landers's credibility.  (<u>See</u> <u>id.</u> at 5-7.)  Second, he alleges that he was not provided information to impeach the purported perjured testimony pseudo-patient witness Shante Watson gave regarding prescriptions she filled.  (<u>See</u> Doc. No. 363 at 3.)  Third, he accuses the Government of withholding evidence showing that Landers and Monica Harrison falsely accused him of filling prescriptions and that Landers and Harrison could not identify each other.  (<u>See</u> Doc. No. 364 at 2-3.)

Fourth, he submits that because several pseudo-patient witnesses were not indicted,[15] they must have been granted immunity, and the Government's failure to disclose their immunity agreements was improper.  (<u>See</u> Doc. No. 365 at 2.)  Fifth, he asserts that the Government did not

---

[14]  At trial and in their filings, the parties interchangeably refer to Baity/Chandler as either "Gena Baity" or "Gena Chandler."  The Court will use both surnames in discussing her.

[15]  Specifically, Defendant notes that Shante Watson, Alana Russell, Kaleana Harvey, Mario Mazziotti, and Ronald Knopman were not prosecuted.  (<u>See</u> Doc. No. 365 at 2 n.2.)  For this reason, he alleges "[i]t can be reasonably inferred that these individuals ha[d] some sort of an agreement with the [G]overnment . . . ."  (<u>Id.</u>)

provide him with copies of his phone records before trial, divesting him of the opportunity to challenge their authenticity.  (See Doc. No. 395 at 3.)  Finally, he states he was not given pictures of the back side of any prescriptions, prohibiting him from attacking witness Paul Scota's testimony on his pharmacy's prescription verification procedures.[16]  (See id. at 3-4.)

The government is required to disclose to a criminal defendant evidence that is favorable to the accused and "material either to guilt or punishment."  Brady v. Maryland, 373 U.S. 83, 87 (1963); United States v. Bagley, 473 U.S. 667, 674 (1985).  Included in the government's required disclosures is any evidence that can be used to impeach testifying witnesses.  See Giglio v. United States, 405 U.S. 150, 154 (1972).  Evidence is material either to guilt or punishment if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  Bagley, 473 U.S. at 682 (opinion of Blackmun, J.); id. at 685 (White, J., concurring in part and concurring in judgment).  See also Kyles v. Whitley, 514 U.S. 419, 433-34 (1995) (rephrasing the inquiry as whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.").  However, the "mere possibility" that an undisclosed item may have affected the outcome of the trial does not establish materiality.  See United States v. Agurs, 427 U.S. 97, 109-10 (1976).

Despite the government's disclosures required under Brady and its progeny, there are significant limitations to what actions the government must take.  Importantly, "[t]here is no

---

[16] Defendant also claims the Government did not turn over information on "unfounded leads" associated with his case.  (Doc. No. 364 at 2-3.)  As will be discussed further in Section III.A.1.c, infra, Defendant does not define "unfounded leads," but the Court believes he uses this term to refer to individuals whom investigators at one point may have believed were participants in Defendant's conspiracy, but were not referred to as participants at his trial.  (See id.)

general constitutional right to discovery in a criminal case, and Brady did not create one . . . ." Weatherford v. Bursey, 429 U.S. 545, 559 (1977).  Because Brady is a disclosure—and not a discovery—rule, absent a defendant's showing that Brady material has not been disclosed, "the prosecutor's decision on disclosure is final.  [A] [d]efen[dant] . . . has no constitutional right to conduct his own search of the [government]'s files to argue relevance."  Pennsylvania v. Ritchie, 480 U.S. 39, 59-60 (1987).  Moreover, although Brady places an affirmative obligation on prosecutors to learn of favorable evidence known by others working on the government's behalf in the case, there is no "duty . . . to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue."  United States v. Merlino, 349 F.3d 144, 154 (3d Cir. 2003) (citing United States v. Morris, 80 F.3d 1151, 1169 (7th Cir. 1996)).  It also is a "well-established principle that the government is not obliged under Brady to furnish a defendant with information he already has or, with reasonable diligence, he can obtain himself."  United States v. Pelullo, 399 F.3d 197, 202 (3d Cir. 2005) (quotation marks and citation omitted); see also United States v. Tadros, 310 F.3d 999, 1005 (7th Cir. 2002) ("Brady . . . does not require the government to act as a private investigator and valet for the defendant, gathering evidence and delivering it to opposing counsel.").

As a general rule, to establish a Brady violation of the Due Process Clause of the Fifth Amendment to the United States Constitution, a defendant must show:  "(1) evidence was suppressed;  (2) the suppressed evidence was favorable to the defense;  and (3) the suppressed evidence was material either to guilt or to punishment."  Pelullo, 399 F.3d at 209 (quotation marks and citation omitted).  For the reasons discussed below, Defendant has not shown any Brady violations occurred because the alleged withholdings either did not occur or the documents are not material to his guilt or punishment.

###### a.  Khalia Landers's PSI Regarding Her Mental Health

First, Defendant contends that because he was not provided with Khalia Landers's PSI, he was not made aware of her mental health diagnoses and treatment, and as a result was unable to properly cross-examine and challenge her credibility.  (See Doc. No. 359 at 4-7.)  Defendant was aware, however, of Landers's mental health and treatments before trial and could have cross-examined her on these issues.  The Government provided Defendant with rough agent notes[17] from an interview with Landers that noted she:

> [R]eported suffering from panic attacks, post-traumatic stress syndrome, and bi-polar disorder, in part stemming from . . . [D]efendant's abuse.  [She] also reported receiving mental health treatment and taking anxiety medication, which she said did not affect her comprehension.

(Doc. No. 374 at 11.)  The information in these notes gave Defendant ample notice of Landers's conditions and that she was receiving treatment, and despite this knowledge, Defendant chose not to explore these issues at trial and did not question Landers about her mental condition or treatment.  (See Doc. Nos. 268 ¶ 4 to 233 ¶ 4; 269 at 39 ¶ 20 to 63 ¶ 1.)

Moreover, at the time of Defendant's trial, he had been married to Landers for over six years.  (See Doc. No. 268 at 144 ¶¶ 13-16, 178 ¶¶ 2-3.)  They separated in February 2012, but their marriage continued.  (See id.)  Defendant would be aware of her mental health challenges from their marriage.[18]

And the Government has represented that it has turned over to Defendant all Brady material, including "pharmacy records, including patient profiles, signature logs, and prescription

---

[17]  According to the Government, the rough agent notes were prepared by a DEA special agent and were written on November 21, 2017.  (See Doc. No. 374 at 11.)

[18]  In a letter dated April 21, 2021, Defendant's standby counsel noted that "[D]efendant and Ms. Landers have been communicating with each other via letters and email for years now."  (Doc. No. 415 at 1 n.2.)

scripts . . . . [and] reports of interviews and proffers [of Monica Harrison and Khalia Landers] . . . ." (Doc. No. 374 at 12; see also id. at 11.) The Government is not permitted, however, to turn over a PSI of another defendant, which is a confidential document prepared at the request of the Court. See E.D. Pa. Local R. 32.3(2). Thus, Defendant has not shown that the Government withheld any Brady evidence in this case.

Finally, Landers's mental health conditions and treatments are not material to Defendant's guilt or punishment. Further explanation of them would not produce evidence that would change the results at trial. As discussed at length in Section II supra, at Defendant's trial, Landers primarily testified about her filling prescriptions for Defendant, her recommending pseudo-patients to Defendant, Defendant's methods of filling the fraudulent prescriptions with pseudo-patients, and Defendant's physical and verbal abuse towards her when she told him she wished to stop participating in his scheme. (See Doc. No. 268 at 140 ¶ 4 to 181 ¶ 13.) However, the Government proffered numerous witnesses that corroborated Landers's testimony, and even apart from her testimony and that of other witnesses, Defendant confessed to his participation in the offenses. (See id. at 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5.) Simply put, there was overwhelming evidence of Defendant's guilt on the charges he was convicted of committing.[19]

As part of the evidence, DEA Special Agent Smith reviewed summary charts on the filled prescriptions that contained the names of Landers and other pseudo-patients. (See Doc. No. 270 at 24 ¶¶ 2-25.) Dr. Burch also confirmed that neither Landers nor the recommended pseudo-patients were patients of his or were prescribed the medications in the fraudulent prescriptions, underscoring Landers's role as a pseudo-patient. (See Doc. No. 267 at 142 ¶ 2 to 143 ¶ 4; 145

---

[19]  Although the jury acquitted Defendant on four counts, believing that the evidence did not show he personally filled certain prescriptions, the acquittals do not diminish the fact that the evidence against him on the counts of conviction was considerable. (See Doc. No. 250 at 2-3.)

¶¶ 15-18.)  Landers's statements that she and other pseudo-patients filled prescriptions for Defendant merely confirmed the testimony of Smith and Burch.

In addition, Agent Gerald Gobin recounted Defendant's post-arrest confession at trial.  (See Doc. No. 268 at 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5.)  Gobin explained that Defendant admitted to, <u>inter alia</u>, receiving fraudulent prescriptions from Harrison, recruiting pseudo-patients to fill the prescriptions, and selling the pills obtained from the prescriptions.  (See <u>id.</u>)  In light of his confession, any information Landers provided on Defendant's involvement in his scheme was cumulative.

Furthermore, six pseudo-patients testified about their roles in Defendant's scheme and his method of filling false prescriptions, including Defendant recruiting them in part with the help of Landers, asking them to fill prescriptions for him that contained the pseudo-patients' identifying information, picking them up and driving them to a pharmacy, giving them money to fill the prescriptions, taking the pills received, and paying them in cash and/or pills.  (See Doc. No. 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23; 22 ¶¶ 5-10, 12, 23; 23 ¶¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24; 36 ¶¶ 11-15; 53 ¶ 10 to 62 ¶ 8; 71 ¶ 20 to 81 ¶ 16; 105 ¶ 21 to 116 ¶ 20; <u>see also</u> Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15.)  Harrison and pseudo-patient Aisha Patton also testified that Defendant would coordinate with Harrison and his sister to alert them via text message when a pseudo-patient would be filling a prescription so they could answer verification calls from the pharmacy and falsely confirm the prescription's validity.  (See Docs. No. 267 at 185 ¶¶ 12-15; 268 at 22 ¶¶ 3-12; 374 at 2.)  Further, although no other witness corroborated Landers's story about Defendant's abuse toward her when she stated she wished to withdraw from his scheme, Harrison also testified about Defendant's anger toward her when she expressed her intent to withdraw, which included him showing a gun during the altercation.  (See Doc. No. 267 at 188 ¶ 25 to 189 ¶ 12.)

Any insight on Defendant the jury gleaned from Landers's testimony was equally evident from Harrison's.

Given that Defendant was aware before trial of Landers's mental health conditions and that she was receiving treatment, and given the overwhelming evidence of Defendant's guilt on the three counts of conviction, no <u>Brady</u> violation occurred.

### b.    Impeachment Evidence Regarding Shante Watson

Next, Defendant argues that he was not provided with information to impeach pseudo-patient witness Shante Watson.  (<u>See</u> Doc. No. 363 at 3.)  Defendant's complaint here, however, is not that the Government withheld evidence from him but rather that Watson provided inconsistent testimony about one prescription she claimed to have filled.  (<u>See</u> <u>id.</u>; Doc. No. 374 at 11.)  The Government represented it turned over all <u>Brady</u> materials for their witnesses, and Defendant does not identify any materials related to Watson that the Government withheld.  (<u>See</u> <u>ids.</u>)  If Defendant believed Watson provided false testimony, he was free to explore any inconsistencies during cross-examination, which he did not do.  (<u>See</u> Doc. No. 268 at 68-69.)  Additionally, the jury observed Watson's testimony and had copies of all pharmacy records to review in reaching its verdict.  (<u>See</u> Doc. No. 374 at 12.)  It was within the jury's purview to assess Watson's credibility and testimonial consistency.  For these reasons, Defendant has not shown a <u>Brady</u> violation as to Watson.

### c.    Evidence on False Accusations and Identifications by Landers and Harrison and "Unfounded Leads"

Defendant also claims the Government withheld evidence showing that witnesses Landers and Harrison falsely accused him of filling prescriptions he did not fill, and that Landers and Harrison could not identify each other.  (<u>See</u> Doc. No. 364 at 2-3.)  Defendant, however, had any information on these subjects available to him at trial and chose not to cross-examine Landers and Harrison about their alleged prior inconsistent statements and misidentifications.  (<u>See</u> Doc. Nos.

267 at 192 ¶ 17 to 214 ¶ 12; 268 at 182 ¶ 4 to 233 ¶ 23; 269 at 39 ¶ 20 to 63 ¶ 1.)  Again, it is noted

that the Government avers it disclosed all <u>Brady</u> materials, including "reports of interviews and

proffers" with Harrison and Landers, and Defendant has not come forward with evidence

suggesting this representation is untrue.  (Doc. No. 374 at 12; <u>see also id.</u> at 11.)

Additionally, Defendant alleges that the Government did not turn over information on

"unfounded leads" associated with his case.  (Doc. No. 364 at 3.)  Defendant does not explain what

he means by "unfounded leads," but claims the following was withheld:

> During proffer interviews with the [G]overnment, Monica Harrison identified
> Raymond Russell, Cinqueta Slater, Kelly Wright, Sharon Robinson, Gloria
> Matthews, Stephanie Lyons, Evelyn Flowers, Joyce McMillan, Norman Davis, and
> Wayne Whitley as individuals who filled prescriptions with the assistance of
> Defendant.  Ms. Harrison also identified Brittany Rivera as someone who filled
> prescriptions for Marquita Fields.  All of which the [G]overnment knew to be
> untrue. . . .
>
> During proffer interviews with the [G]overnment, Khalia Landers identified Alonzo
> Allison and Keyanna Holland as individuals who filled prescriptions for the
> Defendant.  She also identified Shinease Lee as an individual who the Defendant
> purchased prescriptions from.  All of which the [G]overnment knew to be untrue.

(<u>Id.</u> at 2-3 nn.2-3.)  The Court interprets these allegations or "unfounded leads" to refer to the

above individuals whom Defendant claims investigators at one point believed were involved in his

conspiracy but at trial were not alleged to be participants.  (<u>See id.</u> at 3.)

The Court has already considered Defendant's requests for information related to people

not called to testify at his trial.  (<u>See</u> Doc. No. 310 at 4-5.)  In an Order dated August 23, 2018, the

Court denied Defendant's Motion to Compel and Amended Motion to Compel the Government to

produce similar information, reasoning:

> Defendant's Motions contain a lengthy list of names about which he seeks
> information, including Kenya Hollands, Brittany Rivera, Shineace Lee, Joyce
> Johnson, Monica Harrison, Khalia Landers, Dr. William Burch, Ramira Williams,
> Valerie Felder, Bruce McGrier, Alonzo Allison, Keith Covington, Terrance Carter,
> Shante Watson, Ihsanulla Maaf, Auguste Witherkeen, Asha Webb, Gregory Scales,

Derrick Suggs, Paul Scota, and Agent Gobbons.  (Doc. Nos. 298, 305.)  He essentially wants all information on these persons in the Government's possession to be turned over to him.

. . .

The majority of the remaining information that Defendant requests in his Motion pertains to individuals who were not called to testify at trial and/or who were not part of the charges on which Defendant was convicted.  (Doc. No. 298 ¶ 4(c), (d), (e), (j), (k), (m), (u), (v), (x).)  Thus, the information is not subject to disclosure and there is no legal basis to require the Government to provide Defendant with these documents.

Finally, Defendant has not made a showing that any of the requested documents are material to his guilt nor has he provided a legal basis for the considerable amount of his post-conviction discovery requests in this case.  Defendant received a vast amount of documents throughout his trial, including Jencks and Giglio material, and had the opportunity to cross-examine the Government's witnesses in depth at his trial.  Thus, Defendant's Motions (Doc. Nos. 298, 304) will be denied.

(Id. at 4-5.)  This same reasoning applies to Defendant's instant request.  None of the individuals Defendant seeks information on were "called to testify at trial and/or . . . were . . . part of the charges on which Defendant was convicted."  (Id. at 5.)  He also has not shown that this information is material to his guilt.  As discussed above, the Government provided Defendant with "reports of interviews and proffers" with Harrison and Landers, and he chose not to cross-examine them about any perceived inconsistent statements or misidentifications they made.  (Doc. No. 374 at 12; see also Doc. Nos. 267 at 192 ¶ 17 to 214 ¶ 12; 268 at 182 ¶ 4 to 233 ¶ 23; 269 at 39 ¶ 20 to 63 ¶ 1.)

Furthermore, the discussion above on the considerable amount of evidence presented at trial incriminating Defendant in this case also applies here.  See supra Section III.A.1.a.  Any testimony given by Landers and Harrison was corroborated by, inter alia, Defendant's confession that he received prescriptions from Harrison, the testimony from six pseudo-patients, two DEA Special Agents, one of whom testified about the pharmacy records for the false prescriptions, and

24

Dr. Burch.  (See Doc. Nos. 267 at 142 ¶ 2 to 143 ¶ 4, 145 ¶¶ 15-18, 146 ¶ 20 to 148 ¶ 22; 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23, 22 ¶¶ 5-10, 12, 23, 23 ¶¶ 1, 2-4, 9-12, 25 ¶ 12, 30 ¶¶ 10-11, 24, 36 ¶¶ 11-15, 53 ¶ 10 to 62 ¶ 8, 71 ¶ 20 to 81 ¶ 16, 105 ¶ 21 to 116 ¶ 20, 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5; 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15; 270 at 24 ¶¶ 2-25, 35 ¶ 25 to 37 ¶ 10, 42 ¶ 17 to 58 ¶ 1.)  He also confessed to his involvement in the scheme.  (See Doc. No. 268 at 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5.)  His claim of not being provided with "unfounded leads" would not result in a different outcome at trial.  Thus, given all this evidence presented against Defendant, the requested information would not have been material to his guilt and no Brady violation has been shown.

### d.      Immunity Agreements for Pseudo-Patient Witnesses

In addition, Defendant posits that the Government withheld immunity agreements between it and the pseudo-patient witnesses.  (See Doc. No. 365 at 2.)  He reasons that "[i]t can reasonably be inferred that" witnesses Shante Watson, Alana Russell, Kaleana Harvey, Mario Mazziotti, and Ronald Knopman received "some sort of agreement with the [G]overnment based upon the fact that they testified . . . and were never criminally charged."  (Id. at 2 n.2.)  The Government, however, denies that any witnesses were granted immunity.  (See Doc. No. 374 at 13.)

Defendant was free to explore any perceived witness biases on cross-examination, including whether they had immunity agreements with the Government, and he chose not to do so.  (See Doc. Nos. 268 at 62 ¶ 16 to 66 ¶ 10, 81 ¶ 21 to 97 ¶ 1, 116 ¶ 25 to 118 ¶ 10; 269 at 88 ¶¶ 3-19, 111 ¶ 22 to 114 ¶ 6.)  And the absence of any immunity agreements is underscored by the Government's questioning of three different witnesses—Monica Harrison, Aisha Patton, and Khalia Landers—about their cooperation plea agreements with the Government.  (See Doc. Nos. 267 at 127 ¶¶ 3-25; 268 at 29 ¶ 10 to 30 ¶ 5, 142 ¶ 20 to 143 ¶ 17.)  There is nothing to suggest the Government made or withheld additional agreements with other witnesses.   Defendant's

speculation that witnesses received immunity agreements does not rise to the level of a <u>Brady</u> violation.

### e.   Copies of Defendant's Phone Records and the Back Side of Prescriptions

Finally, Defendant objects to not receiving copies of either his phone records or the back side of the prescriptions shown to witness Paul Scota, the pharmacist.  (<u>See</u> Doc. No. 395 at 3-4.) Defendant claims he "was surprised by the undisclosed evidence of . . . [his] phone records" and not receiving the back side of the fraudulent prescriptions.  (<u>Id.</u> at 3.)  However, neither of these items constitutes <u>Brady</u> evidence.

First, the Government is not required to provide Defendant with his own phone records because he could have obtained them on his own.  <u>See</u> <u>Pelullo</u>, 399 F.3d at 202 (holding that it is a "well-established principle that the government is not obligated under <u>Brady</u> to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself") (quotation marks omitted) (quoting <u>United States v. Starusko</u>, 729 F.2d 256, 262 (3d Cir. 1984)).  Second, Defendant's insistence that he did not receive the phone records or back side of prescriptions is belied by the Government's numerous assurances that it turned over to Defendant all relevant materials and his failure to object to the introduction of the phone records or prescriptions into evidence during the trial.  (<u>See</u> Doc. Nos. 267 at 107 ¶ 25 to 109 ¶ 13; 270 at 34 ¶ 16 to 36 ¶ 18; 310 at 4-5; 374 at 11-12.)

Further, neither of these documents are material to Defendant's guilt given all the other evidence presented against him.  The phone records were used as another method to confirm the testimony of Harrison, Landers, and pseudo-patient Patton that Defendant communicated with Harrison and Marquita Fields before filling prescriptions so they could answer verification calls from pharmacies.  (<u>See</u> Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 22 ¶¶ 3-18, 151 ¶¶ 19-25, 152 ¶¶ 20-

25.)  This testimony was confirmed by numerous witnesses, independent of the phone records.

(See Doc. No. 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23; 22 ¶¶ 5-10, 12, 23; 23 ¶¶ 1, 2-4, 9-12; 25

¶ 12; 30 ¶¶ 10-11, 24; 36 ¶¶ 11-15; 53 ¶ 10 to 62 ¶ 8; 71 ¶ 20 to 81 ¶ 16; 105 ¶ 21 to 116 ¶ 20; see

also Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15.)  The records also showed that

Defendant communicated with pseudo-patients while they were filling prescriptions, which was

corroborated by the testimony of at least seven witnesses and the pharmacy logs showing that the

prescriptions were filled.  (See Doc. No. 270 at 34 ¶ 20 to 58 ¶ 1.)

      Moreover, the back side of the prescriptions only was one of several methods Scota used

to confirm a prescription was valid.[20]  (See Doc. No. 267 at 112 ¶¶ 12-21.)  He also verified a

prescription by checking the patient's identification, calling the prescribing physician's office, and

recording in his computer that the prescription was verified.  (See id. at 112 ¶¶ 12-16, 114 ¶¶ 11-

21.)  Furthermore, Scota is the owner of only one of the many pharmacies where Defendant filled

his fraudulent prescriptions.  (See id. at 98 ¶ 11 to 99 ¶ 2.)  Simply put, Defendant has not shown

that the back side of the prescriptions contained Brady evidence or that he was prevented from

examining them before trial if he had requested to do so.

      For all the above reasons, the Government did not commit any Brady violations in this

case.  The Court will next address Defendant's remaining Motions for a new trial.

### 2.     The Court's Jury Instructions Do Not Warrant Granting a New Trial

      In addition to his Brady arguments, Defendant submits that the Court gave an improper

jury instruction on the Government's burden of proof.  (See Doc. No. 361 at 2-4.)  When the Court

defined "proof beyond a reasonable doubt," the trial transcript shows that the Court said, "[p]roof

---

[20]  As mentioned in Section II supra, Scota would place a sticker on the back of the prescription to
show what drug had been filled and who verified the prescription.  (See Doc. No. 267 at 112
¶¶ 12-21.)  He also wrote other notes on the back side.  (See id.)

beyond a reasonable doubt does not mean proof beyond all possible doubt, but to a mathematical certainty." (Doc. No. 272 at 88 ¶¶ 11-12) (emphasis added). Defendant argues the change reduced the Government's burden of proof. (See Doc. Nos. 361 at 2-4; 374 at 14.)

To show that jury instructions violated a defendant's due process rights under the Fifth Amendment to the United States Constitution, a defendant "must demonstrate both (1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the [Government] of its burden of proving every element of the crime beyond a reasonable doubt." Williams v. Beard, 637 F.3d 195, 233 (3d Cir. 2011) (quotation marks and citation omitted). "[T]he Constitution does not require that any particular form of words be used in advising the jury of the [G]overnment's burden of proof." Victor v. Nebraska, 511 U.S. 1, 5 (1994). "The inquiry is not, then, whether a particular word or phrase is used, but rather, when taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." Laird v. Horn, 159 F. Supp. 2d 58, 92 (E.D. Pa. 2001) (alterations in original) (quotation marks and citation omitted). In other words, the instruction must "impress[] upon the jury the need to reach the subjective state of near certitude of guilt . . . ." Victor, 511 U.S. at 2.

Here, the substitution of the conjunction "but" instead of "or" does not rise to the level of a Constitutional violation.[21] Contrary to Defendant's argument, use of the conjunction "but" heightened the Government's burden of proof by instructing the jury that it needed to find Defendant guilty to a mathematical certainty, a higher standard than reasonable doubt. (See Doc. No. 272 at 88 ¶¶ 11-12.) Moreover, "when taken as a whole," the remaining instructions "correctly conve[yed] the concept of reasonable doubt to the jury." Laird, 159 F. Supp. 2d at 92 (quotation

---

[21] The Court agrees that the trial transcript is correct.

marks and citation omitted).  The Court went on to instruct:

> A reasonable doubt is a fair doubt based on reason, logic, commonsense or experience.  It is a doubt that an ordinary reasonable person has after carefully weighing all of the evidence and is a doubt of the sort that would cause him or her to hesitate to act in matters of importance in his or her own life.  It may arise from the evidence or from the lack of evidence or from the nature of the evidence.

(Doc. No. 272 at 88 ¶¶ 14-21.)  Given the above instructions, and taking them as a whole, there is no "reasonable likelihood that the jury applied the instruction in a way that relieved the [Government] of its burden of proving every element of the crime beyond a reasonable doubt." Williams, 637 F.3d at 233 (quotation marks and citation omitted).  Thus, a new trial is not warranted based upon the challenged jury instruction.

### 3.   Defendant Will Not Be Granted a New Trial Based on his Purported Unknowing Waiver of His Right to Counsel

Additionally, Defendant avers that he did not knowingly waive his right to counsel.  (See Doc. No. 362 at 1-5.)  He argues that he lacked full information to make this decision because the Court did not elaborate on:

> [A]ll the statutory offenses [included in the Superseding Indictment], the full range of punishments, possible defenses, that in the event that he . . . is dissatisfied with stand-by counsel['s] assistance he cannot make a claim of ineffective counsel, . . . that he may be hampered in presenting his defense by his lack of knowledge of the law[,] and that his effectiveness of his defense may well be diminished by his dual role as attorney and accused.

(Id. at 2.)  He continues, noting that the Court failed to tell him whether his charges were for violations of either 21 U.S.C. § 843 or 29 U.S.C. § 843, which subsections he was being charged with, and that he could be sentenced to more than three years' supervised release.  (See id. at 2-3.)

The Sixth Amendment to the United States Constitution grants a criminal defendant the right to counsel and the corollary right to refuse counsel and represent himself.  See Faretta v. California, 422 U.S. 806, 814 (1975); United States v. Peppers, 302 F.3d 120, 130 (3d Cir. 2002) ("Thus, a defendant who chooses to represent himself must be allowed to make that choice, even

if it works ultimately to his own detriment") (quotation marks and citation omitted).  Before allowing a criminal defendant to represent himself, the Court must determine the defendant's competency to waive the right to counsel.  See Godinez v. Moran, 509 U.S. 389, 399-400 (1993). The scope of the Court's responsibility is as follows:

1.  The defendant must assert his desire to proceed pro se clearly and unequivocally[;]

2.  The court must inquire thoroughly to satisfy itself that the defendant understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved[; and]

3.  The court must assure itself that the defendant is competent to stand trial.

Peppers, 302 F.3d at 132 (footnotes omitted) (quotation marks and citations omitted).

There are, however, limits to the Court's responsibility.  For example, a defendant need not receive "an explicit accounting of the potential punishment in a Faretta discussion . . . ."  United States v. Fore, 169 F.3d 104, 108 (2d Cir. 1999).  And it is evident that a defendant proceeding pro se waives potential claims of ineffective assistance of counsel against himself or his nonexistent counsel.  See United States v. Tilley, 326 F. App'x 96, 97 (3d Cir. 2009) (holding that pro se defendant is prohibited from litigating the quality of his own defense).  This axiom extends to standby counsel, as there is "no constitutional right to standby counsel, let alone a right to have standby counsel raise objections on" a defendant's behalf.  Id. at 96.

Here, Defendant's claims that he unknowingly waived his right to counsel are belied by the transcript from his colloquy, extensively quoted infra, wherein the Court granted his Motion to proceed pro se.  (See Doc. No. 285.)  The Court will first address Defendant's argument that he was not fully informed on the charges against him and then discuss the remaining alleged deficiencies.

The Court began the colloquy hearing by reading relevant passages from two Third Circuit Court of Appeals decisions, United States v. Booker and United States v. Peppers, so he understood what the Court needed to assess to grant his Motion:

> THE COURT:  Let me just go over what the case required, and then we'll ask you some questions, okay?  I just want you to understand what the law is, because the law requires that you fully understand the nature of your giving up the right to counsel and representing yourself, which you have an absolute right to do, Mr. Fields.

> The Court is quoting and saying: (Reading)

>> "Since a person cannot secure the right to proceed pro se without sacrificing the right to counsel, we require defendants to assert the right to proceed pro se affirmatively and unequivocally.  And we have placed on the Court the burden of establishing that the defendant who does so acts voluntarily, and that he understands both the scope of the rights sacrificed and the restrictions and challenges that he will face."

> As the Supreme Court has indicated, the defendant must knowingly and intelligently forego the traditional benefits associated with the right to counsel before he can proceed in representing himself.  The Court goes on to articulate a standard for determining whether the right to counsel was knowing and intelligent. (Reading)

>> "For a waiver of the right to counsel to be knowing and intelligent, which it must be in order to be valid, the defendant should be made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with . . . his eyes open.

>> To ensure that the defendant truly appreciates the dangers and disadvantages of self-representation, a waiver must be made with an appreciation of the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder.  While our precedents reveal no '[t]alismanic formula' for determination when a colloquy has yielded a defective waiver, we have stated that the District Court's inquiry must establish that the defendant understands all risks and consequences associated with his decision for self-representation.  And even if the colloquy skips just one of the relevant factors, it—to make sure that the waiver is knowingly, intelligent, and voluntary."

In another case <u>Peppers</u> and I'm reading from footnote 5:

> "We outline three skeletal requirements to reflect the obligations placed on the District Court when a defendant seeks to proceed <u>pro se</u>.  The defendant must assert his desire to proceed <u>pro se</u> clearly and unequivocal[l]ly . . . .  The Court must . . . inquire thoroughly to satisfy itself that the defendant understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that a defendant may encounter, and any other facts important to a general understanding of the risks involved.  The Court must assure itself that the defendant is competent to stand trial."

And they do refer us in the footnote to—or bench book, the 2000 edition—the fourth edition, dated 2000 . . . .  Mine has a date of March 2013.  So I have updated questions.

But I say all this on the record, Mr. Fields, because I just want you to understand that you have an absolute right to represent yourself.  But I, as the trial judge, under the law, I have to make sure that . . . and . . . the Court of Appeals puts the burden and the Supreme Court puts the burden on the trial judge to make sure that your giving up your right to counsel and proceeding to represent yourself is . . . knowingly done, voluntarily done, and intelligently done.  So having advised you of all this, do you still wish to represent yourself and give up your right to counsel?

THE DEFENDANT:  I do.

(<u>Id.</u> at 7 ¶ 16 to 10 ¶ 17.)  <u>See also</u> <u>Booker</u>, 684 F.3d 421;  <u>United States v. Peppers</u>, 899 F.3d 211

(3d Cir. 2018).

After asking preliminary questions on Defendant's background and potential prior

substance use, the Court proceeded, explaining the charges against him:

THE COURT:  Do you understand that you are charged in this case with the following offenses?  And before you answer that, you've received a copy of the indictment?

THE DEFENDANT:  Yes, I have.

THE COURT:  And you've read it?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right. . . .  Counts 1 to 32 charge you with a violation of what is

known at the Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2.  Now in Count 1 it says . . . .  that the Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States.  And there are five controlled substance schedules, 1 to 5.  And I'm not going to read every word of this, but I just want to make sure you understand what's in the indictment.

Then paragraph 2 on page 1 says that oxycodone is a narcotic analgesic and that is similar to morphine and is a Schedule 2 controlled substance.

And then if you go over to the next page, it says that oxycodone is used in pain relief drugs in varying strengths.  And it gives the strengths.  And it gives the other drugs that . . . contain oxycodone.  And that's call[ed] acetaminophen.

And then paragraph 3 says that Dr. B[u]rch was a licensed physician in the Commonwealth of Pennsylvania.  And he has a medical license and Drug Enforcement Administration registration number.  And then it goes on to talk about the conspiracy.

. . .

And the conspiracy is from April 11, 2011 to September 29, 2012.  And I'm looking at page 2 of the indictment.  And it says that you conspired and agreed with Khalia Landers and Monica Harrison and others to . . . attempt to knowingly and intentionally distribute a mixture and substance containing a detectible amount of oxycodone, a Schedule 2 controlled substance, in violation of Title 21 U.S.C. § 841(a)(1).  So the object of the conspiracy was to distribute this controlled substance.

And then it lists what's called the manner and means by which the conspiracy was . . . carried out.  And you've read all this, right?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right.  And oh, for example, it says on paragraph 10 let's say, after collecting the pills from pseudo[-]patients, Defendant Lamar Fields sold the pills on the streets of Philadelphia.  Do you see that?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  And I'm not going to read every word of it, but that's distribution.  And then it goes . . . to list on pages 5 to page 13 . . . 126 overt acts.  There has to be overt acts.  Well, the Government has charged overt acts in furtherance of the conspiracy.

Do you understand, Mr. Fields?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Now for example, let's look at overt act number 3 on page 5. It says the defendant, Lamar Fields, and others known and unknown to the Grand Jury obtained the oxycodone tablets in dosages and quantities described below, through the use of forged prescriptions from Monica Harrison and . . . at the pharmacies listed below, each constituting a separate act. And it lists all of these overt acts in this charge. And it gives the overt act number, the date, who the pseudo[-]patient was, and the drug type, and quantity and dosage—and the quantity, and location of the pharmacy where the forged prescription was presented. You see all that?

THE DEFENDANT: Yes, I do.

THE COURT: All right. So that's what you're charged with in Count [1], conspiracy to distribute these items. And again, a conspiracy is an agreement amongst two or more people to do an act—another act illegally. You understand?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Now in Counts 2 through 32,[22] you're charged with actual distribution not conspiracy. . . . And it says on or about the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, you knowingly and intentionally distributed and aided and abetted in the distribution of the pills noted below. Each pill of which is a mixture and substance containing a detectable amount of oxycodone, a Schedule 2 controlled substance obtained from the pharmacies listed below, and each distribution consisting a separate count. And again, there's a charge. It gives the count, the date of the distribution, the drug type dosage, the quantity, and the location of the pharmacy.

And Title 21 U.S.C. § 841(a)(1) is the distribution charge, you know, knowingly and intentionally distributes a controlled substance is . . . could be guilty of that kind of charge. And again, it's just an accusation, the indictment. It's not proof of anything. This is just what you're charged with.

And then you see. . . . it says Title 18 U.S.C. § 2?

THE DEFENDANT: Yes, I do.

THE COURT: All right. That's the aiding and abetting section. And what aiding

---

[22] At the time of the colloquy, the Indictment had not been superseded. (See Doc. No. 134.) However, because only the number and not the substance of the Counts was altered, this discussion is applicable to Counts 2 through 7 of the Superseding Indictment. (See id.)

and abetting is, if you procure or help or assist somebody else, aid and abet somebody else to commit a federal offense, and you have the same object in your mind as that person who's committing . . . the federal offense, when you aid or help or assist them, or aid and abet them, then under federal law, you're equally guilty of that crime as the person who actually did it. Do you understand?

THE DEFENDANT: Yes.

THE COURT: Now that's what aiding and abetting is. Now you look at . . . the next series of counts, counts 33 to 63,[23] again, this charges you with, on or about each of the dates in the chart below, with knowingly and intentionally acquiring and aiding and abetting the acquisition of oxycodone, a Schedule 2 controlled substance, by misrepresentation, fraud, forgery, deception, and subterfuge, that is, you presented and aided and abetted the presentation of fraudulent prescriptions for 10 milligram and 30 milligram oxycodone tablets in the quantity specified below, which were created without the knowledge and permission of the physician to whom the options were attributed and signed forgeries of the physician's signature, with each acquisition constituting a separate count. And in the chart, it gives the count, the date of the distribution, the drug type, dosage, quantity, and the location of the pharmacy. And this goes all the way to . . . page 20, which . . . the last count is 63.

And violation of 843 is . . . whoever acquires a controlled substance through misrepresentation, fraud, forgery, deception, and subterfuge, and does so knowingly and intentionally, would be in violation of the law. Do you understand?

THE DEFENDANT: Yes, I do.

. . .

THE COURT: All right. So these are the charges. This is what you're charged with in this case. Do you have any question about what you're charged with?

THE DEFENDANT: No, I do not.

THE COURT: All right. You understand the nature of these charges?

THE DEFENDANT: Yes, I do.

(Id. at 12 ¶ 19 to 13 ¶ 3, 13 ¶ 12 to 14 ¶ 5, 14 ¶ 13 to 18 ¶ 12, 18 ¶ 20 to 19 ¶ 1) (cleaned up).

As exemplified by the above excerpt, Defendant's claim that he was unaware of "all the

---

[23]  As discussed in note 22, this discussion is still applicable to Counts 8 through 13 of the Superseding Indictment. (See Doc. No. 134.)

statutory offenses [included in the Superseding Indictment]" is belied by the colloquy transcript. (Doc. No. 364 at 2.) During the hearing, the Court explained what it must find to allow Defendant to proceed without counsel, ensured Defendant had read his Indictment, and explained the Indictment and charges against him in detail. (See Doc. No. 285 at 7 ¶ 16 to 10 ¶ 17, 12 ¶ 19 to 13 ¶ 3, 13 ¶ 12 to 14 ¶ 5, 14 ¶ 13 to 18 ¶ 12, 18 ¶ 20 to 19 ¶ 1.) Even after explaining the charges against Defendant, the Court asked him whether he understood their nature, to which he affirmed. (See id. at 19 ¶ 1.) Moreover, although the Indictment was superseded after the colloquy hearing, the Superseding Indictment only altered the number of counts against Defendant and not their content. (See Doc. No. 134.) The Court's detailed explanation of the charges against Defendant and his failure to assert any confusion belie his argument that he did not understand the charges.

Additionally, Defendant also claims he did not understand:

the full range of punishments, possible defenses, that in the event that he . . . is dissatisfied with stand-by counsel assistance he cannot make a claim of ineffective counsel, . . . that he may be hampered in presenting his defense by his lack of knowledge of the law[,] and that his effectiveness of his defense may well be diminished by his dual role as attorney and accused.

(Doc. No. 364 at 2.) These claims, however, also are contradicted by the colloquy conducted by the Court. After explaining the charges, the Court explained the possible punishments he faced if found guilty:

THE COURT: All right. And on Count 1, which is the conspiracy count, you face . . . . a maximum penalty of 20 years' imprisonment, a mandatory term of three years' supervised release, a $1 million fine, and $100 special assessment. Do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: All right. On Counts 2 to 32, on each count, you would face a maximum of 20 years' imprisonment, a mandatory term of three years' supervised release, a $1 million fine, and a $100 special assessment. Do you understand?

THE DEFENDANT: Yes.

THE COURT:  On Counts 33 to 64, . . . if you were convicted, you would face four years' imprisonment, a mandatory term of . . . three years' supervised release, a $250,000 fine, and a $100 special assessment. . . .  The total statutory sentence that you would face is 764 years' imprisonment with a three-year term of supervised release, a $39,750,000 [fine] and a $6300 special assessment.  Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Now, again, do you understand that if you are found guilty on more than one of these crimes the Court can order that the sentences be served consecutively, and that is one after another.  Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT: All right. . . .  [I]n the federal court, we have sentencing guidelines that a Court has to consider. . . .  [O]ne of the factors we consider, if a person is found guilty—and I just want you to understand that these sentencing guidelines are only advisory.  They're not mandatory.  They're just one factor I have to consider.  Are you aware of the presence of sentencing guidelines?

THE DEFENDANT:  Yes, I am.

THE COURT:  All right.  I want you to understand that . . . these advisory sentencing guidelines may have an [e]ffect on your sentence if you're found guilty.  Do you understand?

THE DEFENDANT:  Yes, I do.

(Doc. No. 285 at 19 ¶¶ 2-3, 8-25, 20 ¶¶ 1-20.)   Finally, the Court advised Defendant of the

repercussions of representing himself:

THE COURT:  Do you understand that if you represent yourself, you're on your own?  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  I cannot tell you or even advise you how you should try your case.  You have to do that all on your own.  You understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  And even though you're representing yourself, we have, in the federal court, what's called Federal Rules of Evidence.  There are Federal Rules of Criminal Procedure.  Even in this court, we have what we call Local Rules

of Criminal Procedure.  And are you familiar with the Federal Rules of Evidence?

THE DEFENDANT:  Yes, I am.

THE COURT:  What about the Federal Rules of . . . Criminal Procedure? . . .

THE DEFENDANT:  I'm fairly familiar . . .

THE COURT:  All right.  Now even when you represent yourself, . . . you have to follow these rules.  These rules apply to everybody whether you're represented by counsel or not represented by counsel.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And do you understand that the rules of evidence govern what evidence may or may not be introduced at trial, and that in representing yourself, you must abide by these very technical rules, and that they will not be relaxed for your benefit?  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Now, again, I ask you if you're familiar with the rules of criminal procedure.  But I want you to understand that those rules govern the way a criminal action is tried in federal court and that you are bound by those rules and they will not be relaxed for your benefit.  Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Now I'm going to advise you that, in my opinion, a trained lawyer would defend you far better than you can defend yourself.  I think it would [be] unwise of you to try to represent yourself.  You're not familiar with the law to the extent that a trained lawyer would be.  And the same with court procedure.  You're not familiar with court procedure to the extent of a trained lawyer.  And the same is true with the rules of evidence.  And I strongly urge you to . . . not try to represent yourself.  You understand?

THE DEFENDANT:  Yes.

THE COURT:  I'll say that again.  I strongly urge you to not try to represent yourself.  Knowing what I just said, do you still want to represent yourself?

THE DEFENDANT:  I do . . . .

THE COURT:  All right. . . .  [I]n light of the penalty you might suffer if you are found guilty, and in light of the difficulties in representing yourself, you still desire to represent yourself and to give up your right to be represented by a lawyer?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Is your decision voluntary?

THE DEFENDANT:  Yes, it is.

THE COURT:  All right.  [I]f this case goes to trial, I can't predict what defenses you might have.  How . . . you may try your case, that would be strictly up to you. But a lawyer may see some defenses that you might have that you may miss.  You understand?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And in trying the case, a lawyer may pursue one strategy which might be in your best interest, that you may not see in representing yourself. You understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  You know, I'm supposed to advise you of the general risks involved and ensure you're competent to stand trial.  But it's hard for a Court to . . . tell you what your potential defenses are in a case.  Obviously, the Government, in every criminal case, is required to prove your guilt beyond a reasonable doubt.  Sometimes defendants rely on defenses that the Government just hasn't proven their case.  Sometimes there may be other defenses that a defendant raises.  But these are all things that I want to advise you of and make sure you understand what you're doing.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions you want to ask me about your waiver of your right to counsel and your right to proceed pro se?

THE DEFENDANT:  No, I do not.

. . .

THE COURT:  I'm just looking at this opinion I referred to before.  And the judge, in that case, even advised the defendant that . . . there might [be] potential problems obtaining evidence and locating witnesses as an incarcerated defendant.  Do you understand?

THE DEFENDANT:  Yes, I do.

(Id. at 20 ¶ 21 to 24 ¶ 7, 25 ¶¶ 24-25, 26 ¶¶ 1-4.)  Based on Defendant's affirmations, the Court

found that he knowingly and voluntarily waived his right to counsel, permitted him to represent himself, and appointed standby counsel to aid Defendant.  (See id. at 26 ¶¶ 6-8, 27 ¶¶ 14-15.)

For all these reasons, Defendant's Motion for a new trial based on his allegedly unknowing waiver of his right to counsel will be denied.

### 4.      The Superseding Indictment Was Not Constructively Amended

Next, Defendant claims the Government constructively amended the Superseding Indictment by presenting evidence "of a different conspiracy than alleged in the indictment." (Doc. No. 369 at 4.)  He contends constructive amendments were made by the following three acts.  First, he notes that the Superseding Indictment claims he purchased scripts from Harrison who "filled out the prescriptions completely." (Id. at 4.)  However, at trial, the Government presented evidence that Ramira Williams—another employee of Dr. Burch—and Defendant would aid in filling out the prescriptions.   (See id.)   Second, he claims the Government introduced additional coconspirators at trial who did not testify before the grand jury, thereby "broaden[ing] [his] risk of being found guilty . . . ." (Id. at 5.)  Finally, he argues that although the Superseding Indictment states that he "acted and conspired in Philadelphia and Montgomery County within the Eastern District of Pennsylvania," the Court broadened this geographical area by stating in its jury instruction that he "conspired and agreed in the Eastern District of Pennsylvania." (Id.)

The Third Circuit Court of Appeals recently discussed an indictment's sufficiency in the context of a constructive amendment:

> An indictment is facially sufficient when it not only states the elements of the offense, but also "sufficiently appraises the defendant of what he must be prepared to meet, and . . . allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Stevenson, 832 F.3d 412, 423 (3d Cir. 2016) (citation omitted); see Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged.").  It is constructively amended, however, when it fails to provide that fair notice because the trial "broaden[s] the possible bases for conviction from that which appeared in

the indictment." <u>United States v. McKee</u>, 506 F.3d 225, 229 (3d Cir. 2007) (citation omitted).

<u>United States v. Harra</u>, 985 F.3d 196, 221 (3d Cir. 2021) (alteration in original).  Courts consider the following in determining whether an indictment has been constructively amended:

> An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.  An indictment can be constructively amended through evidence, arguments, or the district court's jury instructions, if they effectively amend the indictment by broadening the possible bases for conviction from that which appeared in the indictment.  When considering a claim of constructive amendment, the key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.  If a defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment.

<u>United States v. Vosburgh</u>, 602 F.3d 512, 532 (3d Cir. 2010) (quotation marks and citations omitted).  Finally, in evaluating an indictment for constructive amendment, "notice need not be ideal, only fair . . . ."  <u>Harra</u>, 985 F.3d at 222.

Here, none of Defendant's arguments show that the Superseding Indictment was constructively amended.  But before turning to Defendant's arguments, the charges against Defendant and his convictions bear repeating.  Defendant was convicted on one count of conspiracy to knowingly and intentionally distribute oxycodone and two counts of intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge (the "acquisition charges").  (<u>See</u> Doc. No. 250 at 1-2.)  The jury acquitted Defendant of four acquisition charges; however, none of the acquittals on the acquisition charges call into question Defendant's convictions.  (<u>See</u> <u>id.</u> at 2-3.)  The acquisition charges covered six occasions when Defendant personally served as his own pseudo-patient and filled a prescription in his own name.  (<u>See</u> <u>id.</u>; Doc. No. 374 at 4-6.)  The jury's decision that

Defendant did not fill prescriptions in his own name on four occasions stands separate from their finding that he twice filled prescriptions in his own name or conspired to fill prescriptions.

Regarding Defendant's constructive amendment claims, none support a finding that the trial "broaden[ed] the possible bases for conviction from that which appeared in the indictment." United States v. McKee, 506 F.3d 225, 229 (3d Cir. 2007) (citation omitted).  He argues that trial evidence proved a different conspiracy than the conspiracy alleged in the Superseding Indictment. (See Doc. No. 369 at 4.)   Defendant, however, was convicted of conspiracy to distribute oxycodone, and he has not shown that the jury convicted him of a different offense.  (See Doc. No. 250 at 1-2.)  As discussed at length in Sections III.A.1.a and III.A.1.c supra, the Government proffered numerous witnesses, pharmacy and telephone records, and Defendant's confession to support a finding that Defendant conspired to knowingly and intentionally distribute oxycodone. (See Doc. Nos. 267 at 142 ¶ 2 to 143 ¶ 4, 145 ¶¶ 15-18, 146 ¶ 20 to 148 ¶ 22; 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23, 22 ¶¶ 5-10, 12, 23, 23 ¶¶ 1, 2-4, 9-12, 25 ¶ 12, 30 ¶¶ 10-11, 24, 36 ¶¶ 11-15, 53 ¶ 10 to 62 ¶ 8, 71 ¶ 20 to 81 ¶ 16, 105 ¶ 21 to 116 ¶ 20, 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5; 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15; 270 at 24 ¶¶ 2-25, 35 ¶ 25 to 37 ¶ 10, 42 ¶ 17 to 58 ¶ 1.)

With all this evidence, and contrary to Defendant's contention, the Government did not prove a conspiracy different from the one described in the Superseding Indictment.  First, Defendant's argument that a constructive amendment occurred because the Superseding Indictment notes he only purchased scripts from Harrison who "filled out the prescriptions completely" fails.  (Doc. No. 369 at 4.)  Though he claims that trial evidence showed different degrees of involvement in the conspiracy by Harrison, other Dr. Burch employees, and uncharged coconspirators, none of this evidence altered the charges against him because the Superseding

Indictment stated, and trial evidence showed, Defendant conspired with others to obtain and fill the fraudulent prescriptions.  (See id. at 4-5.)

Second, for these same reasons, Defendant's second basis for arguing a constructive amendment—that the Government introduced additional coconspirators at trial who were not presented to the grand jury—also fails.  (See id. at 5.)  Contrary to Defendant's assertion, the Superseding Indictment contained allegations on the roles of uncharged coconspirators.  (See Doc. No. 374 at 19.)  Regardless, there is no rule requiring the prosecutor to disclose all of its evidence to the grand jury.  See United States v. Williams, 504 U.S. 36, 55 (1992) ("Over the years we have received many requests to exercise supervision over the grand jury's evidence-taking process, but we have refused them all . . . .").

Finally, the jury instructions properly identified the Eastern District of Pennsylvania as the proper venue for his charged offenses.  (See Doc. No. 374 at 19.)  The Court was not required to enumerate the counties within the District where Defendant allegedly committed his crimes, and the Court did not broaden his charges by not so doing.  For the above reasons, the Superseding Indictment was not constructively amended.

### 5.    Defendant Will Not Be Granted a New Trial Based on Purported Newly Discovered Evidence

Finally, Defendant states that he should be granted a new trial based on newly discovered evidence regarding:  (1) Khalia Landers's medications;  and (2) alleged statements of pseudo-patient Gena Baity/Chandler.  (See Doc. Nos. 376 at 2; 396 at 3-4; 424 at 3-5.)  First, he highlights that newly discovered evidence shows that Landers takes mental health medication that "causes her confusion, memory loss, and affects her judgment," thus calling her testimony into question. (Doc. Nos. 396 at 3-4; 424 at 3.)  Second, he states that a private investigator approached Gena Baity/Chandler, a pseudo-patient who did not testify at Defendant's trial, and showed her pictures

of Defendant and Landers, and she denied knowing either of them.  (See ids.)  Moreover, she also

told the investigator that she never rode in a car with Defendant or Landers to fill a prescription.

(See ids.)

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the

court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R.

Crim. P. 33(a).  The Third Circuit has noted that a district court can grant a new trial on the basis

of newly discovered evidence if the following five requirements are met:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial;  (b)
> facts must be alleged from which the court may infer diligence on the part of
> movant;  (c) the evidence relied on must not be merely cumulative or impeaching;
> (d) it must be material to the issues involved;  and (e) it must be such, and of such
> nature, as that, on a new trial, the newly discovered evidence would probably
> produce an acquittal.

United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000) (quoting Gov't of the Virgin Islands v.

Lima, 774 F.2d 1245, 1250 (3d Cir. 1985)).  "The movant has a heavy burden in meeting these

requirements."  Id. (quotation marks and citation omitted).

Defendant has not met his heavy burden because neither of the alleged new facts would

alter the outcome of his trial.  As discussed at length in evaluating whether Landers's medications

and mental health constituted Brady material in Section III.A.1.a supra, Defendant was aware of

Landers's mental health and the fact she received treatment before trial.  (See Doc. No. 374 at 11.)

Additionally, as also discussed in that Section, Landers's testimony was corroborated by numerous

pharmacy records, Defendant's confession, and testimony from DEA Special Agent Smith, Dr.

Burch, six pseudo-patients, and Monica Harrison.  (See Doc. No. 267 at 142 ¶ 2 to 143 ¶ 4, 185

¶¶ 12-15, 188 ¶ 25 to 189 ¶ 12; see also Doc. No. 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23; 22 ¶¶ 3-

12, 23; 23  ¶¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24; 36 ¶¶ 11-15; 53 ¶ 10 to 62 ¶ 8; 71 ¶ 20 to 81

¶ 16; 105 ¶ 21 to 116 ¶ 20; see also Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15 145

¶¶ 15-18; 270 at 24 ¶¶ 2-25; see also Doc. No. 374 at 2.)  Any alleged new facts on Landers's mental health and receipt of treatment by themselves would not produce an acquittal or even probably produce one.

Furthermore, the same applies to the evidence regarding Baity/Chandler.  The alleged new evidence does not overcome the considerable amount of evidence showing Defendant engaged in a scheme to fill fraudulent prescriptions.  (See ids.)  Further, Baity/Chandler, who filled only one prescription for Defendant, did not testify at trial, further diminishing the efficacy of any new evidence about her.  (See Doc. No. 374 at 4-6.)  For these reasons, the alleged new evidence regarding Landers and Baity/Chandler do not warrant a new trial.

In sum, for the foregoing reasons, Defendant's Motions for a new trial (Doc. Nos. 359, 361-365, 369, 376, 395-96, 424) all will be denied.  The Court will now consider Defendant's Motions for Reconsideration, for Acquittal, to Compel, and to Dismiss.

### B.      Defendant's Motions for Reconsideration Will Be Denied

Defendant has filed three Motions for Reconsideration.  (See Doc. Nos. 360, 366, 418.)  In his first Motion, he challenges the Court's denial of two Motions to Suppress that sought to exclude from evidence items obtained from the rental car he was driving during his March 2013 traffic stop and arrest.  (See Doc. Nos. 255 at 1; 360 at 2-6.)  He contends that (1) the recent United States Supreme Court decision in Byrd v. United States, 138 S. Ct. 1518 (2018), created an intervening change in the law requiring suppression of the evidence, and (2) the "good faith" exception to the Fourth Amendment's warrant requirement is inapplicable to his case.  (See Doc. No. 360 at 2-6.)  In his second and third Motions for Reconsideration, Defendant asks the Court to reexamine its denial of a Motion to Dismiss he filed before trial, in which the Court held that no statute of

limitations violation occurred in his case.[24]  (See Doc. Nos. 157, 202, 366, 418.)

"The standard . . . to prevail on a motion for reconsideration is high . . . ."  Berry v. Jacobs IMC, LLC, 99 F. App'x 405, 410 (3d Cir. 2004).  Motions for reconsideration "are granted for compelling reasons . . . not for addressing arguments that a party should have raised earlier" and "they do not empower litigants . . . to raise their arguments piece by piece."  United States v. Dupree, 617 F.3d 724, 732-33 (3d Cir. 2010) (internal quotation marks omitted).  This high standard is rooted in judicial economy:

> Because of the interest in finality, at least at the district court level, motions for reconsideration should be granted sparingly; the parties are not free to re-litigate issues the court has already decided. . . .  [A] motion for reconsideration is not properly grounded in a request for a district court to rethink a decision it has already made, rightly or wrongly . . . .

Williams v. Pittsburgh, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998) (internal citations omitted).

"The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence."  Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 251 (3d Cir. 2010) (quotation marks omitted) (quoting Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)).  Thus, a proper motion for reconsideration "must rely on one of three grounds:  (1) an intervening change in controlling law; (2) the availability of new evidence;  or (3) the need to correct clear error of law or prevent manifest injustice."  Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (quotation marks omitted) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)).  However, "[a] motion for reconsideration 'addresses only factual and legal matters that the Court may have overlooked.  It is improper on a

---

[24] Defendant styled one of these two Motions as an "Amended Motion to Dismiss for Violation of Statute of Limitations."  (Doc. No. 418.)  Because this Motion repackages the statute of limitations argument contained in the original Motion to Dismiss (Doc. No. 157) and in the Motion for Reconsideration of the Motion to Dismiss (Doc. No. 366), it will be considered as another Motion for Reconsideration.

motion for reconsideration to ask the Court to rethink what it had already thought through—rightly or wrongly.'" In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 637, 640 (E.D. Pa. 2010) (quoting Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993)). Therefore, "[m]ere dissatisfaction with the Court's ruling . . . is not a proper basis for reconsideration." Progressive Cas. Ins. Co. v. PNC Bank, N.A., 73 F. Supp. 2d 485, 487 (E.D. Pa. 1999).

First, Defendant seeks reconsideration of the denial of his Motion to Suppress evidence seized during his March 2013 traffic stop and arrest because of an alleged intervening change in the law: the United States Supreme Court decision in Byrd v. United States, 138 S. Ct. 1518 (2018). (See Doc. No. 360.)  However, Byrd does not change the Court's prior decision.  To assert an infringement of Fourth Amendment rights, an individual must first show that he or she has a "legitimate expectation of privacy in the premises" searched.  Rakas v. Illinois, 438 U.S. 128, 143 (1978).  Without an expectation of privacy in the premises, no Fourth Amendment violation can occur.  See Byrd v. United States, 742 F. App'x 587, 588 n.2 (3d Cir. 2018) ("[T]he question of whether a defendant has Fourth Amendment standing is distinct from the question of whether the search itself comported with the Fourth Amendment . . . .").  In Byrd, the Supreme Court held that "the mere fact that a driver in lawful possession or control of a rental car is not listed on the rental agreement will not defeat his or her otherwise reasonable expectation of privacy."  138 S. Ct at 1531.

Defendant only could be afforded Fourth Amendment protections if he had a reasonable expectation of privacy in the rental car he was driving.  In reviewing the merits of the Motion to Suppress, this Court considered whether the police search of the rental vehicle comported with the

Fourth Amendment.[25]  (See Doc. No. 255 at 12-15.)  The Court denied Defendant's Motion to Suppress on a ground unrelated to the fact that he was not listed on the car's rental agreement. (See id. at 13-15.)  As the Court wrote in the Opinion denying the Motion to Suppress:

> Police officers are permitted to conduct inventory searches of lawfully seized vehicles without a warrant.  United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (citing Colorado v. Bertine, 479 U.S. 367, 371 (1987)).  Three objectives are served when conducting an inventory search:  "(i) the protection of the owner's property while it remains in police custody;  (ii) the protection of the police against claims or disputes over lost or stolen property;  and (iii) the protection of the police from potential danger."  Id. (citing South Dakota v. Opperman, 428 U.S. 364, 368 (1976).  A caveat to this directive, however, is that the search must be conducted in accordance with some established standard or routine consistent with a purpose that is noninvestigative.  Mundy, 621 F.3d at 288 (3d Cir. 2010) (citing United States v. Salmon, 944 F.2d 1106 at 1120-21 (3d Cir. 1991) (citations omitted)).  This ensures that officers are "not [ ] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime." Id. (brackets in original) (citing Florida v. Wells, 495 U.S. 1, 4 (1990)).

> Officer Haas testified that when he and Officer Palmer stopped Defendant for a traffic violation, they seized the vehicle Defendant was driving because he was an unauthorized driver under 75 Pa. Cons. Stat. § 1574(a).  (Doc. No. 206 at 23.)  A representative of Budget, as the owner of the vehicle, informed them that Defendant was not the lawful owner of the car and was not authorized to drive it.  After seizing the car, the officers conducted an inventory search of the vehicle.  In deciding to conduct an inventory search, Officer Haas stated that he relied upon the Philadelphia Police Department's routine procedures when taking one's property:

>> Any time that you are taking somebody's property you're going to search and make sure that - - you're going to search the property and make sure that you're not missing anything. You don't want to have a person make an allegation that you took something of theirs from their property that will later come down.  And we want to document everything that is in the vehicle.

> (Id. at 24.)  He further explained that they conducted the search of the vehicle "to make sure there weren't any weapons or any other kind of contraband."  (Id. at 23.) Officer Haas also said that in an unrelated case, he received a verbal reprimand for failure to voucher an item of property after a vehicle search.  (Id. at 26.)

---

[25]  Although the Court did not say directly that Defendant had standing, because the Court considered the Motion on the merits, it is evident that the Court found sub silentio that Defendant had standing.  Thus, Byrd was followed.  See Byrd v. United States, 138 S. Ct. 1518, 1531 (2018).

Additionally, Officer Palmer stated that he received training on inventory searches and followed routine procedures that he was trained on while he conducted the search of the Ford Taurus Defendant had been driving.  (Id. at 54.)

The officers did the inventory search not only to ensure that Defendant would not accuse them on of theft or tampering with his property, but also to protect themselves in case they uncovered any weapons or dangerous items.  Based on the officers' testimony, it is clear that at the time of the search and seizure of the Ford Taurus, there were established procedures within the Philadelphia Police Department on when and how to conduct inventory searches.  The officers acted in accordance with these procedures and did not exceed their authority when they conducted the inventory search.  Thus, the inventory search was lawful and items recovered from that search will not be suppressed.

(Id.)  As the above analysis shows, the Court denied Defendant's Motion because it determined the inventory search of the rental car was lawful, not because Defendant lacked standing to challenge the inventory search.  (See id.)  Thus, Byrd does not give Defendant footing to challenge the denial of his Motion to Suppress.

Second, in his first Motion for Reconsideration Defendant also requests reconsideration of the denial of his Motion to Suppress because the "good faith" exception to the Fourth Amendment's warrant requirement is inapplicable to his case.[26]  (See Doc. No. 360 at 5-6.)  The Court, however, did not rely upon the "good faith" exception when denying his Motion to Suppress.  (See Doc. No. 255.)  Regardless, Defendant does not rely on any change in the law, new evidence, or clear error regarding the good faith exception.  (See id.)

Finally, in the latter two Motions, Defendant argues that this Court should reconsider its denial of a Motion to Dismiss he filed before trial, in which he argued a violation of the statute of limitations.  (See Doc. Nos. 366, 418.)  The Third Circuit has held that when the Government

---

[26] The "good faith" exception to the Fourth Amendment's warrant requirement provides that evidence obtained by police without a warrant is not subject to exclusion from a criminal trial "when police officers act with an objectively reasonable good-faith belief that their conduct is lawful . . . ."  Davis v. United States, 564 U.S. 229, 238 (2011) (quotation marks and citation omitted).

obtains a superseding indictment, the date when an original indictment was filed is controlling for statute of limitation purposes if the superseding indictment does not materially broaden or substantially amend the charges from the first indictment.  See United States v. Oliva, 46 F.3d 320, 324 (3d Cir. 1995) (citing United States v. Friedman, 649 F.2d 199, 204 (3d Cir. 1981)).  On November 9, 2017, the Court issued an eight-page Opinion and denied Defendant's Motion to Dismiss, holding Defendant's Superseding Indictment was not barred by the relevant statute of limitations:

> Most importantly, the statutory violations in the counts challenged in the Superseding Indictment (2 to 13) are the same as the statutory violations in the original Indictment.  They obviously contain the same elements that must be proved beyond a reasonable doubt by the Government in order to obtain a conviction. Moreover, the charges on each of the substantive counts in the Superseding Indictment do not expose Defendant to a greater sentence.  By significantly reducing the number of violations, his sentencing exposure actually has been reduced.

> Moreover, Counts 2 to 13 of the Superseding Indictment allege that Defendant distributed Endocet or oxycodone and acquired Endocet or oxycodone by fraud between June 4, 2011 and November 2, 2011, at pharmacy locations in Philadelphia, Pennsylvania.  The comparable Counts in the original Indictment allege the same offenses, on the same dates, with the same type of drug, acquired at pharmacies in the same city.  Once again, Endocet is a form of oxycodone.  They also use the same language to describe the manner in which the offenses were committed.  For all these reasons, the charges contained in the Superseding Indictment did not materially broaden nor substantially amend the original charges.

> Defendant has had notice of the allegations in the Superseding Indictment and the underlying evidence for a considerable period of time.  He is aware of the activities the Government is charging him with and has had plenty of time to prepare a defense.

(Doc. No. 202 at 7.)  In his instant Motion, Defendant does not present any change in law, new evidence, or clear error by the Court, and he merely asks the Court to rethink what it had already thought through.  See In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d at 640.  For this reason, Defendant's other Motions for Reconsideration (Doc. Nos. 366, 418) also will be denied.

### C.   Defendant's Motions for a Judgment of Acquittal Will Be Denied

Defendant's next category of post-trial Motions consists of three Motions for a Judgment of Acquittal.  (Doc. Nos. 367-68, 373.)  In his first and third Motions, he raises identical arguments that no rational jury could have found him guilty of conspiring to distribute oxycodone and acquiring oxycodone by fraud.  (See Doc. Nos. 367, 373.)  In his second Motion, he contends that the Government created a variance between the conspiracy charge in the Superseding Indictment and the evidence presented at trial.  (See Doc. No. 368.)  Each will be discussed seriatim.

### 1.   Defendant's First and Third Motions for a Judgment of Acquittal

Defendant's first and third Motions for Acquittal, which are identical, repackage the arguments set forth in his Motion for a Judgment of Acquittal made at trial.  (See Doc. Nos. 270 at 127 ¶ 8 to 140 ¶ 24; 367 at 3-9; 373 at 3-9.)  After the Government rested its case, Defendant moved for acquittal on all counts against him.  (See Doc. No. 270 at 127 ¶ 8 to 130 ¶ 12.)  His arguments on the insufficiency of the Government's case focused on the following:

> The [acquiring] counts, I guess it's [8] through [13]—the Government has not established any facts that it was I who presented those prescriptions.  Monica Harrison has testified that she didn't verify any discussions in my name.  In regards to Ramon Pharmacy, they have no ID on file.  They have the wrong phone number. They don't have my proper address.  They don't have no records to indicate that it was I that filled that prescription at Ramon Pharmacy.
>
> In regards to Lehigh Pharmacy, besides the fact that it's an ID on file, they have no evidence that it was I that filled that prescription at the pharmacy.  They weren't verified by Monica, as I said earlier, also, as well as Ramon Pharmacy and Lehigh. No -- none of those prescriptions was verified by Monica.  They didn't introduce no evidence that Monica verified them.  On her own testimony, she says that she doesn't -- I didn't fill any prescriptions in my name. She didn't give me no prescriptions in my name. So the Government has no evidence, in particular, to those counts.
>
> Only count that they have any kind of evidence to is -- would be Count [8], because of the fact that it's an ID on file, that someone presented that ID and that phone number to the pharmacy in filling that prescription.  Besides that, they have no evidence to support all of the evidence for Counts [8] to [13].

In regards to the conspiracy count, the elements of conspiracy . . . . Now the elements of conspiracy are a shared unity of purpose and intent to achieve a common goal and an agreement to work towards that goal. And to sustain that burden, the Government must show those elements and prove that the defendant entered into an agreement and knew that agreement had the specific unlawful purpose charged in the indictment.

Now that applies to me and/or other alleged co[]conspirators. Now throughout the trial, either the alleged pseudo-patients either testified that they had no knowledge of what I was going to do with the medication [when] I received it, and it was never informed by me on what I was going to do with the medication. Other pseudo-patients have mentioned that their goal and filling the prescription was to support their addiction. And the Government alleged that my goal was to make money from distributing the drugs on the streets of Philadelphia. So there has been no common goal -- either no common goal between I and the alleged co[]conspirators or those co[]conspirators has no -- was not knowingly and intentionally conspirators. They had no willful intent, that they had no knowledge of what I was going to do with the medication once I received it. And even if they did have knowledge, case law states that mere knowledge of the illegal activities of another is not enough to support an inference of an agreement to join a conspiracy, because even active assistance is not always sufficient. One may know of and assist even intentionally of a substantive crime without joining a conspiracy to commit it.

. . .

So either the witnesses have either said they didn't know what I was going to or they testified that they were forced to do things, or that their goal was different from mine. So the elements of the conspiracy have not been met.

(Id. at 127 ¶ 8 to 128 ¶ 10, 128 ¶ 12 to 129 ¶ 13, 130 ¶¶ 9-12.)

In once again asserting in the post-trial Motions these arguments regarding his conspiracy conviction (Count 1), Defendant alleges that no conspiracy existed because the pseudo-patients were unaware of his intent to sell the obtained pills. (See Doc. Nos. 270 at 130 ¶¶ 4-12; 373 at 3-7.) And regarding his acquisition count convictions (Counts 8 and 9), he contends that the Government did not prove Defendant filled prescriptions in his own name. (See Doc. Nos. 270 at 133 ¶¶ 14-19, 134 ¶¶ 8-10; 373 at 8-9.)

Defendant seeks relief pursuant to Federal Rule of Criminal Procedure 29. (See Doc. No. 373 at 2.) Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may file a

motion for judgment of acquittal based on insufficient evidence presented at trial.  See Fed. R. Crim. P. 29(c).  On a motion for judgment of acquittal under Rule 29, the court must decide whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial.  United States v. Caraballo-Rodriguez, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see also United States v. Freeman, 763 F.3d 322, 343 (3d Cir. 2014).  The court must view the evidence in a light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision."  Caraballo-Rodriguez, 726 F.3d at 430 (quoting United States v. Gambone, 314 F.3d 163, 170 (3d Cir. 2003)).  This standard is highly deferential and dictates that it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its] judgment for that of the jury."  Id. (citations omitted).  The decision to overturn a conviction based on insufficient evidence may only be made "where the prosecution's failure is clear," United States v. Leon, 739 F.2d 885, 890 (3d Cir. 1984) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)), or where the verdict "fall[s] below the threshold of bare rationality," Caraballo-Rodriguez, 726 F.3d at 431.

Here, viewing the evidence in the light most favorable to the Government, sufficient evidence was presented at trial to support the convictions.  First, the Government presented substantial evidence in support of Defendant's conspiracy conviction (Count 1).  Each pseudo-patient who testified said they agreed to acquire a controlled substance for Defendant.  (See Doc. No. 270 at 132 ¶¶ 9-13.)  The Government also presented pharmacy records recounting each fraudulent prescription's filling, phone records showing Defendant's contacts with the pseudo-patients and Dr. Burch employees, a stack of Dr. Burch prescriptions found in Defendant's hotel room, and a false prescription containing Defendant's fingerprint.  (See id. at 131 ¶¶ 14-16, 132

¶¶ 16-23.)  Furthermore, Defendant confessed to DEA Special Agent Gobin that he worked with others to obtain fraudulent Dr. Burch prescriptions, recruited pseudo-patients, obtained oxycodone pills, and distributed the pills.  (See id. at 133 ¶¶ 1-5.)  This substantial evidence requires upholding the jury's conviction on the conspiracy charge.

Second, regarding his acquisition convictions (Counts 8 and 9), the Government presented evidence such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Caraballo-Rodriguez, 726 F.3d at 431.  To show Defendant acquired oxycodone by fraud, the Government presented evidence including the pertinent pharmacies' prescription records on the dates and at the times when Defendant allegedly filled the prescriptions.  (See Doc. No. 270 at 130 ¶ 22 to 131 ¶ 1.)  The prescriptions in those records contained Defendant's name, address, and phone number.  (See id. at 131 ¶¶ 1-6.)

Moreover, Defendant's acquittal on four of the six acquisition counts (Counts 10-13) does not undermine his convictions on two of the acquisition counts (Counts 8 and 9).  Each acquisition charge refers to a separate occasion when Defendant attempted to fill a fraudulent prescription in his own name.  (See Doc. Nos. 250 at 2-3; 374 at 4-6.)  The jury's decision that Defendant did not fill prescriptions in his own name on four occasions stands separate from their finding that he did so twice.  It shows that the jury followed the Court's instruction to consider whether the evidence supports a finding of guilt on each charge separately.  For all these reasons, Defendant's first and third Motions for a Judgment of Acquittal (Doc. Nos. 367, 373) will be denied.

### 2.    Defendant's Second Motion for a Judgment of Acquittal

Defendant also filed a Motion for a Judgment of Acquittal in which he contends there was a variance between the conspiracy charge in the Superseding Indictment and the facts presented at trial.  (See Doc. No. 368 at 2-6.)  In his Motion, he claims the Superseding Indictment charged him with an overarching conspiracy to obtain oxycodone by fraud, but the trial evidence proved

numerous conspiracies:  (1) one conspiracy where Defendant worked with Harrison and his sister

Marquita Fields to fill prescriptions with pseudo-patients;  and (2) a second conspiracy where

Defendant made his own prescriptions and filled them with separate pseudo-patients.  (See id. at

3.)

"Variances and constructive amendments are similar in that both involve variations

between the charges in an indictment and the evidence at trial."[27]  Vosburgh, 602 F.3d at 532

(quotation marks and citation omitted).  There are, however, important differences between the

two:

> A variance occurs where the charging terms of the indictment are not changed but
> when the evidence at the trial proves facts materially different from those alleged
> in the indictment.  Not all variances constitute reversible error.  A variance result[s]
> in a reversible error only if it is likely to have surprised or has otherwise prejudiced
> the defense.  To demonstrate prejudice from a variance, the defendant must show
> that the variance prejudiced some substantial right.  A variance that sufficiently
> informs the defendant of the charges against him and allows him to prepare his
> defense without being misled or surprised at trial does not prejudice the defendant's
> substantial rights.  Constructive amendments, by contrast, are per se reversible
> under harmless error review, [and] are presumptively prejudicial under plain error
> review.

Id. (alterations in original) (footnote omitted) (quotation marks and citations omitted).  "[T]he

concerns raised by a variance argument are the fairness of the trial and the protection of the

defendant's right to notice of the charges against [him] and [his] opportunity to be heard."  United

States v. Daraio, 445 F.3d 253, 261 (3d Cir. 2006).

When arguing a variance occurred on a conspiracy charge, the standard is whether when

"viewing the evidence in the light most favorable to the government, a rational trier of fact could

have concluded from the proof adduced at trial the existence of the single conspiracy in the

---

[27] Defendant also argues a constructive amendment of the Superseding Indictment occurred, which is addressed in Section III.A.4 supra.

indictment . . . ."  United States v. Greenidge, 495 F.3d 85, 93 (3d Cir. 2007) (citation omitted).

The Third Circuit has enumerated the following test to distinguish single and multiple

conspiracies:

> First, we examine whether there was a common goal among the conspirators.
> Second, we look at the nature of the scheme to determine whether the agreement
> contemplated bringing to pass a continuous result that will not continue without the
> continuous cooperation of the conspirators.  Third, we examine the extent to which
> the participants overlap in the various dealings.

United States v. Kelly, 892 F.2d 255, 259 (3d Cir. 1989) (quotation marks and citations omitted).

Importantly, a single conspiracy does not necessarily transform itself into numerous conspiracies

because of a change in personnel or the presence of sub-schemes within the conspiracy.  See id. at

258-59.

Here, no variance occurred between the conspiracy charges set forth in the Superseding

Indictment and the evidence offered at trial.  The Government presented evidence showing the

existence of a single conspiracy to obtain oxycodone by using fraudulent prescriptions.  For

example, each pseudo-patient and Landers testified about Defendant giving them fraudulent

prescriptions, his driving them to pharmacies to fill the prescriptions, and his paying them for the

pills received.  (See Doc. Nos. 268 at 21 ¶ 5 to 24 ¶ 22, 53 ¶ 7 to 54 ¶ 11, 72 ¶ 14 to 75 ¶ 10, 105

¶ 21 to 116 ¶ 20, 146 ¶ 16 to 181 ¶ 13; 269 at 78 ¶ 15 to 87 ¶ 22, 91 ¶ 11 to 111 ¶ 15.)  Additionally,

Harrison and Marquita Fields testified about Harrison filling out fraudulent prescriptions, selling

them to Defendant, and communicating with him prior to pharmacy verification calls, which was

all in furtherance of Defendant obtaining the oxycodone.  (See Doc. No. 267 at 170 ¶ 3 to 192

¶ 11.)  The fact that Defendant used different methods to obtain fraudulent prescriptions and

different pseudo-patients to fill those prescriptions does not change the overall common goal to

obtain oxycodone by fraud.  Each actor had a common goal to obtain pills by using the fraudulent

prescriptions and the scheme required the continuous cooperation of pseudo-patients to obtain the pills and of someone to create the prescriptions—whether that be Harrison, Defendant, or any other Dr. Burch employee.  All this evidence proved a single conspiracy, wherein Defendant served as the hub and others as the spokes.  The fact that Defendant had or engaged in a sub-scheme to sell the pills without the knowledge of other conspirators does not change the fact that a single conspiracy as charged in the Superseding Indictment was proved at trial.

In addition, Defendant has not shown that he was prejudiced or surprised by the alleged variance.  The Superseding Indictment contained information on his obtaining and creating fraudulent prescriptions and using numerous pseudo-patients to fill them.  (See Doc. Nos. 134 at 4 ¶¶ 8, 10; 374 at 24.)  Defendant's lack of surprise is further bolstered by his failure to object to the Government's opening arguments or to claim surprise during the testimony of coconspirators. (See Doc. No. 374 at 24.)  Their testimony was consistent with the charges in the Indictment and no prejudice has been shown.  Thus, Defendant's second Motion for Acquittal (Doc. No. 368) also will be denied.

### D.      Defendant's Motion to Compel Will Be Denied

On February 18, 2021, Defendant filed a Motion to Compel the Government to submit to the Court for an in camera review documents he claims are Brady material that were withheld from him.  (See Doc. No. 405 at 1-2.)  He asks the Court to review the following materials:

A.   All the materials mentioned in [(Doc. No. 364 at 5 n.6)], in regards to the individuals mentioned in footnotes 2 and 3 as well as Shineace Lee.[28]

B.   Any information from anyone who mentioned any of the above-mentioned individuals and their involvement in the filling of fake Dr. Burch prescriptions,

---

[28] Here, Defendant refers to his Amended Motion for a New Trial Based Upon Brady Violations, where he alleged the Government withheld evidence showing that Khalia Landers and Monica Harrison falsely accused him of filling prescriptions he did not fill, and that Landers and Harrison could not identify each other.  (See Doc. No. 364 at 2-3.)  This Motion is discussed more thoroughly in Section III.A.1.c supra.  (See id.)

unrelated to the Defendant.

C. Any information concerning any individual who accepted responsibility for any of the above-mentioned individuals (including themselves) in the filling of fake Dr. Burch prescriptions, unrelated to the Defendant.

D. Any grand jury testimony from Agent Jeremy Smith and Agent Gerald Gobin where they testify about the above-mentioned individuals and their involvement in the filling of fake prescriptions, and especially who they filled them for.

E. Khalia Landers' psychological examination, sentencing memoranda, and any other documents that reflect her mental impairments related to, and/or that may cause, confusion, memory loss, the inability to narrate and/or recall accurately and truthfully due to her psychological mental health conditions or medications for such conditions.

(Id. at 2.) The materials Defendant requests in footnote 6 of Document 364, one of his Amended

Motions for a New Trial Based Upon Brady Violations, are the following:

A. Any interviews, proffers, pleadings, testimony, and/or grand jury testimony of any of the above-mentioned individuals where they do not mention the Defendant and/or Marquita Fields as being a part of a scheme to fill fraudulent prescriptions.

B. Any evidence of any of the above-mentioned individuals being shown a photograph of the Defendant and not identifying the Defendant.

C. Any evidence of Khalia Landers and Monica Harrison being shown photographs of each other and failing to identify one another.

D. Any evidence showing that the government had phone records [noting contact] between the Defendant and any of the above-mentioned individuals.

E. Any evidence showing that other parties made statements that any of the above-mentioned individuals, in Footnote 3, were involved with the Defendant in filling fraudulent prescriptions.

F. Any evidence of an immunity agreement with any witness whether formal or informal.

(Doc. No. 364 at 5 n.6.)   Furthermore, the "individuals mentioned in footnotes 2 and 3" of

Document 364 are people Defendant claims Harrison identified as additional pseudo-patients, and

Shineace Lee is an individual Harrison believed Defendant purchased prescriptions from.  (Doc.

No. 364 at 2-3 nn.2, 3.)  None of these individuals, however, testified at Defendant's trial.

As discussed in Section III.A.1.c supra, the Court has already denied similar requests by Defendant.  (See Doc. No. 310 at 4-6.)  Previously, he filed a Motion and Amended Motion to Compel the Government to produce similar materials about these individuals.  (See Doc. Nos. 298, 304.)  In a six-page Order, the Court explained why Defendant is not entitled to these materials, stating:

> Defendant's Motions contain a lengthy list of names about which he seeks information, including Kenya Hollands, Brittany Rivera, Shineace Lee, Joyce Johnson, Monica Harrison, Khalia Landers, Dr. William Burch, Ramira Williams, Valerie Felder, Bruce McGrier, Alonzo Allison, Keith Covington, Terrance Carter, Shante Watson, Ihsanulla Maaf, Auguste Witherkeen, Asha Webb, Gregory Scales, Derrick Suggs, Paul Scota, and Agent Gobbons.  (Doc. Nos. 298, 305.)  He essentially wants all information on these persons in the Government's possession to be turned over to him.
>
> . . .
>
> The majority of the remaining information that Defendant requests in his Motion pertains to individuals who were not called to testify at trial and/or who were not part of the charges on which Defendant was convicted.  (Doc. No. 298 ¶ 4(c), (d), (e), (j), (k), (m), (u), (v), (x).)  Thus, the information is not subject to disclosure and there is no legal basis to require the Government to provide Defendant with these documents.
>
> Finally, Defendant has not made a showing that any of the requested documents are material to his guilt nor has he provided a legal basis for the considerable amount of his post-conviction discovery requests in this case.  Defendant received a vast amount of documents throughout his trial, including Jencks and Giglio material, and had the opportunity to cross-examine the Government's witnesses in depth at his trial.  Thus, Defendant's Motions (Doc. Nos. 298, 304) will be denied.

(Id. at 4-5.)

Defendant still "essentially wants all information on these persons in the Government's possession to be turned over to him."  (Id. at 4.)  The Government provided Defendant with a vast amount of information in this case, including "reports of interviews and proffers" with Harrison and Landers, information on Landers's mental condition, the grand jury testimony of Agents Smith

and Gobin, and reports of interviews, grand jury testimony or immunity and plea agreements of all witnesses who testified at trial.  (Doc. No. 374 at 12; see also Doc. Nos. 298 ¶ 4(c), (d), (e), (j), (k), (m), (u), (v), (x); 402 at 1; 410 at 2-3.)  Moreover, as the Court explained in its previous Order, Defendant is not entitled to materials "pertain[ing] to individuals who were not called to testify at trial and/or who were not part of the charges on which Defendant was convicted."  (Doc. No. 310 at 5.)  In sum, the evidence Defendant seeks in his Motion to Compel either has been provided to him or the Government is not required to provide.  For these reasons, his Motion to Compel (Doc. No. 405) will be denied.

### E.      Defendant's Motion to Dismiss Will Be Denied

Finally, on June 1, 2021, Defendant filed a Motion to Dismiss for Government Interference with Defense Access to Witnesses.  (Doc. No. 423.)  In the Motion, he contends the Government instructed two witnesses—Defendant's sister Marquita Fields and his wife Khalia Landers—not to talk with him.  (See id. at 3.)  In support, he cites portions of the witnesses' trial testimony wherein they affirmed a Government attorney told them not to discuss the case with anyone, including Defendant, and they abided by the direction.  (See Doc. No. 271 at 21 ¶¶ 11-23; 22 ¶¶ 3-5; 81 ¶¶ 10-12; 82 ¶ 21 to 83 ¶ 21).

"Generally, because witnesses belong neither to the defense nor to the prosecution, both must have equal access to witnesses before trial."  United States v. Bryant, 655 F.3d 232, 238 (3d Cir. 2011) (quotation marks and citation omitted).  But a defendant's due process rights are not "violated when a potential witness freely chooses not to talk; a witness may of [her] own free will refuse to be interviewed by either the prosecution or the defense."  Id. at 239 (quotation marks and citation omitted).  Thus, a Government request that a witness not disclose information falls short of "affirmative steps to restrict or stop witnesses from conferring with the defense" and does not violate due process.  Id. at 238.

Here, the Government did not interfere with Defendant's access to witnesses Marquita Fields or Khalia Landers.  First, Fields testified that she was advised not to speak with Defendant prior to being interviewed by federal agents on July 9, 2014.  (See Doc. No. 271 at 21 ¶¶ 2-16.) The Government's request was justified and did not interfere with Defendant's access to witness Fields because the interview occurred while his investigation was ongoing and before his arrest in 2015.  (See Doc. No. 430 at 4.)  Further, Defendant does not claim witness Fields was told not to speak with him after the investigative interview.  Thus, the Government did not actively inhibit Defendant's access to his sister.

Second, the Government did not interfere with Defendant's access to Landers.  Landers explained that she did not communicate with Defendant because her attorney "didn't think that that would be a good idea."  (Doc. No. 271 at 83 ¶¶ 3-4.)  She also noted that her separation order with Defendant prohibited her from interacting with him.  (See id. ¶¶ 15-16.)  The advice from Landers's attorney and her separation order with Defendant show that Landers freely chose not to talk with Defendant and not that the Government interfered with Defendant's access to her.  For these reasons, Defendant's Motion to Dismiss (Doc. No. 423) will be denied.

### F.     Defendant's Request for a Post-Trial Evidentiary Hearing Will Be Denied

Defendant requests an evidentiary hearing on his post-trial Motions.  (See, e.g., Doc. No. 415 at 2.)  But based on his allegations and a careful review of his Motions, a hearing is not required.  He offers no evidence of Brady or Giglio violations by the Government, and the purported newly discovered evidence does not meet the standard to grant him a new trial.  Further, he has not shown the Court should reconsider its prior rulings or acquit him on his three convictions.  All in all, Defendant's Motions are an attempt to retry his case and nothing in his Motions suggest that a hearing on the Motions is required.  This Court has had numerous hearings

with Defendant after trial (<u>see</u> Doc. Nos. 279, 295, 324, 344, 420), and no further hearings are required.  Appropriate rulings can and have been made on all his filings to date.

**IV.    CONCLUSION**

For all of the foregoing reasons, Defendant's nineteen post-trial Motions (Doc. Nos. 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 373, 376, 395, 396, 405, 418, 423, 424) will be denied.  An appropriate Order follows.