IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION NO. 15-129 |
| LAMAR FIELDS, | |
| Defendant. | |

## OPINION

**Slomsky, J.**                                                     **April 10, 2024**

### TABLE OF CONTENTS

I.   **INTRODUCTION** ........................................................................................... 1

II.  **BACKGROUND** ............................................................................................. 2

    **A. Offenses Charged and Evidence Presented at Defendant's Trial** ............................. 2

    **B. Hearing From February 7 to 10, 2023 on Defendant's Post-Trial Motions** ........... 13

    **C. Khalia Landers's Testimony** ........................................................... 17

        1. September 3, 2015 Pre-Sentence Report ................................................. 18

        2. November 21, 2017 Interview Notes ...................................................... 19

        3. November 30, 2017 Trial Testimony ...................................................... 19

        4. November 3, 2018 Psychological Evaluation ........................................... 19

        5. February 7, 2023 Testimony at Post-Trial Hearing ................................... 20

    **D. Other Witnesses at Post-Trial Motions Hearing** .................................. 33

III. **DEFENDANT'S OMNIBUS POST-TRIAL MOTIONS** .................................. 34

    **A. Defendant's Access to Witnesses** ................................................... 35

    **B. Discovery Matters** ......................................................................... 41

        1. Defendant has Failed to Show That His Lack of Access to His 2012 Phone Records Warrants the Relief he Requests ................................................. 43

        2. Defendant has Failed to Show That His Lack of Access to the Backside of the Prescriptions Filled at Lehigh Pharmacy Warrants the Relief he Requests ....... 43

        3. Defendant Has Not Shown Prejudice Resulting from an Alleged Discovery Violation ...................................................................... 44

    **C. Waiver of Counsel** ....................................................................... 49

**D. Motion to Suppress** .................................................................................................... 66

**E. Reasonable Doubt Instruction** ................................................................................. 74

**F. Statute of Limitations** ............................................................................................... 77

**G. Motion for Judgment of Acquittal on Count One** ................................................. 81

**H. Motion for Judgment of Acquittal on Counts Eight and Nine** .............................. 84

**I. Constructive Amendment** ......................................................................................... 85

**J. Variance** .................................................................................................................... 90

**K. Newly Discovered Evidence** ..................................................................................... 94

    1. Landers's Alleged Perjury about Gena Baity Is Not Newly
       Discovered Evidence .................................................................................... 102

    2. Landers's Alleged Perjury at Trial Regarding Her Involvement in the
       Conspiracy, Her Mental Health Conditions, and Her Medications Are Not
       Newly Discovered Evidence ......................................................................... 103

    3. Landers's Alleged False Testimony about Individuals Filling
       Prescriptions for Defendant Is Not Newly Discovered Evidence ......................... 107

**L. Brady Issues** ............................................................................................................. 107

    1. Immunity Agreements .................................................................................. 110

    2. Perjury ........................................................................................................ 111

    3. Khalia Landers's Mental Health Conditions ................................................. 113

    4. Alleged False Testimony by Khalia Landers and Monica Harrison ..................... 115

**IV. CONCLUSION** ........................................................................................................ 119

I.      **INTRODUCTION**

On April 1, 2015, a grand jury returned a sixty-three (63) count Indictment charging Defendant Lamar Fields with the following offenses:  conspiracy to knowingly and intentionally distribute oxycodone (Count 1);  knowingly and intentionally distributing, and aiding and abetting the distribution of oxycodone (Counts 2 to 32);  and knowingly and intentionally acquiring, and aiding and abetting the acquisition of oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge (Counts 33 to 63).  (See Doc. No. 1 at 1.)  On April 12, 2017, the Indictment was superseded, charging the same offenses, but in fewer counts:  conspiracy to knowingly and intentionally distribute oxycodone (Count 1); knowingly and intentionally distributing, and aiding and abetting the distribution of, oxycodone (Counts 2 to 7); and knowingly and intentionally acquiring, and aiding and abetting the acquisition of oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge (Counts 8 to 13).  (Doc. No. 134.)  At trial, the Government proceeded only on the charges of conspiracy (Count 1) and acquiring a controlled substance by fraud (Counts 8 to 13).  (See Doc. No. 310 at 2.)

After a nine-day trial from November 27 to December 8, 2017, at which Defendant represented himself with the assistance of standby-counsel, a jury acquitted Defendant on several acquisition of oxycodone by fraud charges (Counts 10 to 13), but convicted him on the conspiracy charge and two acquisition of oxycodone by fraud charges (Counts 1, 8, and 9).  (See Doc. No. 250 at 1-3.)

Before the Court is Defendant's Second Amended Post-Trial Omnibus Motion, which covers a plethora of post-trial Motions in which Defendant contends that his convictions should

be overturned, a judgment of acquittal entered, or a new trial awarded.  (Doc. No. 564.)[1]  For all

the reasons that follow, Defendant's Second Amended Post-Trial Omnibus Motion will be denied.

## II.     BACKGROUND

### A.     Offenses Charged and Evidence Presented at Defendant's Trial

To begin, on October 2, 2015, before his trial, Defendant requested that he be permitted to

represent himself pro se.  (See Doc. No. 285 at 4 ¶ 20.)  In response, the Court went through a

detailed colloquy to ensure Defendant understood the nature of his request.  (See id. at 5 ¶¶ 5-6,

14-16, 6 ¶ 24 to 7 ¶ 7.)[2]  At the colloquy hearing, the Court found that Defendant knowingly and

voluntarily waived his right to counsel and permitted him to represent himself, but appointed

standby-counsel to assist him.  (See Doc. No. 285 at 26 ¶¶ 6-8, 27 ¶¶ 14-15.)  Thereafter, at the

nine-day trial, the Government presented evidence showing that Defendant used eleven

individuals, as well as himself, to obtain at least 8,310 oxycodone pills,[3] containing approximately

147,800 milligrams of oxycodone, with a street value of over $100,000.  (See Doc. No. 374 at 3-

6.)

As noted, a jury convicted Defendant of conspiring to distribute oxycodone and acquiring

oxycodone by fraud.  (See id. at 1.)  To challenge his convictions, Defendant has filed a 92-page

Second Amended Post-Trial Omnibus Motion with two attachments totaling 26 pages.  (Doc. No.

564.)  Resolving the Omnibus Motion necessitates recounting the scheme Defendant put in place

---

[1]   The post-trial activity in this case has been extensive.  Defendant has been afforded considerable
leeway in pursuing his claims; given his pro se status.  Standby-counsel has assisted Defendant
to a considerable extent.  As of the date of this Opinion, the docket in this case has reached
number 573.

[2]   The colloquy is set forth in Section III.A.2, infra.

[3]   Some of the pills acquired by Defendant used the brand-name Endocet, which is a combination
of oxycodone and acetaminophen.  (See Doc. No. 374 at 4-6.)

to obtain the oxycodone, the role played by numerous individuals in the scheme, and the evidence presented at his ensuing trial.

From 2011 through 2013, Defendant used fraudulent prescription pads to obtain oxycodone pills and to sell them to others.  (See Doc. No. 374 at 1.)  Initially, Defendant obtained prescription pads from co-conspirator Monica Harrison, a medical assistant employed by Dr. William Burch, M.D.[4]  (See id. at 2.)  For a fee, Harrison would steal blank prescriptions from Dr. Burch's office without his knowledge.  (See id.; Doc. No. 267 at 170 ¶¶ 3-10.)  She then would fill out the prescriptions with information needed to obtain the pills at a pharmacy, such as:  the quantity and dosage of oxycodone pills to be obtained, Dr. Burch's forged signature, his Drug Enforcement Administration ("DEA") number, and identifying information for "pseudo-patients," which is a term used to describe individuals who would be filling the prescription.  (See Doc. Nos. 267 at 174 ¶¶ 21-23, 175 ¶¶ 11-15; 374 at 2.)  The pseudo-patients were not Dr. Burch's patients.  He did not prescribe the medicine on the forged prescriptions.  (See Doc. No. 374 at 2.)  At times, Defendant and co-conspirator Khalia Landers, his wife, also posed as pseudo-patients.  (See id.)

Harrison did not work alone, however, in misusing Dr. Burch's prescription pads.  Two other Dr. Burch employees, Ramera Williams and Marquita Fields, Defendant's sister, aided Harrison.  (See Doc. No. 267 at 170 ¶¶ 20-22.)  According to Harrison's testimony at trial:

> We would take [prescriptions] out of the book and [write] whatever medication that [Defendant] wanted . . . Ramera would sign it.  Again, I would fill the prescription out for the medical dosage, I would write the name, date of birth, and also the DEA number.

(Id. at 175 ¶¶ 11-15.)  Marquita Fields answered telephone calls from pharmacies seeking verification of the prescription, a process discussed further below.  (See id. at 174 ¶¶ 24-25, 178 ¶

---

[4]   As will be discussed below, at some point in 2012, Defendant made his own fraudulent prescriptions without Harrison's participation.  (See Doc. No. 374 at 3.)

23 to 179 ¶ 3.)  The identifying information written on the prescription was provided by Defendant to Harrison.  (See id.)  Written on the prescription was the name of the person who would fill the prescription and the drug type and quantity to be filled.  (See id.)  Once the fraudulent prescriptions were prepared with Defendant's specifications, he would pick up the prescriptions at various locations around Philadelphia or at Dr. Burch's office.  (See id. at 181 ¶¶ 11-13.)

Once in receipt of the false prescriptions, Defendant and Khalia Landers, his wife, would recruit individuals to serve as pseudo-patients to fill the prescriptions.  (See Doc. No. 374 at 2.) Overall, they recruited eleven individuals to serve as pseudo-patients, six of whom testified at Defendant's trial.  (See, e.g., Doc. No. 267 at 141 ¶ 23 to 143 ¶ 4.)  For instance, pseudo-patient Aisha Patton testified that Defendant told her she could "make some extra money by filling some" illegitimate prescriptions for him.  (Doc. No. 268 at 21 ¶¶ 10-11; see also id. at 36 ¶¶ 11-15.)  She described how she and Defendant filled the prescriptions:

> [H]e would meet me, bring me the prescriptions, we would then drive to the pharmacy . . . .  [H]e would drive. . . .  I would then get out with the prescriptions, a certain amount of money, go into the pharmacy and get it filled. . . .  At that time I knew his sister was working [for Dr. Burch].  And he would . . . call her to say that we were about to go into the pharmacy and then the pharmacy w[ould] call the doctor and I believe his sister would be the one that would answer the phone. . . . He told me his sister worked there. . . .  [I paid with m]oney that [Defendant] gave me. . . .  I would bring [the filled prescription] back out, give it to [Defendant]. . . . [In return I would get] two bottles or two hundred dollars. . . .  Oxycontin was the . . . [first prescription].  I don't remember the second one. . . .  [He would] put [the pills] in the glove compartment. . . .  Sometimes he would come past my house, sometimes he would call me by phone. . . .  [I would provide the pharmacies with] my name, my address and telephone number. . . .

(Id. at 21 ¶¶ 16-17, 19, 22-23; 22 ¶¶ 5-10, 12, 23; 23 ¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24.)

According to Patton and Harrison, pharmacies engaged in different prescription verification measures when an individual was trying to fill a prescription.  (See Doc. Nos. 267 at 176 ¶¶ 23-25; 268 at 22 ¶¶ 3-18.)  Generally, the process involved the pharmacist calling the

prescribing physician's office to confirm "the name and the date of birth [of the person filling the prescription] and the dosage that was on the prescription . . . that they were taking into the pharmacy . . . matched." (Doc. No. 267 at 176 ¶¶ 23-25.) Defendant would tell Harrison and his sister via text message what time a pseudo-patient was going to fill a prescription so one of them could answer a call from a pharmacy and falsely confirm the prescription's validity. (See id. at 185 ¶¶ 12-15; see also Doc. Nos. 268 at 22 ¶¶ 3-12; 374 at 2.)

Patton testified that she filled prescriptions for Defendant "[a]bout seven [or] eight times," based on when Defendant asked her for help. (Doc. No. 268 at 23; see also id. at 5-7.) She stated that others were in the car twice when she went to pharmacies with Defendant. (See id. at 26 ¶¶ 2-7.) One time she was with Kaleana Harvey, another pseudo-patient who was filling a prescription for Defendant, and once with Khalia Landers. (See id. at 26  ¶¶ 2-7, 27 ¶ 22 to 28 ¶15.) Each time, except for the final one, Defendant followed the same routine. (See id. at 25 ¶ 23 to 26 ¶ 1.) According to Patton, however, the final time did not go according to plan:

> The last time I went to go fill it . . . I took my two daughters. I don't never take them with me. And I had no one to watch them when I went to the pharmacy, but I needed the money at that time. So I took my two youngest daughters with me. . . . I took them out [of] the car, cause my daughter started crying, so they went into the pharmacy with me. And I handed [the prescription] over to the pharmacist like I do any other time. And he asked my daughters, do they love me and do I love them, and we both replied, yes. And he said well, grab a hold of them and just hug them . . . and he put a big X on the prescription and told me to get . . . out of his pharmacy. . . . I ran out [of] the pharmacy. . . . [Defendant] laughed.

(Id. at 34 ¶¶ 3-7, 12-18, 24, 35 ¶ 6.) After this incident, Patton ceased filling prescriptions for Defendant. (See id. at 35 ¶¶ 9-10.)[5]

---

[5] Patton later received a letter from the Government stating she was a target of an investigation. Defendant suggested that she could "fix this . . . . [b]y coming up with a story about some lady named Monica." (Doc. No. 268 at 35 ¶¶ 20, 22.) Defendant suggested that Patton lie about Monica Harrison working as "a therapist or something of that nature and . . . that she came to

At trial, five other pseudo-patients—Alana Russell, Shante Watson, Kaleana Harvey, Mario Mazziotti, and Ronald Knopman—testified about their participation in the conspiracy at Defendant's direction.  (See id. at 53 ¶ 10 to 62 ¶ 8, 71 ¶ 20 to 81 ¶ 16, 105 ¶ 21 to 116 ¶ 20; see also Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15.)  This included Defendant recruiting them with Khalia Landers's help, asking them to fill prescriptions with the pseudo-patients' identifying information, picking them up and driving them to a pharmacy, giving them money to pay for the prescription, obtaining the pills, and paying them in cash and/or pills for their services.[6] (See id.)  Several pseudo-patients noted Defendant filled out these prescriptions while they were in his car.  (See Doc. Nos. 268 at 55 ¶¶ 12-15, 23-25; 269 at 81 ¶¶ 14-20.)

In late 2011, Defendant's scheme began to unravel.  (See Doc. No. 267 at 188 ¶¶ 16-17.) Harrison informed Defendant that she no longer had "scripts" to give him, and he became enraged. (See id. at 188 ¶¶ 10-25.)  According to Harrison:

> He was very angry.  I had went to the house where his mother and sister dwell . . . .  And I was talking to his sister.  We were talking about this is the end, we were going to stop.  [Defendant] came in ranting and raving, calling me, his mother, sister are full of [expletive], and asking where his money was, one of us stole it.  He also was saying that . . . we owed him 10 more people he had to do.[7] We didn't fulfill our end of the bargain with filling the rest of his scripts.  And he didn't care.  He said [expletive] me, pulled out a gun—well, showed it, and said that he didn't care about me.  He cared more about his sister because she has a daughter, so [expletive] me, and when he got to that point, I just left.

---

[Patton] with the proposition" of providing Patton with legitimate prescriptions.  (Id. at 36 ¶¶ 5-7; see also id. ¶¶ 8-10.)

[6]  Only pseudo-patient Patton testified that Defendant placed calls to Dr. Burch's employees to inform them that they were about to fill a prescription at a pharmacy.  (See Doc. No. 268 at 22 ¶¶ 3-18.)  Co-conspirators Harrison and Landers confirmed Patton's testimony.  (See Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 152 ¶¶ 7-15.)

[7]  Harrison understood the phrase owing ten (10) more people to mean that "[Defendant] wanted 10 more people to go into the pharmacy to fill the fake scrip[t]s."  (Doc. No. 267 at 190 ¶¶ 1-2.)

(Id. at 188 ¶ 25 to 189 ¶ 12.)  Harrison also testified that the following day Marquita Fields, Defendant's sister, told her that the fight continued after she left, and "it got physical in front of [Marquita Fields's] daughter. . . .  She showed me bruises that was on her arms."  (Id. at 190 ¶ 24, 191 ¶¶ 7-8.)  Defendant overcame the prescription shortage by making his own prescriptions by photocopying blank prescriptions belonging to Dr. Burch.[8]  (See id. at 191 ¶ 21 to 192 ¶ 5.)

In addition to testimony from Harrison and six pseudo-patients, Khalia Landers, Defendant's wife, co-conspirator, and a pseudo-patient, testified as a Government witness.  (See Doc. No. 268 at 140 ¶ 4 to 181 ¶ 13.)  She said that Defendant asked her to fill prescriptions for him.  (See id. at 146 ¶¶ 16-22, 147 ¶¶ 1-5.)  She testified that he drove her to a pharmacy, gave her money and a prescription with her personal information on it, and took the pills Landers had received.  (See id. at 147 ¶ 14 to 150 ¶ 25.)  Corroborating the testimony of Harrison and Patton, Landers said that Defendant would call Harrison or his sister at Dr. Burch's office before she entered the pharmacies.[9]  (See Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 22 ¶¶ 3-18, 151 ¶¶ 19-25, 152

---

[8]  Khalia Landers testified that Defendant drove to a photocopy store in the Cheltenham Mall in Philadelphia, Pennsylvania and "presented a . . . blank prescription to [a worker] and asked him could he make some prescription papers like that."  (Doc. No. 268 at 170 ¶¶ 16-18.)  Additionally, Dr. Burch affirmed that some of the filled fraudulent prescriptions were not his prescriptions because they were a different color.  (See Doc. No. 267 at 158 ¶ 1 to 159 ¶ 14.)

[9]  Landers stated that she often overheard Defendant's conversations with Harrison and described them as follows:

> [S]he would be the one that picked up the phone in case whoever was at the pharmacy called and wanted to know like, did this doctor write the prescription, and she would say yeah, such and such, like got approved of it.

> So in case it was me, for instance, and I was the one that wanted the prescription filled, then she would say Khalia Landers, birthday 7/31/78, or whatever, like that was the one time was okay to get the prescription filled.  She verified them.

(Doc. No. 268 at 152 ¶¶ 7-15.)

at ¶¶ 20-25.)

According to Landers, she eventually learned that Defendant "was selling [the pills] to people wholesale." (Doc. No. 268 at 151 ¶ 18.)  Landers also testified that before entering the pharmacy, Defendant would sometimes instruct her to have a prescription for a certain drug filled because "some his clients wanted certain kinds of pills." (Id. at 149 ¶ 22 to 150 ¶ 5.)  She testified that Defendant promised her that he would help her get her children back and move into a bigger house in exchange for helping him acquire the prescription drugs he would sell to other people. (See id. at 178 ¶ 21 to 179 ¶ 6.)

Landers not only filled prescriptions but also recommended potential pseudo-patients to Defendant.  She testified:

> I knew a lot of times like my friends was always like struggling or going through things.  I mean, my brother [Jamar Cook] was always like back and forth between like different girls['] houses, or like moving around a lot and stuff like that, so I knew right off the top of my head that I can count at least like three people that . . . wouldn't mind . . . doing something like that. . . . [f]illing prescriptions for money. . . . Shante Watson, [Keiana] Phillips, and my brother Jamar Cook. . . . [W]hen we drove up on them and I was trying to talk to Shante, [Defendant] told me I ain't know like how to say it or whatever, and he was like you don't know how to talk to people.  He was like, let me talk to them.  So she got in the car and he started . . . talking to her about how he want her to do it and stuff.  And one of the things that struck out the most to me was, when he was like, when you go to these places, the pharmacies and stuff, he was like, you can't be dressed like that, like you a street-walker or out in the street.  Like you got to [dress] more appropriate, like cover your body more, cause she liked to dress like revealing her body and stuff like that.  So that was like one of the main things that stuck out to me.

(Id. at 155 ¶¶ 5-11, 14, 16-17, 22-25, 156 ¶¶ 1-10.)  Landers also said that she was with Defendant when he drove Watson, Phillips, Cook, and other pseudo-patients to pharmacies to fill prescriptions.  (See id. at 156 ¶¶ 11-15, 159 ¶¶ 22-24, 164 at ¶¶ 3-10.)  She also was in the car with Defendant when he drove to different locations to sell the prescriptions drugs.  (See id. at 172 ¶¶ 1-24.)

Eventually, Landers told Defendant that she no longer wished to participate in his scheme.
(See id. at 176 ¶¶ 17-25.)   According to her, Defendant responded in a manner similar to his
response when Harrison said she wished to withdraw:

> He was angry.  He ended up taking my driver's license and said he was going to
> get somebody else to start doing it . . . .  I know he was angry . . . .  And we would
> like fight and stuff like that. . . .  He said he was going to kill me and if he couldn't
> have me, nobody could have me.

(Id. at 177 ¶¶ 2-10, 14-15.)  She added that Defendant hit her more than once, and in response she
received a protection from abuse order.  (See id. ¶¶ 16-24.)

Defendant engaged in this scheme undetected by law enforcement for nearly two years.
(See Doc. No. 374 at 1.)  However, in March 2013, Philadelphia police conducted a traffic stop of
a rental car Defendant was driving, and Defendant gave them a false name and driver's license.[10]
(See id. at 3.)   After a search of the vehicle uncovered over $9,000 in cash in the glove
compartment, Defendant accompanied the police to their station and also permitted them to search
the hotel room where he was staying.  (See id.)  Upon entering the room, police found and seized
items suggesting Defendant's true identity, Defendant's driver's license, a piece of paper with
Defendant's name written on it, and other items showing Defendant was staying in the room.  (See
id.)  They also seized hundreds of fraudulent prescription slips.  (See id.)  Once Defendant learned
the officers knew his real name, he fled the police station.  (See id.)  He was apprehended, placed
in handcuffs, and put in the back of a police vehicle.  (See Doc. Nos. 206 at 104; 207 at 44, 69;
255 at 9-10.)

Thereafter, on May 15, 2015, federal agents arrested Defendant on the charges filed in this

---

[10]  The March 2013 traffic stop is discussed at length in an Opinion denying the Motion to Suppress
Evidence, dated December 18, 2017.  (See Doc. No. 255); United States v. Fields, No. 15-129,
2017 WL 6450605 (E.D. Pa. Dec. 18, 2017).

case.  (See Doc. No. 374 at 7.)  One of the agents who took part in the arrest, DEA Special Agent

Gerald Gobin, advised Defendant of his Miranda rights.  (See Doc. No. 268 at 121 ¶¶ 18-19.)  After

waiving his rights, Defendant proceeded to discuss his scheme with Gobin, which Gobin recounted

at trial:

> I then spoke with [Defendant] and told him I would explain everything to him and
> if he wants to talk to me he can, if he does not, he doesn't have to.  And I said . . .
> I just wanted to get an idea . . . of what his position was right now.  . . . I explained
> that this investigation has been going on a long time.  I'm aware of prescriptions
> being written, fake prescriptions being used in the name of Dr. Burch, they're being
> passed at multiple pharmacies by multiple individuals, and we've been, again,
> conducting this investigation for quite some time.
>
> I asked [Defendant] . . . if he wants [to] talk to me, tell me about the prescriptions
> that he's getting from Monica [Harrison], and he explained that he's getting
> prescriptions from [Harrison], who worked at Dr. Burch's office, for 200 to $250.
> I then asked him, were they filled out by [Harrison] or did someone else fill them
> out?  [Defendant] explained to me that he—or [Harrison] would fill out these
> prescriptions, sometimes before she met with him, and then there were occasions
> where she was in his presence and would write names and fill them out in his
> presence.  And I said, did you actually see her write on the prescriptions, and he
> told [me] he did.
>
> I then said, well, then what happened next with the prescriptions?  How were they
> passed?  [Defendant] told me that he recruited several individuals to go to various
> locations, various pharmacies, to hand off these prescriptions and collect the pills.
> And we continued on back and forth, and I . . . asked him, what people passed the
> prescriptions?  He said these were people he recruited.  He didn't give any names
> of who he recruited.  And I said, well, where did they go?  And two of the
> pharmacies he told me right off the top of his head . . . .  I then said, well, what
> happens with the pills after they're collected from the pharmacy?  He told me that
> he would use some of them, he would also party with females and he would give
> them some of the pills.  And at that point I asked him, what would he do with the
> pills that were left?  And he informed me that he would sell them.
>
> And then we continued on.  I asked him, who were his customers, if he could think
> of any, or who were his big customers?  He told me Mario Mazziotti and a male of
> Chinese [descent] named Dave, and that was the two customers he gave me.
>
> I then went into more of the investigation.  I let him know I had seen evidence that
> was collected by the Philadelphia Police Department resulting from [the March
> 2013] traffic stop and a search at a hotel room and there were prescriptions found
> in Dr. Burch's name.  [Defendant] told me that these were prescriptions he had

gotten from [Harrison].

(Id. at 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5.)

The Government corroborated these transactions with testimony from, among other witnesses, two DEA Special Agents, Dr. William Burch, and pharmacist Paul Scota. (See generally Doc. Nos. 267-70.) Of note, Dr. Burch testified that Defendant, Landers, and the other pseudo-patients were never his patients and were not prescribed the medications in the fraudulent prescriptions. (See Doc. No. 267 at 142 ¶ 2 to 143 ¶ 4, 145 ¶¶ 15-18.) He also described discrepancies in the fraudulent prescriptions that showed they were not written by him, such as formatting errors and misuse of medical terminology. (See id. at 146 ¶ 20 to 148 ¶ 22.)

Paul Scota, a pharmacist and owner of Lehigh Pharmacy, one of the pharmacies that filled the fake prescriptions, testified at trial and explained his process of verifying prescriptions, which included: checking government-issued identification for the patient and the person picking up the prescription, verifying personal identifying information on the prescriptions, calling the prescribing physician's office, and recording that the prescription was verified in a computer system. (See id. at 101 ¶¶ 2-4, 17-20, 112 ¶¶ 12-16, 114 ¶¶ 11-21.) Further, Scota described an additional verification measure he used. (See id. at 112 ¶¶ 12-21.) He would place a sticker on the back of the prescription to identify what drug had been filled and who verified the prescription. (See id.) He also wrote other notes on the prescription. (See id.)

Further, DEA Special Agent Jeremy Smith testified about the pharmacy transactions. (See Doc. Nos. 268 at 119; 270 at 3.) Agent Smith reviewed summary charts he prepared compiling pharmacy records for the filled fraudulent prescriptions. The charts showed the number of

prescriptions filled by each pseudo-patient and Defendant.[11]  (See Doc. No. 270 at 24 ¶¶ 2-25.) Additionally, Smith described the entries on Defendant's phone records, which showed that he was in contact with Harrison, his sister, and the other pseudo-patients while filling fraudulent prescriptions.  (See id. at 35 ¶ 25 to 37 ¶ 10, 42 ¶ 17 to 58 ¶ 1.)  Transactions by pseudo-patients are summarized in the following chart:

| Name of Pseudo-Patient | Number of Overt Acts[12] | Total mg of Oxycodone Obtained | Total Number of Pills Obtained |
|---|---|---|---|
| Gena Baity/Chandler | 1 | 1200 mg | 120 |
| Terrance Carter | 11 | 20100 mg | 990 |
| Jamar Cook | 18 | 31800 mg | 1860 |
| Lamar Fields | 2[13] | 3000 mg | 180 |
| Kaleana Harvey | 7 | 17400 mg | 1200 |
| Ronald Knopman | 2 | 6300 mg | 210 |
| Khalia Landers | 3 | 8700 mg | 450 |
| Mario Mazziotti | 2 | 6200 mg | 330 |

---

[11]  Defendant stipulated that his fingerprint was found on a false prescription filled by non-witness pseudo-patient Jamar Cook.  (See Doc. No. 270 at 131 ¶¶ 14-16.)

[12]  Each overt act refers to a separate date when Defendant and the pseudo-patient filled a prescription together.  (See Doc. No. 374 at 4-6.)

[13]  In the Superseding Indictment, the Government lists six overt acts involving a time when Defendant allegedly acquired oxycodone with fraudulent prescriptions in his own name.  (See Doc. No. 374 at 4-6.)  The above chart, however, only includes two of these overt acts.  The six overt acts correspond to the six acquisition counts in the Superseding Indictment.  (See Doc. No. 250 at 2-3.)  The jury found Defendant guilty of acquiring oxycodone on only two of the six occasions, and for this reason the Court includes only the two acquisitions by Defendant in the chart.  (See id.)

| Aisha Patton | 7 | 29100 mg | 1290 |
| Keiana Phillips | 10 | 13800 mg | 1020 |
| Alana Russell | 2 | 3000 mg | 180 |
| Shante Watson | 5 | 7200 mg | 480 |
| **TOTAL** | 70 Overt Acts | 147800 mg | 8310 Pills |

(See Doc. No. 374 at 3-6.)

Following the nine-day trial, a jury convicted Defendant of one count of conspiracy to knowingly and intentionally distribute oxycodone "from in or around April 2011 to in or around March 29, 2013" (Count 1) and two counts of acquisition of oxycodone by fraud and forgery occurring "on or about June 4, 2011" (Count 8) and "on or about July 1, 2011" (Count 9). (Doc. No. 250 at 1-2.) The jury acquitted Defendant of four acquisition charges occurring "on or about September 24, 2011, . . . October 1, 2011, . . . October 24, 2011, . . . [and] November 2, 2011" (Counts 10-13). (Id. at 2-3.) The six acquisition charges (Counts 8-13) refer to occasions where Defendant himself attempted to fill a fraudulent prescription in his own name. (See id.; Doc. No. 374 at 4-6.) Thus, the jury found that Defendant twice posed as a pseudo-patient. (See id.)

**B.      Hearing From February 7 to 10, 2023 on Defendant's Post-Trial Motions**

A post-trial hearing on Defendant's Omnibus Motion was held from February 7 to 10, 2023. It occurred over five (5) years after trial due to delays resulting from the Covid pandemic, the discovery Defendant sought, and the numerous post-trial motions he filed. Several hearings also had to be held in the interim. At the February 7 to 10, 2023 post-trial hearing, Defendant presented witnesses, exhibits, and arguments on his then outstanding post-trial Motions. The Motions pending at the time of the hearing were: (1) a Motion for Reconsideration (Doc. No.

439)[14]; (2) a Supplemental Motion for Reconsideration (Doc. No. 445); (3) a Motion for

Reconsideration Regarding Bail (Doc. No. 469)[15]; and (4) a Motion to Compel (Doc. No. 507).[16]

On February 8, 2023, the Court stated that it would "consider all the motions de novo." (Doc. No.

---

[14] On August 31, 2021, the Court had issued an Opinion and Order denying Defendant's then pending nineteen (19) post-trial motions. (Doc. Nos. 433, 434.) Defendant sought reconsideration for various reasons, among them that the Court said it would afford him an evidentiary hearing on his Motions. The hearing was held from February 7 to 10, 2023. To afford Defendant a full opportunity to pursue his post-trial motions, the Court vacated the Opinion and Order dated August 31, 2021. (Doc. No. 538.)

On June 26, 2023, Defendant submitted his Post-Trial Omnibus Motion, writing as follows:

> Defendant Lamar Fields hereby submits this amended post-trial motion in connection with the hearing held on February 7-10, 2023. During said hearing, the Court stated that it will rule on the Defendant's post-trial motions <u>de novo</u> . . . Therefore, the Defendant will be withdrawing his previous [post]-trial motions and replacing it with his newly drafted post-trial omnibus motion for efficiency, and clarification, and to avoid any confusion to satisfy the Court's concerns during the hearing held on February 10, 2023.

(Doc. No. 564 at 3.)

Also on June 26, 2023, he filed a Motion to Withdraw Certain Motions. (Doc. No. 548.) In the Motion, pursuant to the Court's assurances that it would consider his post-trial motions <u>de novo</u>, Defendant sought withdrawal of the original nineteen (19) post-trial motions. (<u>Id.</u> at 1.) On July 5, 2023, the Court granted the Motion to Withdraw Certain Motions. (Doc. No. 551.) Accordingly, the Court deemed as withdrawn without prejudice each of Defendant's earlier filed post-trial Motions. (Doc. Nos. 359, 360, 361, 362, 363, 364, 366, 368, 369, 373, 395, 396, 411, 423, 424, 544, 545.)

[15] On February 8, 2023, the second day of the hearing on his post-trial motions, Defendant stated: "We can disregard the Motion for Bail. . . . You could deny the Motion for Bail." (Doc. No. 522 at 114 ¶¶ 16, 18-19.)

[16] On February 7, 2023, because he "was afforded an opportunity to personally interview Ms. Landers," Defendant consented to the denial of his Motion to Compel (Doc. No. 507) because it was moot. (Doc. No. 521 at 227 ¶¶ 4-25.)

522 at 9.)[17]

At the end of the hearing, the Court ordered that (1) the transcript of Khalia Landers's March 18, 2019 sentencing hearing be transcribed and filed under seal in the above-docketed case and (2) Khalia Landers's March 13, 2015 guilty plea hearing also be transcribed and filed under seal in the above-docketed case.  (Doc. No. 524 at 75 ¶ 21 to 76 ¶ 4.)  The Court gave Defendant sixty (60) days after he receives these two transcripts in which to file a supplemental memorandum on his post-trial Motions.  (See id. at 81 ¶¶ 18-20.)

In a letter to the Court dated March 21, 2023, Defendant requested that the sixty (60) day start date for submission of his memorandum in support of his post-trial motions begin once he and/or his standby-counsel received:  (1) certain Brady material referred to in the letter[18]; (2) the

---

[17] On April 10, 2023, the Court denied the Motion for Reconsideration (Doc. No. 439) and Supplemental Motion for Reconsideration (Doc. No. 445).  (Doc. No. 538.)  On February 10, 2023, the Court withdrew the Motion for Reconsideration Regarding Bail (Doc. No. 469).  (Doc. No. 516.)  On the same day, the Court denied the Motion to Compel (Doc. No. 507) as moot. (Doc. No. 515.)

[18] This request for Brady material was the subject of many of Defendant's filings.  (See Doc. Nos. 531, 535, 536, 541.)  For example, Defendant asserted that fourteen (14) named individuals gave grand jury testimony that was inconsistent with that of Khalia Landers and Monica Harrison.  (See Doc. No. 524 at 21-22.)  On March 9, 2023, the Court ordered the Government to provide Defendant with any grand jury testimony of the fourteen (14) named individuals. (Doc. No. 533 at 1.)

In a letter dated March 14, 2023 from Assistant United States Attorney Jerome M. Maiatico, he stated that "[t]he [G]overnment reviewed the available record and did not find any such grand jury testimony."  (Doc. No. 534-1 at 1.)  On March 21, 2023, Defendant sought an Order "directing the Government to search its files for any evidence whatsoever that is inconsistent with Khalia Landers and Monica Harrison's 'prior proffer statements.'"  (Doc. No. 535 at 1.)

On April 10, 2023, the Court denied the Motion to Compel because the evidence sought by Defendant was "double hearsay or even more than double hearsay" and "[t]he reports of interview and grand jury testimony of the fourteen (14) named individuals, if any exists, were already provided to Defendant by the Government."  (Doc. No. 537 at 2.)  On May 18, 2023, Defendant filed a Motion for Reconsideration asking the Court to reconsider its denial of his

transcripts of the hearing held from February 7 to 10, 2023 on his post-trial motions; (3) Khalia Landers's psychological evaluation performed by Dr. Jeffrey E. Summerton; (4) the sections of Khalia Landers's pre-sentence reports regarding her mental health; and (5) information from reputable websites containing information on Khalia Landers's psychological conditions to be provided by his standby-counsel.  (Doc. No. 536.)

On April 10, 2023, the Court issued an Order stating as follows:

> By now, Defendant should have the transcripts of the hearings held on February 7 to 10, 2023.  He was given by his standby-counsel a copy of Khalia Lander[s]'s psychological evaluation performed by Dr. Jeffrey E. Summerton which was minimally redacted by the Court at the Government's request, and was given the section of Khalia Lander[s]'s pre-sentence report regarding her mental health from her pertinent Presentence Report, dated September 3, 2015, prepared by the United States Probation Office.  The information on the websites on Landers's psychological conditions is being supplied to Defendant by his standby-counsel, Matthew Lee, Esquire.  For all these reasons, Defendant will be given sixty (60) days to file his submissions on his post-trial motions.

(Doc. No. 537 at 3.)[19]

As a result, on June 12, 2023, Defendant filed his first Post-Trial Omnibus Motion.  (Doc. No. 544.)  He subsequently filed a Corrected Post-Trial Omnibus Motion wherein he attached as an exhibit a "Memorandum of Law in Further Support of Motion to Dismiss Indictment based

---

Motion to Compel.  (Doc. No. 541.)  On June 13, 2023, the Court denied his Motion for Reconsideration because "there has been no clear error of law or manifest injustice."  (Doc. No. 564 at 4.)

[19] Upon consideration of a letter from Defendant dated May 1, 2023 (Doc. No. 539-1), the Court ordered the Clerk of Court to file under seal full unredacted versions of (1) Dr. Summerton's November 3, 2018 psychological evaluation of Landers (Doc. No. 539-2), (2) the September 3, 2015 Pre-Sentence Report on Landers prepared by United States Probation Officer Darien R. Prioleau ("U.S. Probation Officer Prioleau") (Doc. No. 539-3), and (3) the February 22, 2019 Pre-Sentence Report of Landers prepared by U.S. Probation Officer Prioleau (Doc. No. 539-4). (Doc. No. 540.)  The mental health portion of the September 3, 2015 Presentence Report on Landers is the only one relevant to Defendant's arguments because it was prepared prior to her testifying at trial.

upon Government's Deliberate and Willful <u>Brady</u> Violations." (<u>See</u> Doc. Nos. 545, 545-1.) Then, on June 26, 2023, Defendant filed an Amended Post-Trial Omnibus Motion. (Doc. No. 547.) Finally, on November 13, 2023, he filed Defendant's Second Amended Post-Trial Omnibus Motion, which is being considered in this Opinion.[20] (Doc. No. 564.)

### C. Khalia Landers's Testimony

At the February 7 to 10, 2023 post-trial hearing, Defendant introduced exhibits and had several witnesses testify.[21] Of all the witness testimony introduced by Defendant, the testimony of Khalia Landers was both the longest and least credible. At the hearing, Defendant attempted to elicit from Landers that when she testified at his trial, she was suffering from mental health disorders and side effects from medications treating those disorders. (<u>See</u> Doc. No. 521 at 123.)

Before describing Landers's post-trial testimony further, it is important to briefly describe

---

[20] In responding to Defendant's Second Amended Post-Trial Omnibus Motion, the Government relies on its Response in Opposition to Defendant's First Amended Post-Trial Omnibus Motion. (Doc. No. 552.) In addition to the Motions described above, on November 13, 2023, Defendant filed a Motion to Withdraw Certain Motions (Doc. No. 563), which the Court granted (Doc. No. 570). In that Order, four of Defendant's Motions were withdrawn: (1) Defendant's Post-Trial Omnibus Motion (Doc. No. 544), (2) Defendant's Corrected Post-Trial Omnibus Motion (Doc. No. 545), (3) Defendant's Amended Post-Trial Omnibus Motion (Doc. No. 547), and (4) Defendant's Reply to the Government's Response to Defendant's Amended Post-Trial Omnibus Motion (Doc. No. 558). (<u>See</u> Doc. No. 570.) Additionally, Defendant filed three Motions for Admission of Exhibits in Support of his Post-Trial Omnibus Motions: (1) Defendant's Motion for Admission of Exhibits in Support of his Post-Trial Omnibus Motion (Doc. No. 566), (2) Defendant's Amended Motion for Admission of Exhibits in Support of his Post-Trial Omnibus Motion (Doc. No. 568), and (3) Defendant's Second Amended Motion for Admission of Exhibits in Support of his Post-Trial Omnibus Motion (Doc. No. 569). On January 4, 2024, the Court granted Defendant's Second Amended Motion for Admission of Exhibits. The prior two Motions were withdrawn. (Doc. No. 572.) Additionally, Defendant filed a new Reply to the Government's Response in Opposition to Defendant's Second Amended Post-Trial Omnibus Motion. (Doc. No. 565.)

[21] The testimony of the other witnesses is discussed in relevant part, <u>infra</u>, as it pertains to each Motion.

the documentation of Landers's mental health before and during Defendant's trial.

### 1.   September 3, 2015 Pre-Sentence Report

On July 9, 2014, before Defendant was first indicted, Landers was indicted by a grand jury for her involvement in Defendant's drug conspiracy.  See United States v. Landers, No. 14-354, Doc. No. 1.  On March 12, 2015, a Superseding Information was filed against her in the same case. Counts One to Fifty-One (1-51) charged her with offenses involving Defendant's acquisition of the controlled substances, Counts Fifty-Two (52) and Fifty-Three (53) charged her with tax-related offenses, and Count Fifty-Four (54) with falsely testifying at the trial of her brother, Jamar Cook. Id., Doc. No. 17.  On March 13, 2015, Landers pled guilty to all fifty-four (54) charges in the Superseding Information.  Id., Doc. No. 20.

Prior to her sentencing, United States Probation Officer Darien Prioleau prepared a Pre-Sentence Report ("PSR") on Landers dated September 3, 2015.  The Mental Health Section of her PSR stated:

> The defendant [Khalia Landers] was reportedly diagnosed with bipolar disorder and maniac [sic] depression in 1988.  However, the defendant does not recall the name of the psychologist that evaluated her.  In 1999, Ms. Landers received a mental health evaluation from the late Dr. Luz Perez-Rocha.  Following the completion of the defendant's mental health evaluation, Dr. Perez-Rocha diagnosed Ms. Landers with impulse control disorder, personality disorder, and post traumatic disorder which was the result of physical and sexual [abuse] that she endured during her adolescence.  [Landers] stated that while she was incarcerated at State Correctional Institute-Muncy she received a psychological evaluation that determined her need for mental health services.  She stated that she met with a psychiatrist every sixty days for therapy and re-evaluation.   [Landers] reported that she is currently prescribed Wellbutrin to treat bipolar disorder.

(Doc. No. 534-2 at 21.)  No other information on Landers's mental health conditions is contained in the September 3, 2015 PSR.

### 2.      November 21, 2017 Interview Notes

On November 21, 2017, in preparation for Defendant's trial, DEA Special Agent Jeremy

Smith interviewed Landers and prepared rough notes.  Regarding her mental health, he noted she:

> [R]eported suffering from panic attacks, post-traumatic stress syndrome, and bi-
> polar disorder, in part stemming from Fields' abuse. K.L also reported receiving
> mental health treatment and taking anxiety medication, which she said did not affect
> her comprehension.

(Doc. No. 552 at 32.)  There is no other information about Landers's mental health conditions

contained in these notes.

### 3.      November 30, 2017 Trial Testimony

As described above, Landers testified at Defendant's trial as a Government witness.  (See

Doc. No. 268 at 140 ¶ 4 to 181 ¶ 13.)  She testified that Defendant asked her to fill prescriptions

for him, described Defendant's scheme, and corroborated the testimony of other pseudo-patients

and witnesses.  The details of the scheme have been fully described above.  She also described in

detail that when she told Defendant she no longer wanted to take part in the scheme, he became

angry, threatened to kill her, and turned violent.  (Id. at 176-77.)

During her testimony, Landers did not mention any medications or health conditions that

would affect her ability to understand questions, give truthful testimony, or recall information.  In

fact, her testimony was detailed, fluid, corroborated by other witnesses, and she stated that she

agreed to provide truthful testimony and understood that lying on the stand would result in a

perjury charge.  (Id. at 142-43.)

### 4.      November 3, 2018 Psychological Evaluation

On November 3, 2018, Dr. Jeffrey E. Summerton preformed a pre-sentence psychological

evaluation of Landers.  His evaluation was done about eleven (11) months after the conclusion of

Defendant's trial.  Regarding her mental status and memory, Dr. Summerton wrote in his report:

Ms. Landers was coherent, relevant, and fluent in her speech.  She was responsive and cooperative in manner.  Ms. Landers denied formal thought disorder and there was no evidence to the contrary.  Ms. Landers denied significant difficulties with her memory and denied that she had any deficits which might impair her daily functioning.  There were no memory problems observed during the evaluation.

(Doc. No. 534-2 at 8.)  Dr. Summerton's report provided a detailed evaluation of Landers's mental health.  However, the excerpt above was the only discussion of her memory and comprehension. It shows that she was lucid, rational, and did not struggle with her recollection of events.

### 5.    February 7, 2023 Testimony at Post-Trial Hearing

On February 7, 2023, Khalia Landers testified at the post-trial hearing.  Defendant attempted to elicit from Landers testimony that when she testified at his trial, she was suffering from mental health disorders and side effects from medications treating those disorders, neither of which he contended were disclosed to him by the Government before trial.  (See Doc. No. 521 at 123.)  For the first time, now years after her September 15, 2015 Pre-Sentence Report, the November 2017 notes of interview by Agent Smith, and the November 2018 psychological evaluations by Dr. Summerton, Landers testified that the various documents described above did not accurately reflect her mental state during Defendant's trial and that her mental health and medications made her unable testify accurately.

During her testimony, Landers disputed the information in her September 3, 2015 Pre-Sentence Report.  Because she could not recall what exactly was included in her Pre-Sentence Report, Landers was provided a copy of it to refresh her recollection.  (See id. at 125 ¶ 25 to 126 ¶ 22.)  She read the portion on her mental health history.  She testified that she informed U.S. Probation Officer Darien Prioleau during his preparation of the September 3, 2015 Pre-Sentence

Report that she suffered from "memory loss, confusion, hallucination[s], [and] psychosis."[22]  (Id. at 123 ¶¶ 12-13.)  As quoted above, her September 3, 2015 PSR does not state that Landers had issues with memory loss, confusion, hallucinations, or psychosis.  She also testified that her Pre-Sentence Report did not include all of the medications she informed Probation Officer Prioleau that she was taking or all of the mental health conditions she was suffering from.  (Id. at 124 ¶¶ 18-20, 127 ¶¶ 2, 9-18.)

Landers also disputed the information contained in DEA Agent Smith's rough notes of their pre-trial interview.  The following exchange took place during Defendant's direct-examination of Landers:

Q.  So during trial did you suffer from -- how many medications were you on at that time?

A.  A lot.  I'm on a lot now.

Q.  Do you recall participating in the interview dated November 21st, 2017, days before my trial, the Defendant's trial?

A.  Did what?

Q.  Days before the Defendant's trial, do you recall participating in the proffer meeting with the Government?

A.  I can't remember.

MR. FIELDS:  I'm going to pull up a document to refresh your recollection.

---

[22]  At this point, Defendant was not given access to the September 3, 2015 Pre-Sentence Report because he did not demonstrate a "specific showing of the need for disclosure in the interest of justice."  United States v. Blanco, 884 F.2d 1577, 1578 (3d Cir. 1989).  (See also Doc. No. 521 at 49-50.)  However, the Court left open for later determination whether the section of her September 3, 2015 Pre-Sentence Report should be given to Landers to refresh her recollection.  (See Doc. No. 521 at 49.)  On February 10, 2023, the Court reconsidered and provided to Defendant a copy of the mental health section of Landers's September 3, 2015 Pre-Sentence Report and Dr. Jeffrey E. Summerton's November 3, 2018 Psychological Evaluation, as discussed in more detail infra.  (See Doc. No. 524 at 4-5.)

(Doc. No. 521 at 129 ¶¶ 7-18.)[23]

Defendant showed her the agent's rough notes of his proffer interview of Landers:

Q.  Since we're here, [the bottom of one of the agent's rough notes] says panic disorder, anxiety, PTSD, and bipolar.  But from what you've read inside your PSR, did it state more diagnosisis (sic) than that?

A.  He took it from me.  Oh, yeah --

Q.  Do you recall what you just read?

---

[23] The document Fields had his standby-counsel "pull up" were rough notes written by DEA Special Agent Jeremy Smith during his proffer interview of Landers (the "Landers Notes") on November 21, 2017.  Defendant argued that the Government did not provide him with these rough notes of the interview until two years after his trial.  (See id. at 131 ¶ 22 to 133 ¶ 7, 140 ¶¶ 13-15, 141 ¶¶ 1-3.)  However, the Government filed a letter of record in this case stating:

On the morning of Monday, November 27, 2017, on the first day of trial in this case, in the courtroom [Assistant United States Attorney] MaryTeresa Soltis handed the defendant and standby-counsel a manila folder containing a photocopy of the Landers Notes.  AUSA Soltis told the defendant and standby-counsel that the manila folder contained "Jencks" materials related to expected Government witnesses, which included Landers.  On that morning, the defendant acknowledged multiple times on the record that he received the new "Jencks materials. . . .  The Landers Notes were disclosed promptly, just days after they were created and after the intervening Thanksgiving holiday and weekend.  The Landers Notes were scanned into the Government's electronic discovery system and placed into a folder for this case labeled "Jencks" materials and a subfolder labeled "Produced in Courtroom."

(Doc. No. 534-3 at 2.)

Defendant did not use the notes at trial during any his direct or cross-examination of Landers, who at the time was his wife.  Additionally, he did not make any requests during trial to investigate Landers's mental health conditions.  The first time Defendant argued to the Court that he did not receive Agent Smith's rough notes was at the February 2023 post-trial motion hearing.  In an Order dated March 9, 2023, the Court stated: "[T]he Government has given its response to the Court's request to verify that it turned over to Defendant the rough notes of DEA Special Agent Jeremy Smith's interview of Khalia Landers before she testified at trial in which she described her mental health challenges.  No further search is required." (Doc. No. 533 at 5.)  The Court credits the Government's representation that it turned over to Defendant a copy of the Landers Notes before trial.  They are <u>Brady</u> material.  At the time, it would have been clear to the experienced prosecution team that they had to be turned over to Defendant.

A.  Yeah, yeah, yeah, it did because it was something anger, personality disorder -

Q.  That's fine.  It was just more than what this was.

A.  It was a whole lot.  But what you had, you didn't have nothing -- I don't understand why I say stems from what Lamar Fields -- that you didn't have nothing to do with none of that stuff.

(Id. at 141 ¶¶ 8-19.)

Next, Landers testified that Dr. Summerton's Report was also inaccurate and he "put what he wanted to put into [her November 3, 2018] psychological evaluation [report]."  (Id. at 124 ¶¶ 21-22.)  Defendant asked Landers whether during her evaluation with Dr. Summerton she told him that she suffered from mental conditions that he did not put in his November 3, 2018 Psychological Evaluation.  (Id. at 145 ¶¶ 16-18.)  She did not recall whether she did, so the Court questioned her.  (See id. at 145 ¶ 21.)

THE COURT:  Would the psychological evaluation with Dr. Summer[ton] refresh your recollection?

A.  Yes.
. . .
THE COURT:  All right.  I'll let her read her mental status and mental health history--

MR. FIELDS:  So --

THE COURT:  -- from the report.
. . .
THE COURT:  All right.  Did you read it?

A.  Yeah.  Yes.

THE COURT:  All right.  What's the question?

BY MR. FIELDS:
. . .
Q.  So the question again was did you provide information to the doctor that did your psych. evaluation that you suffer from hallucinations, memory loss, confusion, psychosis, anything of that nature?

23

A.  He didn't ask me that but I do say medication for psychosis.  I say Trileptal.

Q.  So there's nothing in that report that suggests -- but do you take -- you do suffer from psychosis.

A.  I take Trileptal for it.

Q.  No hallucinations, no confusion, memory loss as well.

A.  I only have problems with right now it's problems with my memory and confusion right now.

Q.  Right.

A.  And sometimes like my words.  Like I'll make jokes with the girls and be like, oh, my God, I hope I'm not having dilexia (sic) problems.  And they be like, girl, don't wish that upon yourself.  But it's because I be forgetting stuff --

Q.  Like --

A.  -- or whatever like that.  But --

Q.  Now, you said that that's how it is right now.  Was it like that during the trial phase?

A.  Yes.  But it's getting worse.  It's been getting worse over the years.

(Pause in proceedings)

A.  You see, in dyslexia, is it dyslexia?  What is it when you start forgetting stuff?  I probably even said that wrong.  It's not even dyslexia, is it?  Dyslexia's when you see stuff backwards, ain't it?

Q.  Dementia.

A.  See.  That --

Q.  So --

A.  -- stuff, that's what I'm talking about forgetting.

(Id. at 147 ¶¶ 7-9, 150 ¶¶ 18-21, 152 ¶ to 154 ¶ 7.)  Landers also testified that the medications she

took, which she said were not in Dr. Summerton's November 3, 2018 Psychological Evaluation,

affected her comprehension during Defendant's trial and "ma[de] [her] feel weird." (Id. at 155 ¶¶ 5-18.) When asked to describe how her medications and how each of her mental conditions affect her, she stated the following:

Q.  Okay.  So does your medication affect that?

A.  Yes.

Q.  How?

A.  Because sometimes I could be in a conversation and I get lost just in a blink of a eye.  And I hear what you saying but it's like my brain is just not grabbing it so it makes me feel weird.  And I be like, damn, I know what they said but I can't grab it right then and there.  Like that makes you feel weird.

Q.  Anything else the medication does to you?

A.  It makes me feel tired, sleepy, grouging (sic).

Q.  Okay.  So in particular with panic bipolar, how does that affect you?

A.  Huh?

Q.  Your bipolar disorder, how does that affect you?

A.  Up and down, don't want to be bothered one minute, the next minute I might, and then the next minute I might snap, and the minute I might -- I can't say all of that.

Q.  Okay.  How does your PTSD affect you?

A.  I could be sitting there laughing and joking at the TV, and then the next minute I might have bad flashbacks about my past --

Q.  What about your panic attacks?

A.  -- when I was little.  My panic attacks, I could be asleep and just have one of those and my heart start racing.  And then I got to get up and sometimes I got to throw like cold water on me.  Or one time I was upstate, they had to keep putting a heart monitor on me because I kept having them so bad that I lost all this weight.  It was a really, really bad.  I was in like the panic attack thing where my body wouldn't even come out of it.  It was really bad then.

Q.  What about your anxiety?

A.  It's just sometimes my body keeps shaking.  It feel like little bugs just all over you.

Q.   So not only does your psychological diagnosisis (sic) affect you [sic] comprehension and memory and your psychosis but also the medications you take further affect your memory and confusionist (sic).

A.  Yeah.  It's bad and it's getting worse.

(Id. at 156 ¶ 2 to 157 ¶ 14.)

The Court shortly thereafter read into the record Dr. Jeffrey Summerton's psychological evaluation of Landers:

THE COURT:  Well, I just want to put on the record, I mean, the psychological evaluation of 11/3/18, with respect to the state of her memory, on page seven under -- that Ms. Landers read, this is what the psychiatrist said.  Mental status and mental health history.  Ms. Landers was coherent, relevant and fluent in her speech.  She was responsive and cooperative in manner.  Ms. Landers denied formal thought disorder, and there was no evidence to the contrary.

Ms. Landers denied significant difficulties with her memory and denied that she had any deficit which might impair her dialing [sic] functioning.  There were no memory problems observed during the evaluation.  Ms. Landers appeared to be below average to average in intelligence.  Her insight appeared to be fair, and her judgment adequate to meet the demands of everyday life; although subject to being compromised influence [sic] of emotional factors.

BY THE COURT:

Q.  This is a conversation being reported by the psychologist on -- in 2018.  Do you recall this?

A.  Yes.  But he also said that I wasn't suicidal.  And I've cut myself plenty of times.  So that paper right there, he wrote what he wanted to write.  He also said other things in that paragraph that wasn't even accurate.  So I don't understand how he said that.

And then his conclusives (sic) was that I only had PTSD.  So he ruled out everything that was said in that even though he had my stuff from Hahnemann, even though he had my other stuff from the other doctors.  He ruled out what he wanted to ruled (sic) out.  And that's Jeffrey Summerton.

26

(Id. at 165 ¶ 7 to 166 ¶ 10.)  Landers then testified that she hid her mental health history, criminal background, and seven children—"a lot of stuff"—from Defendant because she "just wanted [him] to date [her] for who [she] was, not run away from the person [she] was."  (Id. at 171 ¶¶ 20-22.)

On cross-examination, Landers testified that she does not recall "telling the Government or testifying here in this trial that when [she] told Mr. Fields that [she] didn't want to fill prescriptions anymore," Defendant threatened to kill her.  (Id. at 163 ¶¶ 21-25.)  Then, on redirect-examination, Defendant asked Landers whether she recalls AUSA Soltis asking her if she remembers testifying at trial that Defendant threatened to kill her.  (See id. at 172 ¶¶ 14-24.)  To refresh her recollection, Defendant displayed to Landers a transcript of her testimony during his trial and asked her a lengthy question:

> Q.  So the question was, now, ma'am, did you -- did there come a time you decided to -- you wanted out of the scheme.  You responded, uh-huh.  She says, that is yes. You said, yes, yes.  Okay.  I'm sorry, yes.  It's okay.  And did you tell Lamar this? You said yes.  It said, how did he respond?  You responded by saying he was angry. He ended up taking my driver's license and said he was going to get somebody else to start doing it, which he did.  I don't even know if he did because I didn't really see my name like it's being as like for the prescriptions that he filled around the time if I said I wasn't.  So I didn't really know what he did with my non-driver's license.  But I know he was angry and he said he was going to get somebody else to start filling it.  And we would like fight and stuff like that.  She then asked you, did he threaten you?  You said, yeah.  You responded, what did he say?  He said he would kill me and if he couldn't have me, nobody could have me.
> Now when I allegedly -- do you recall that?
>
> A.  No.
>
> MR. FIELDS:  But it happened.
>
> A.  Okay.
>
> MR. FIELDS:  As you can see.
>
> BY MR. FIELDS:
>
> Q.  Now with regards to --

BY THE COURT:

Q.  Wait a minute.  Did it happen?

A.  No.

THE COURT:  Okay.

A.  Well what?

MR. FIELDS:  No, no, excuse me.

MS. SOLTIS:  Your Honor, at this point I'm going to ask maybe Ms. Landers have a conversation with her attorney.

A.  Why?

THE COURT:  All right.  Could you please talk to your client?

MR. FURLONG:  Sure.

MR. FIELDS:  Could I object to that for a second?

A.  Why?

THE COURT:  You can object, but I'm going to let Ms. Landers talk to her lawyer.

A.  I just don't remember saying it.

(Pause, Witness confers with Counsel)

(Id. at 174 ¶ 3 to 175 ¶ 19.)  Defendant argued that Landers's answers suggested not that she might be committing perjury, but that she is suffering from memory loss and confusion.  (See id. at 176 ¶¶ 3-6.)  The Court told Defendant that he was "asking her for questions from testimony that she gave under oath in this court" and asking her if her testimony "was true."  (Id. at 176 ¶¶ 17-21.) The Court further explained: "[S]omething very concerning has come up.  You're questioning a witness about testimony given in this court under oath, and she's contradicting the testimony it seems.  There could be consequences to that.  That's why she has a lawyer."  (Id. at 179 ¶¶ 12-17.)

The Court permitted Defendant to meet with Landers outside the courtroom along with their respective attorneys, which included his standby-counsel.  (See id. at 194 ¶ 19 to 195 ¶ 5, 195 ¶¶ 17-18, 24-25.)  After the meeting, Defendant continued his direct-examination.

BY MR. FIELDS:
. . .
Q.  Now, I just want to ask you a couple questions based on what we've just discussed downstairs.  Now, you're familiar with perjury, correct?

A.  Yes.

     THE COURT:  With what?

     MR. FIELDS:  Perjury.

     THE COURT:  Perjury, yes.

BY MR. FIELDS:

Q.  Now, you've been convicted of perjury in the past, right?[24]

A.  Yes.

Q.  Now, are you aware that the perjury -- statute of limitations for perjury is five years?

A.  Yes.

(Id. at 196 ¶ 20 to 197 ¶ 10.)  Defendant asked Landers if she remembered sending letters to the Court informing it that she believed she was coerced by her attorney to plead guilty while under the influence of her medications, and she said she did remember sending those letters.  (See id. at 197 ¶¶ 14-19.)  Landers testified that after she was indicted, she was confused when she saw the initials "J.C.," which are her brother Jamar Cook's initials, and other initials in the indictment and that she pled guilty without knowing what the initials meant.  (See id. at 199 ¶¶ 3-15.)  She contends

---

[24]  As noted earlier, Landers pled guilty to a charge of falsely testifying at the trial of her brother, Jamar Cook.

she pled guilty because she was facing a lot of time and "had a brand new baby at home."  (Id. at

199 ¶¶ 17-18.)  Defendant continued his line of questioning.

> Q.  Let me try that one.  Because you was facing a lot of time, did they tell you that you could get less time if you were to cooperate or something like that?
>
> A.  Yeah, but I didn't.
>
> Q.  Did you -- did your lawyer ever look into your work schedule, your school schedule to help show the Government that a lot of those overt act initials you were not present for?
>
> MS. SOLTIS:  Objection, relevance, Your Honor.
>
> THE COURT:  Yeah.  What's the relevance of this, Mr. -- this testimony?
>
> MR. FIELDS:  To this particular question or the testimony throughout?
>
> THE COURT:  The line of questioning.
>
> MR. FIELDS:  Well, in my newly discovered evidence motion, I'm trying to show that ultimately she perjured herself in the court.
>
> THE COURT:  What?
>
> MR. FIELDS:  I'm ultimately showing how she committed perjury at trial.
>
> MS. SOLTIS:  Well, that's a whole other --
>
> MR. FIELDS:  That's newly discovered -- this would be newly discovered evidence.
>
> MS. SOLTIS:  We've got a whole other issue if that's where he's going, Your Honor.
>
> MR. FIELDS:  And what issue would that be?
>
> MS. SOLTIS:  I mean, she's got rights as she sits up there.
>
> THE COURT:  Huh?
>
> MS. SOLTIS:  She's got -- she has Fifth Amendment rights as she sits up there and he's -- if he's trying to establish that she committed perjury in this court, we have a whole other list of issues associated with that.

MR. FIELDS:  Well, if you look at my newly discovered evidence motion, I already wrote that she committed perjury but under her Fifth Amendment right, there's a Fifth Amendment right not to self-incrimination.  Five years has passed since the trial.  So she would not be incriminating herself.

THE COURT:  She --

MR. FIELDS:  She would be exempt --

MS. SOLTIS:  That may be Mr. Fields' interpretation of the law, Your Honor, but that's not correct.

MR. FIELDS:  Okay.  So what is the correct interpretation?

THE COURT:  Mr. Fields, we're not going to debate what the law is correct today. She's testifying today.

MR. FIELDS:  Okay.

THE COURT:  Her counsel is present.

A.  Yes.

MR. FIELDS:  So, Your Honor, being as though you're the judge and the fact finder, as you said, isn't it true that since the trial has been five years ago that if she lied during trial, she could not be charged with perjury?

THE COURT:  I'm not here to give legal advice.  Mr. -- Counsel, have you consulted with your client?

MR. FURLONG:  I have, Your Honor.

THE COURT:  And does she wish to continue to testify?

MR. FURLONG:  It seems that she does but my advice at this point in time for her is --

THE COURT:  Wait.  Come in and speak into the mike [sic].

MR. FURLONG:  Sorry.  Based on where he's going with his questioning and what he's doing to her on the stand, at this point in time, I'm going to ask that she take the Fifth Amendment because this is exactly the complaint that I had when I filed a Presentencing Memorandum as to what he does to her.  And I think my advice to her at this point in time is to take the Fifth.

THE COURT:  All right.

31

MR. FIELDS:  Can I finish my questions, please?

THE COURT:  Well, it's up to Ms. Landers what she wants to do.  Ask your next question.
. . .
Q.  So let me rephrase the question again.  Now, during your meetings with your attorney when you were informing him of -- that you weren't guilty of certain charges, did he intimidate you in any way to plead guilty although you informed him that you were not?

A.  Yes.

(Id. at 199 ¶ 25 to 202 ¶ 23, 204 ¶¶ 18-23.)  Landers proceeded to testify that her counsel allegedly coerced her to plead guilty and that she was under the influence of medication that caused hallucinations and psychosis during the guilty plea negotiations.  (See id. at 203 ¶ 21 to 210 ¶ 15.)

On recross-examination, the following exchange took place:

Q.  [Assistant United States Attorney MaryTeresa Soltis:]  . . .  And part of your [guilty plea] agreement with the Government was to tell the truth, correct?

A.  It was.

Q.  It was?

A.  It was.

Q.  And it was to tell the truth at any point in time that you met with the Government, correct?

A.  It was.

Q.  And it was to tell the truth at any point in time that you testified under oath, correct?

A.  It was.

Q.  And part of that agreement was that you couldn't not tell the truth because you were afraid, correct?

A.  It was.

Q.  And you couldn't not tell the truth because you wanted to protect someone, correct?

A.  Can I see my lawyer?

THE COURT:  Huh?  Yes, I'll let you consult with counsel.  Go ahead.

A.  No, just right here.

(Witness confers with counsel)

THE COURT:  Can you restate the last question?

MS. SOLTIS:  Sure, sure.

BY MS. SOLTIS:

Q.  Part of your agreement with the Government was that you were not permitted to give false information or to testify falsely to protect someone?

A.  I'll plead the Fifth.

Q.  Okay.  Are you protecting Mr. Fields now?

A.  No.

Q.  Are you telling the truth as you sit here today?

A.  Yes.

Q.  Has all of your testimony here today been the truth?

A.  Yes.

(Id. at 212 ¶ 7 to 213 ¶ 15.)

### D.   Other Witnesses at Post-Trial Motions Hearing

On February 7, 2023 Defendant called several other witnesses in addition to Khalia Landers.  Drug Enforcement Agency ("DEA") Special Agents Jeremy Smith and Gerald Gobin testified along with Keyanna Holland, Naimah Fuller, and his sister Marquita Fields.  (See generally id.)  Defendant called DEA Special Agents Smith and Gobin to establish that Monica

Harrison and Khalia Landers made false accusations to them regarding other individuals' involvement as pseudo-patients in Defendant's scheme.  (See id. at 5 ¶¶ 20-25.)  They testified that Monica Harrison and Khalia Landers did not provide any false information about individuals filling prescriptions for Defendant.  (See id. at 17 ¶ 1-8.)  Defendant called Keyanna Holland because he claimed she never filled fraudulent Dr. Burch prescriptions for him despite Landers having told DEA agents that she did fill prescriptions for him.  (See id. at 29 ¶¶ 11-17.)  Defendant called Naimah Fuller, the individual he contends gave him permission to drive the rental car that was searched during a traffic stop on March 29, 2013, the fruits of which Defendant sought to be suppressed in a renewed motion to suppress that was included in the Second Amended Omnibus Motion. (See Doc. No. 159.)  And Defendant also called Marquita Fields, his sister, in support of his argument that the Government ordered her not to talk to him during the investigation of the case, and therefore interfered with his access to her as a witness.  (See Doc. No. 521 at 67 ¶¶ 19-22.)

### III.    DEFENDANT'S OMNIBUS POST-TRIAL MOTIONS

In the Second Amended Post-Trial Omnibus Motion, Defendant lists fourteen (14) different motions he is pursuing in his quest for a new trial, judgment of acquittal, or dismissal of the Superseding Indictment.  They are: (1) Government Interference with the Defense Access to Witnesses; (2) Discovery Violation; (3) Invalid Waiver of Counsel; (4) Motion to Suppress; (5) Erroneous Reasonable Doubt Instruction; (6) Violation of Statute of Limitations; (7) Motion for Judgment of Acquittal of Count 1 (Rule 29); (8) Motion for Judgment of Acquittal of Counts Eight and Nine (Rule 29); (9) Constructive Amendment and Variance[25]; (10) Newly Discovered

---

[25] The Court will address Defendant's arguments on constructive amendment and variance under separate headings, infra.

Evidence; (11) <u>Brady</u> Violation (Immunity Agreements); (12) <u>Brady</u> Violation (Perjury); (13) <u>Brady</u> Violation (Khalia Landers's Mental Health Conditions); and (14) <u>Brady</u> Violation (False Allegations by Khalia Landers/Monica Harrison).  (Doc. No. 564 at 2.)  Each Motion will be discussed in turn.

### A.      Defendant's Access to Witnesses

Defendant argues that before his trial the Government interfered with his access to his sister Marquita Fields and Khalia Landers and that, as a result, he "suffered actual prejudice to the preparation of his defense."  (Doc. No. 564 at 3-4, 9.)  He seeks "the extreme remedy of dismissal of Count One of the Superseding Indictment (S.I.) with prejudice."  (<u>Id.</u> at 14.)  In Count One, Defendant was charged with conspiracy to knowingly and intentionally distribute oxycodone, in violation of 21 U.S.C. § 846.  (Doc. No. 134 at 1.)

First, at trial, Marquita Fields, who did not testify as a Government witness, was called by Defendant to testify and the following testimony was adduced during her direct-examination:

   Q.  [Defendant:] Do you recall participating in an interview with the agents on July 9th, 2014?

   A.  [Marquita Fields:] Not necessarily the date, but most likely, yes.
   . . .
   Q.  Now, prior to being interviewed by the agents, were you informed by [Assistant United States Attorney] Faith Taylor that you are not to discuss anything with anybody, and if you were if anyone was to approach you and ask you any question, that you are to contact the agent and/or your lawyer?

   A.  Yes.
   . . .
   Q.  Now, did you follow those instructions.

   A.  I did.
   . . .
   Q.  Would you still have followed those instructions if I was if I would have tried to ask you any questions?

   A.  Oh, yes, of course.

(Doc. No. 271 at 21 ¶ 2 to 22 ¶ 5.)  The Government did not cross-examine Marquita Fields.  (See id. at ¶¶ 10-11.)  During Monica Harrison's testimony at Defendant's trial, she described an occasion when Defendant physically assaulted Marquita Fields:

Q.  [Soltis:] And then you told us he pulled out a gun?

A.  [Monica Harrison:] He showed it, yes.

Q.  All right. When he showed the gun, where was the gun?

A.  On his hip, on the left side.
…
Q.  What happened after that?

A.  He was still cussing. I left. I left because I was scared.

Q.  Okay. Did you learn at some point that he and his sister had had an argument?

A.  Yes.

Q.  And how did you learn that?

A.  She told me the next morning at work.

Q.  Okay. What was that argument about?

A.  About the scrips [sic], about the money. And she told me that it got physical in front of her daughter, and they were – she was upset.

Q.  Did you see -- when you say she, who are you referring to?

A.  Marquita Fields.

Q.  All right. And that next morning, when you saw Marquita Fields, what did she look like?

A.  Horrible. She had –

Q.  Why do you say that?

A.  From what she looked like, she had a long night. She showed me bruises that was on her arms. And she just basically told me how she was upset about what happened.

36

Q.  When you say she was -- she said she was upset about what happened, what did you understand that to mean?

A.  About the fight that they had.

(Doc. No. 267 at 190-91.)

At the February 7 to 10, 2023 post-trial hearing, Defendant called Marquita Fields as a witness and the following exchange took place:

Q.  [Defendant:] Do you recall participating in a scheme to fill fraudulent prescriptions for Dr. Burch?

A.  [Marquita Fields:] I do.

Q.  Now, do you recall being informed by the Government specifically not to speak to the Defendant?

A.  Anyone.  I wasn't to speak to anyone.
. . .
Q.  Did that include the Defendant?

A.  Correct.

Q.  Now you were -- this was an interview for you to provide information about the Defendant, correct?

A.  I don't recall that that's specifically the reason but I was asked several different questions in reference to you and anything that was involved.

Q.  So it's safe to say that part of the interview was about the Defendant, me, the Defendant?

A.  Could be, yes, yes.

Q.  Could be or yes?

A.  Yes.

Q.  So when you were told not to speak about this with anyone, is it safe to say that whoever you're providing cooperating information about was anyone that they don't want you to speak with.

A.  Correct.

Q.  And what led you to this conclusion?

A.  The question -- well not necessarily the questioning but the information that was given to me and told to for me to not speak to anyone in reference to the questioning, the case itself, whatever was going on during the time, for my wellbeing and so on.

Q.  Your wellbeing from who?

A.  For anyone, just so that I would be safe, that I wouldn't give unnecessary information to whomever.  I was just told not to say anything.

Q.  To anyone.

A.  To anyone.

Q.  And when you was asked these -- when you were asked not to speak to anyone, were you under the impression that if you were to speak to anyone, it would either harm you or hinder their investigation?

A.  Correct.

Q.  When they told you not to speak to anyone, was this a request or an instruction?

A.  I took it as both.

Q.  So can I -- I'm going to give you an example.  Did the Government ask you not to speak to the Defendant or anyone, or did they instruct you not to speak to them?  For example, did they -- did the[y] inform you -- did they ask you not to talk to the Defendant but inform you that the choice was yours?

A.  I don't think I had a choice.  It was more so that I should not speak to anyone and that's it.

Q.  Or did they instruct you not to speak to the Defendant?  For example, did the Government tell you not to talk to the Defendant or anyone?

A.  I don't recall those type of words.  I know I was told not to speak to anyone.  It didn't matter, it wasn't specifics on whom but not to talk about it at all.

Q.  Now, did they put a restriction on this instruction?

A.  Not that I recall.

Q.  So let me be more specific.  Did they say that this instruction is just for the grand jury process or did they say -- or did they say after the grand jury process you

will be able to speak to anyone?

A.  It wasn't specific.

Q.  Now, you participated in this proffer hearing and pursuant to a cooperation agreement, correct?

A.  Correct.

Q.  And were you charged?

A.  I was not.

Q.  Were you given some form of immunity for providing information, for cooperating with the Government?

A.  I don't recall if that's the word that was used but I was told to cooperate all the way around.

Q.  And how can I say this?  What was your benefit for cooperating?  Were you given some kind of agreement to cooperate?

A.  Not necessarily agreement but I was told that I would be fine.  That's the words. "You're gonna be okay."  I remember those words.

Q.  And what you take that as, being fine?

A.  That no charges would be against me, that I would be all right in reference to the case itself.  That's what I got from that.

Q.  And you were told this by the Government or -- were you -- excuse me.  Were you -- did you have an attorney at the time?

A.  I did.

Q.  Were you told by your attorney this or the Government?

A.  No, the Government.

(Doc. No. 521 at 82 ¶ 3 to 85 ¶ 17.)

  "Generally, because witnesses belong neither to the defense nor to the prosecution, both must have equal access to witnesses before trial."  United States v. Bryant, 655 F.3d 232, 238 (3d Cir. 2011) (quotation marks and citation omitted).  But a defendant's due process rights are not

"violated when a potential witness freely chooses not to talk; a witness may of [her] own free will refuse to be interviewed by either the prosecution or the defense." Id. at 239 (quotation marks and citation omitted). Thus, a Government request that a witness not disclose information falls short of "affirmative steps to restrict or stop witnesses from conferring with the defense" and does not violate due process. Id. at 238.

Here, it is not clear that Government counsel or the agents "required" Marquita Fields to not speak to Defendant, as opposed to a request during an ongoing investigation. First, Marquita Fields testified at trial when called to testify by Defendant that she was advised by Government counsel not to speak with anybody prior to being interviewed by federal agents on July 9, 2014. (See Doc. No. 271 at 21 ¶¶ 2-16.) The Government's request was justified because of concern about her safety and well-being during an investigation, especially since it had evidence of her fight with Defendant and his threatening remarks to others. In this regard, the Government did not interfere with Defendant's access to witness Fields because the interview occurred while the investigation was ongoing and before his arrest in 2015. (See Doc. No. 430 at 4.) In addition, Defendant called Marquita Fields to testify on direct-examination as his witness at trial so he had access to her. She was his sister.

Moreover, at the post-trial hearing, Marquita Fields described the Government's suggestion to not speak to anyone about the investigation as both a "request" and an "instruction." Her ambivalence is self-evident. When asked by Defendant again whether she thought the Government was asking her not to speak to anyone or instructing her not to do so, Marquita Fields testified that "[i]t was more so that I should not speak to anyone and that's it." The request or instruction was not targeted at Defendant Fields. In addition, she was represented by counsel at the time the Government informed her that she should not talk to anyone about the investigation.

40

Second, the Government did not interfere with Defendant's access to Khalia Landers.  At trial, Landers explained that she did not communicate with Defendant because her attorney "didn't think that that would be a good idea." (Doc. No. 271 at 83 ¶¶ 3-4.)  She also had a separation order in place during his trial against Defendant.  She obtained this court order after she told him that she wanted to leave the scheme and Defendant threatened to kill her and hit her more than once. (Doc. No. 268 at 177 ¶¶ 2-21.)  After she got the separation order entered against him, she also "ended up changing [her] locks," removed his name from the deed of her house, and kicked him out of the house.  (Id. at ¶¶ 21-24.)  She noted that her separation order with Defendant prohibited her from interacting with him.  (See Doc. No. 271 at 83 ¶¶ 15-16.)  The advice from Landers's attorney and her separation order with Defendant show that Landers freely chose not to talk with Defendant before his trial, not that the Government interfered with Defendant's access to her.  For all these reasons, Defendant's request that Count One of the Superseding Indictment be dismissed will be denied.

## B.   Discovery Matters

Defendant contends the Government violated Federal Rule of Criminal Procedure 16[26] by failing to disclose to him (1) his 2012 phone records and (2) "a copy of the back of the prescriptions alleged to have been filled by the Defendant at Lehigh Pharmacy." (Doc. No. 564 at 15-16.)  For these alleged violations, Defendant seeks dismissal of the Superseding Indictment or, "in the alternative, a new trial." (Id. at 19.)

---

[26] Federal Rule of Criminal Procedure 16 provides that "[u]pon a defendant's request," the Government must allow the defendant to inspect documents within its "possession, custody, or control" that it "intends to use . . . in its case-in-chief at trial."  Fed. R. Crim. P. 16(a)(1)(E).

To support his contention that the Government committed discovery violations, he cites

United States v. Lee, 573 F.3d 155 (3d Cir. 2009).  (Id. at 15.)  In Lee, the Third Circuit stated the

following about the standard for granting a new trial after a discovery violation:

> On appeal, a new trial is warranted to remedy a discovery violation where "'the remedy offered by the district court was inadequate to provide [the defendant] with a fair trial.'"  United States v. Lopez, 271 F.3d 472, 483 (3d Cir. 2001) (quoting United States v. Miller, 199 F.3d 416, 420 (7th Cir. 1999)) (alteration in original). To determine whether the district court's remedy was adequate, "'[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'"  United States v. Mitchell, 365 F.3d 215, 254 (3d Cir. 2004) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995) (discussing standard for granting a new trial after a Brady violation")).
> …
> In general, a new trial is required where prejudice resulting from a discovery violation is serious enough to adversely affect a court's ability to reach a just conclusion.  Cf. United States v. Starusko, 729 F.2d 256, 262 (3d Cir. 1984) (discussing standard for Brady violations).  One way a discovery violation may do this is by interfering with the defendant's ability to prepare for trial and develop an intelligent defense strategy.  See, e.g., United States v. Lanoue, 71 F.3d 966, 976 (1st Cir. 1995) (holding that new trial was required where use of undisclosed Rule 16 material "unfairly surprised the defense and deprived it of the opportunity to design an intelligent litigation strategy that responded to the [undisclosed evidence]"), abrogated on other grounds by United States v. Watts, 519 U.S. 148 (1997).

573 F.3d at 161-62, 164.  To show that a defendant did not receive a fair trial resulting in a verdict

worthy of confidence, he must "demonstrat[e] a 'reasonable probability of a different result,' had

the withheld evidence been available."  Mitchell, 365 F.3d at 254.

As an initial matter, Defendant's claim that he did not receive the phone records or back

side of prescriptions is belied by the Government's numerous assurances that it turned over to

Defendant all relevant materials and by his failure to object to the introduction of the phone records

or prescriptions into evidence during the trial.  (See Doc. Nos. 267 at 107 ¶ 25 to 109 ¶ 13; 270 at

34 ¶ 16 to 36 ¶ 18; 310 at 4-5; 374 at 11-12.)  In fact, the Court finds that the Government either

gave this evidence to him or made it available for inspection by him.  In any event, assuming

arguendo Defendant did not see these items before their use at trial, there was no reasonable probability that Defendant would have had a different result at trial.  Nevertheless, the Court will evaluate Defendant's arguments below.

### 1. Defendant has Failed to Show That His Lack of Access to His 2012 Phone Records Warrants the Relief He Requests

Defendant argues that he is entitled to a dismissal of the Superseding Indictment or a new trial because the Government failed to disclose to him his 2012 phone records.  If such a failure occurred–and the Court is not finding it did–it did not interfere with Defendant's ability to receive a fair trial or result in a verdict unworthy of confidence.  In this case, the phone records were used as another method to confirm the testimony of Harrison, Landers, and pseudo-patient Patton that Defendant communicated with Harrison and Marquita Fields before filling prescriptions so they could answer verification calls from pharmacies.  (See Doc. Nos. 267 at 185 ¶¶ 1-17; 268 at 22 ¶¶ 3-18, 151 ¶¶ 19-25, 152 ¶¶ 20-25.)  This testimony was confirmed by numerous witnesses, independent of the phone records.  (See Doc. No. 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23; 22 ¶¶ 5-10, 12, 23; 23 ¶¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24; 36 ¶¶ 11-15; 53 ¶ 10 to 62 ¶8; 71 ¶ 20 to 81 ¶ 16; 105 ¶ 21 to 116 ¶ 20; see also Doc. No. 269 at 80 ¶ 22, 97 ¶ 22 to 111 ¶ 15.)  Defendant's confession even bolstered the testimony of these witnesses.

### 2. Defendant has Failed to Show That His Lack of Access to the Backside of the Prescriptions Filled at Lehigh Pharmacy Warrants the Relief He Requests

Next, Defendant argues that he is entitled to a dismissal of the Superseding Indictment or a new trial because the Government failed to disclose to him the backside of prescriptions allegedly filled at Lehigh Pharmacy, a claim the Court is not finding occurred here.  Again, this alleged failure would not lead to a verdict unworthy of confidence or interfere with Defendant's ability to receive a fair trial.  The backside of the prescriptions was only one of several methods pharmacist

Scota used at his Lehigh pharmacy to confirm a prescription was valid.  (See Doc. No. 267 at 112 ¶¶ 12-21.)  Scota would place a sticker on the back of the prescription to show what drug had been filled and who verified the prescription.  (See id.)  He also wrote other notes on the back side.  (See id.)  But he also verified a prescription by checking the patient's identification, calling the prescribing physician's office, and recording in his computer that the prescription was verified.  (See id. at 112 ¶¶ 12-16, 114 ¶¶ 11-21.)  Furthermore, Scota is the owner of only one of the many pharmacies where Defendant filled his fraudulent prescriptions.  (See id. at 98 ¶ 11 to 99 ¶ 2.)

In addition, the evidence against Defendant on the Count One conspiracy charge was overwhelming.  He confessed to working with others to obtain fraudulent Dr. Burch prescriptions, recruited pseudo-patients, obtained oxycodone pills, and distributed the pills.  (See Doc. No. 270 at 133 ¶¶ 1-5.)  Moreover, pharmacy records showed each fraudulent prescription filled, a stack of Dr. Burch prescriptions was found in Defendant's hotel room, and a false prescription with Defendant's fingerprint was introduced into evidence.  (See Doc. No. 270 at 131 ¶¶ 14-16, 132 ¶¶ 16-23.)  Therefore, assuming arguendo Defendant was not afforded access to the backside of the prescriptions, the failure of Defendant to inspect them before trial would not undermine the confidence in the jury verdict at all.

### 3.  Defendant Has Not Shown Prejudice Resulting from an Alleged Discovery Violation

Furthermore, Defendant has not shown that he was prejudiced in any way regarding the two items he contends were undisclosed.  Defendant argues here that the Government's alleged withholding of his 2012 phone records prejudiced him because they were "presented to the jury to show the connection between the defendant and the pseudo patients" and he was not "prepared to challenge this evidence."  (Doc. No. 522 at 56 ¶ to 57 ¶ 5.)  As for the back of the prescription, Defendant contends that the Government's alleged withholding of it prevented him from

questioning Paul Scota's credibility at trial.  (See id. at 55 ¶¶ 6-24.)  In particular, Defendant posits

he would have used the back of the prescription as follows:

> [W]ith this evidence, I could've shown the jury that, since they failed to adhere to
> its policies in one area regarding the verification of the prescription process, they
> may have been negligent in the policy and procedure of confirming whoever -- who
> presented the prescription.  With this evidence, the jury may have believed it was a
> third party that filled the prescription, not the defendant.

(Id. at 56 ¶¶ 11-13.)

Despite Defendant's claims that he would have questioned Scota regarding his and his

employees' adherence to the pharmacy's identification verification procedures, he did pursue a

similar line of questioning during his direct-examination of Scota at trial.  The line of questions

pursued shows that there were other avenues used by the pharmacist and/or his employee

pharmacist to verify that the prescription was not fake before it was filled.

Q.  [Defendant:] So how do you know it was me that presented this prescription?

A.  [Paul Scota:] Based on our policies and procedures.

Q.  And is your policy always followed?

A.  Yes.

Q.  Even when you're not there?

A.  Yes.

Q.  Do you know who the pharmacy tech or clerk was that filled these prescriptions?

A.  No.  I mean, I -- we have -- I only had two techs at that time, so -- I mean, I
could give names, but they didn't type it.  They didn't type the prescription, because
their initials would have been on the record.  So the pharmacist typed the
prescription, who actually filled it.

Q.  Do you know who that pharmacist was?

A.  Yes, I do.

Q.  You mind providing that name?

A.  Dave Blythe.

. . .

Q.  Has fraudulent in the past -- has fraudulent prescriptions been passed at your pharmacy?

A.  Have I ever --

Q.  Encountered that?

A.  Yes, all the time.

Q.  And how do you normally handle that matter when you come across that?  Is it you find that on your own or is that through the police?

A.  I'll follow up by the -- follow up by the doctor will -- there's a whole different procedures [sic] I use to figure out if it's a fake prescription, but normally, I confiscate them.

Q.  Has it ever happened -- has a situation ever happened where you found out after the fact, other than this case, that a prescription was fake and the DEA may have asked you for records regarding those fake prescription?

A.  Yes.

Q.  Do you -- excuse me.  Do you or either anybody else at your pharmacy, do you all verify every time?

A.  Usually, first fill, with the doctor, if we don't know the -- if we don't know the patient or the doctor.

Q.  So you didn't verify the first time, that's what you're saying?

A.  Yes.

Q.  And all the subsequent times, you don't verify?

A.  No, because we already have a knowledge and we have the ability to look back at handwriting patterns and, you know, a lot of these docs, we have rapports with, so we know if -- we know the -- we know the data coming in.

Q.  When you verify, do you document whether -- if it was verified?

A.  Yes.

Q.  And do you write by whom it was verified from?

46

A.  Yes, usually.

Q.  Usually?

A.  Well

Q.  You said usually?

A.  Yeah.  I mean, if the girl -- if the girl at the office verifies a prescription, we'll put her name, verified by, time, date.

Q.  And when you do verify, you put down who verified or whether you did verify, where is that at?  Where do you place than at on the records?

A.  On the back, where -- we have to put a sticker of what's filled, by what doctor like all the drug info is on the back of the prescription.  So if we have to write notes, we write on the -- we'll write it on the back.

Q.  So the proof that you verified and who verified the prescription will be on the back of the prescriptions?

A.  Yes.

(Doc. No. 267 at 109 ¶ 24 to 112 ¶ 21.)  At no point during trial, even after this testimony regarding the back of the prescriptions, did Defendant object that he did not have access to them.  On re-direct-examination, Scota testified again that he "verif[ies] that the patient who is presenting the prescription at your pharmacy is, in fact, the person that is named on the prescription, but [is] also calling the doctor's office as well to verify that the doctor provided the prescription."  (Id. at 113 ¶ 20 to 114 ¶ 3.)  On re-cross examination, Defendant continued questioning Scota:

Q.  Based on the questions that you were just asked by the Government, those answers again will be on the back of the prescription, the answers to whatever questions that --

A.  Yes.

Q.  Okay.  You said that the way you would know -- or excuse me.  The way you would know that a prescription was filled by one of your pharmacy techs is because initial[s] would be on the front of the prescription or the back?

A.   No, it's in the computer record.  When -- if a technician would type the prescription, they would put in the pharmacist in charge's initials and who typed the prescription.  If they -- if a technician typed it, you'll see their initials also on your bottle.  If you're familiar with a prescription bottle, you'll usually see the pharmacist's initials, it might have a slash, and then the technician's initials.

Q.   And if --

A.   If they were involved.

Q.   And if that's not there, that means the technician --

A.   The pharmacist himself typed it in.

Q.   And that's, again, is Dave Blythe.

A.   Yes.

(Id. at 114 ¶ 7 to 115 ¶ 2.)

Defendant's assertions that having access to the back of the prescription filled at Lehigh Pharmacy would allow him "to impeach the [G]overnment's strongest witness for Counts 8 and 9" and "mitigate[] the devastating effect of his testimony that his employees always follow his policies and procedures" do not bear out in the record.  (Doc. No. 564 at 17.)  As the above testimony shows, verification by a pharmacy technician's initials on the back of the prescription is not the only method of verifying prescriptions brought to Lehigh Pharmacy.  In fact, if the pharmacist himself verified the prescription, no initials would appear on the back of the prescription.  As Scota testified, Dave Blythe, the pharmacist on duty when the prescriptions that are the subject of Counts Eight and Nine were brought to Lehigh Pharmacy to be filled, verified the prescription, so no pharmacy technician's initials would be on the back of the prescription.  Moreover, he also verified a prescription by checking the patient's identification, calling the prescribing physician's office, and recording in his computer that the prescription was verified.

48

Insofar as the phone records are concerned, the evidence was overwhelming that Defendant knew, had contact with, and used the various individuals to fill the false prescriptions. Moreover, he does not describe how being deprived of the phone records prevented him from challenging the evidence on his connections with pseudo-patients.

Accordingly, Defendant has not shown how he was deprived of the opportunity to develop an intelligent defense strategy because of the Government's alleged discovery violations. His claims are all speculative. For all these reasons, Defendant is not entitled to dismissal of the Superseding Indictment or to a new trial.

### C.      Waiver of Counsel

Defendant represented himself at trial. He now argues that he did not knowingly waive his right to counsel. (See Doc. No. 564 at 19-22.) He asserts that he lacked full information to make this decision for the following reasons:

> 3. … in its colloquy [the Court] acknowledged that there were other defenses that the Defendant may raise, [but] it failed to inform the Defendant of them. Nor did the Court inquire whether he understood or knew what those other defenses were.
> 4. In addition, the Court upon hearing that the Defendant was only "fairly familiar" with the Rules of Criminal Procedure and Evidence, the Court did not ask any follow-up questions to determine the full extent of his understanding, and whether he knew that those rules would prohibit him from simply telling the jury his story.
> 5. The Court limited its follow-up questions to whether the Defendant understood that the rules govern what evidence may or may not be introduced at trial, the way a criminal action is tried in Federal Court, and that the Defendant is bound by and must abide by those rules.
> 6. Furthermore, the Court did not "assure itself," on the record, that the Defendant was competent to stand trial. The Court, in its colloquy only stated, "I'm suppose[d] to . . . ensure you're competent to stand trial," but failed, during the colloquy, to take the necessary steps to do so.
> . . .
> 11. Lastly, the Court failed to inform the Defendant of all other facts essential to the broad understanding of the whole matter and any other facts important to the general understanding of the risk involved.

(Id. at 19-21.) (internal citations omitted). Defendant also argues the Court "failed to inform the

Defendant of the risk of forfeiting his right to file a claim of ineffective assistance of counsel against Court-appointed standby-counsel, whom the Court appointed for that very reason, i.e., to provide assistance." (Id. at 22.) Defendant further states that "[t]his is especially true where the Defendant, in this matter, was forced to rely on standby-counsel in important matters of his defense regarding the following: finding expert witnesses, submitting the necessary paperwork to the Court to approve the funds for expert witnesses, performing paralegal duties, and making sidebar objections and arguments." (Id.) In support of his assertion, Defendant cites "[t]ranscripts where the Court informed the Defendant that standby-counsel will perform paralegal duties and make arguments at sidebars." (Id.) For these reasons, Defendant seeks to vacate his conviction and a new trial. (Id. at 23.) Defendant's arguments, however, are without merit.

"The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." United States v. Taylor, 21 F.4th 94, 99 (3d Cir. 2021) (internal quotation marks omitted) (quoting Faretta v. California, 422 U.S. 806, 819 (1975)). In Taylor, the Third Circuit explained that the Sixth Amendment:

> guarantees a criminal defendant the right to decline the assistance of counsel and to represent himself. See [Faretta, 422 U.S.] at 819-21; [United States v.] Jones, 452 F.3d [223,] 228 [(3d Cir. 2006)]. Of course, to exercise this right, a defendant must relinquish his right to counsel and its accompanying benefits. Peppers, 302 F.3d at 129. Thus, he must knowingly, intelligently, and voluntarily waive his right to counsel before a court may allow him to proceed pro se. Buhl v. Cooksey, 233 F.3d 783, 789 (3d Cir. 2000).

Id. at 99-100.

In the Third Circuit, three requirements that must be met before a court can grant an individual's request to proceed pro se:

1. The defendant must assert his desire to proceed pro se clearly and unequivocally.

2. The court must inquire thoroughly to satisfy itself that the defendant understands "the nature of the charges, the range of possible punishments, potential defenses,

technical problems that the defendant may encounter, and any other facts important to a general understanding of the risks involved."[27]

3. The court must "assure itself" that the defendant is competent to stand trial.

United States v. Banks, 55 F.4th 246, 254 (3d Cir. 2022) (quoting Peppers, 302 F.3d at 132) (internal citations omitted).

In Peppers, the Third Circuit set forth "a useful framework for the court to assure itself that a defendant's decision to proceed pro se is knowing and voluntary." 302 F.3d at 136. The Third Circuit recommended that district courts ask the following fourteen (14) questions:

1. Have you ever studied law?

2. Have you ever represented yourself in a criminal action?

3. Do you understand that you are charged with these crimes: [state the crimes with which the defendant is charged]?

4. Do you understand that the U.S. Sentencing Commission has issued sentencing guidelines that will be used in determining your sentence if you are found guilty?

5. Do you understand that if you are found guilty of the crime charged in Count 1, the Court must impose an assessment of $ , and could sentence you to as many as years in prison and fine you as much as $ ? [Ask defendant this question for each count of the indictment or information.]

6. Do you understand that if you are found guilty of more than one of these crimes, this Court can order that the sentences be served consecutively, that is, one after another?

7. Do you understand that if you represent yourself, you are on your own? I cannot tell you -- or even advise you -- as to how you should try your case.

7a. Do you know what defenses there might be to the offenses with which you are charged? Do you understand that an attorney may be aware of ways of defending against these charges that may not occur to you since you are not a lawyer? Do you understand that I cannot give you any advice about these matters?

---

27 Stated differently, "at a minimum, the inquiry must address whether the defendant understands 'the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder' to enable the trial court to assure itself that the defendant knowingly and intelligently waives his right to counsel." Taylor, 21 F.4th at 103 (quoting United States v. Booker, 684 F.3d 421, 425-26 (3d Cir. 2012)).

8.  Are you familiar with the Federal Rules of Evidence?*

8a.  Do you understand that the Federal Rules of Evidence govern what evidence may or may not be introduced at trial and that, in representing yourself, you must abide by those rules?

9.  Are you familiar with the Federal Rules of Criminal Procedure?*

9a.  Do you understand that these rules govern the way a criminal action is tried in federal court?  Do you understand that you must follow these rules?

10.  Do you understand that you must proceed by calling witnesses and asking them questions, and that, except when and if you yourself testify, you will not be permitted to tell the jury matters that you wish them to consider as evidence?

10a.  Do you understand that it may be much easier for an attorney to contact potential witnesses, gather evidence, and question witnesses than it may be for you?

11.  I must advise you that in my opinion a trained lawyer would defend you far better than you could defend yourself.  I think it unwise of you to try to represent yourself.  You are not familiar with the law.  You are not familiar with court procedure.  You are not familiar with the rules of evidence.  I strongly urge you not to try to represent yourself.

12.  Now in light of the penalties that you might suffer if you are found guilty, and in light of all of the difficulties of representing yourself, do you still desire to represent yourself and to give up your right to be represented by a lawyer?

13.  Are you making this decision freely, and does it reflect your personal desire?

14.  Do you have any questions, or do you want me to clarify or explain further anything that we have discussed here?

Id. at 136-37.  The Third Circuit continued by stating that:

If the answers to the foregoing questions satisfy the court that the defendant knowingly and voluntarily desires to proceed pro se, the court would then state the necessary conclusions, such as:

I find that the defendant has knowingly and voluntarily waived the right to counsel.  I will therefore permit the defendant to represent himself (or herself).

*As is evident from the follow-up questions, the purpose of inquiring as to the defendant's knowledge is only to ascertain the extent to which the defendant understands the procedure that is to be followed during the course of the trial, not to assess his legal knowledge or training to determine his ability to represent himself well.

Id. at 137.[28]   Regarding the above framework, the Third Circuit does "not require all trial courts to ask these questions—'there is no talismanic formula for the court's inquiry.'"  Taylor, 21 F.4th at 102 (quoting Peppers, 302 F.3d at 135).  "Nevertheless, at a minimum, the inquiry must address whether the defendant understands 'the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder' to enable the trial court to assure itself that the defendant knowingly and intelligently waives his right to counsel."  Id. at 103 (quoting United States v. Booker, 684 F.3d 421, 425-26 (3d Cir. 2012)); see also United States v. Jones, 452 F.3d 223, 234 (3d Cir. 2006) ("Although no scripted recital is required for this inquiry, we do require that all of the subjects covered in the model questions set forth in Peppers be fully explored in the inquiry, to the extent those subjects are relevant.").

Moreover, a defendant proceeding pro se waives potential claims of ineffective assistance of counsel against himself or his nonexistent counsel.  In United States v. Hoffman, the Third Circuit considered a defendant's petition under 28 U.S.C. § 2255 challenging his sentence and conviction.  Nos. 21-2178 & 22-2103, 2023 WL 1775654 (3d Cir. Feb. 6, 2023).  In addressing the defendant's ineffective assistance of counsel claims against his standby-counsel, the Third Circuit stated the following:

> Nothing herein, however, should be construed as granting [the defendant] leave to file a successive § 2255 petition or opining that an ineffective assistance of counsel claim can be brought against standby-counsel.  See United States v. Morrison, 153 F.3d 34, 55 (2d Cir. 1998) (holding that no such claim exists).

Id. at *2 n.2; see also United States v. Tilley, 326 F. App'x 96, 97 (3d Cir. 2009) (holding that pro se defendant is prohibited from litigating the quality of his own defense).  This axiom extends to standby-counsel, as there is "no constitutional right to standby-counsel, let alone a right to have

---

[28]  The asterisk included in the last quoted paragraph from Peppers refers to the questions regarding the defendant's knowledge of the Federal Rules of Evidence and Criminal Procedure.

standby-counsel raise objections on" a defendant's behalf.  Tilley, 326 F. App'x at 96.  For this reason, Defendant's claim that his waiver of the right to counsel was ineffective because he was not advised by the Court that he cannot claim that his standby-counsel was constitutionally ineffective is without merit.

But most importantly, Defendant's claim here that he did not knowingly, voluntarily, and intelligently waive his right to counsel is belied by the transcript of his colloquy, extensively quoted infra, wherein the Court granted his Motion to proceed pro se.  (See Doc. No. 285.)  In this regard, the Court will first address Defendant's general claim that he did not knowingly, voluntarily, or intelligently waive his right to counsel.  Then, the Court will address Defendant's argument that he was not fully informed on possible defenses or of the other risks associated with proceeding to represent himself at trial.  Finally, the Court will discuss the remaining deficiencies alleged by Defendant.

At a hearing held on October 2, 2015,[29] the Court began the colloquy on the waiver of the right to counsel by addressing a letter from Defendant to the Court:

> THE COURT:  . . .  Mr. Fields, would you like to speak to counsel?
>
> THE DEFENDANT:  No, thank you.
>
> THE COURT: All right.  I take it from what you just said that you want a different lawyer?
>
> THE DEFENDANT:  I would like to proceed pro se.
>
> THE COURT:  You want to represent yourself?
>
> THE DEFENDANT:  Yes, I do.

---

[29]  The trial began on November 28, 2017, when jury selection commenced.

(Id. at 4 ¶¶ 14-22.)  The Court continued its colloquy by reading relevant passages from Booker

and Peppers so Defendant understood what the Court needed to assess to grant his Motion:

> THE COURT:  Let me just go over what the [Booker] required, and then we'll ask you some questions, okay?  I just want you to understand what the law is, because the law requires that you fully understand the nature of your giving up the right to counsel and representing yourself, which you have an absolute right to do, Mr. Fields.

> [The Court then read the following passage from Booker:]

>> "Since a person cannot secure the right to proceed pro se without sacrificing the right to counsel, we require defendants to assert the right to proceed pro se affirmatively and unequivocally.  And we have placed on the Court the burden of establishing that the defendant who does so acts voluntarily, and that he understands both the scope of the rights sacrificed and the restrictions and challenges that he will face."

> As the Supreme Court has indicated, the defendant must knowingly and intelligently forego the traditional benefits associated with the right to counsel before he can proceed in representing himself.  The Court goes on to articulate a standard for determining whether the right to counsel was knowing and intelligent. (Reading)

>> "For a waiver of the right to counsel to be knowing and intelligent, which it must be in order to be valid, the defendant should be made aware of the dangers and disadvantages of self-representation so that the record will establish that he knows what he is doing and his choice is made with . . . his eyes open.

>> To ensure that the defendant truly appreciates the dangers and disadvantages of self-representation, a waiver must be made with an appreciation of the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder.  While our precedents reveal no '[t]alismanic formula' for determination when a colloquy has yielded a defective waiver, we have stated that the District Court's inquiry must establish that the defendant understands all risks and consequences associated with his decision for self-representation.  And even if the colloquy skips just one of the relevant factors, it—to make sure that the waiver is knowingly, intelligent, and voluntary."

> In another case Peppers and I'm reading from footnote 5:

> "We outline three skeletal requirements to reflect the obligations placed on the District Court when a defendant seeks to proceed <u>pro se</u>. The defendant must assert his desire to proceed <u>pro se</u> clearly and unequivocal[l]ly . . . . The Court must . . . inquire thoroughly to satisfy itself that the defendant understands the nature of the charges, the range of possible punishments, potential defenses, technical problems that a defendant may encounter, and any other facts important to a general understanding of the risks involved. The Court must assure itself that the defendant is competent to stand trial."

And they do refer us in the footnote to—or bench book, the 2000 edition—the fourth edition, dated 2000 . . . . Mine has a date of March 2013. So I have updated questions.

But I say all this on the record, Mr. Fields, because I just want you to understand that you have an absolute right to represent yourself. But I, as the trial judge, under the law, I have to make sure that . . . and . . . the Court of Appeals puts the burden and the Supreme Court puts the burden on the trial judge to make sure that your giving up your right to counsel and proceeding to represent yourself is . . . knowingly done, voluntarily done, and intelligently done. So having advised you of all this, do you still wish to represent yourself and give up your right to counsel?

THE DEFENDANT: I do.

(<u>Id.</u> at 7 ¶ 16 to 10 ¶ 17.) <u>See also</u> <u>Taylor</u>, 21 F.4th at 103 ("[A]t a minimum, the inquiry must address whether the defendant understands 'the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder' to enable the trial court to assure itself that the defendant knowingly and intelligently waives his right to counsel."); <u>Booker</u>, 684 F.3d 421; <u>Peppers</u>, 203 F.3d 211.

The Court asked preliminary questions on Defendant's background and potential prior substance use.

THE COURT: All right. How old are you?

THE DEFENDANT: Thirty-five years old.

THE COURT: And how far did you go in school?

THE DEFENDANT: I graduated high school.

THE COURT:  Do you read and write the English language?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right. And are you currently under the influence of drugs or alcohol?

THE DEFENDANT:  No, I'm not.

THE COURT:  Have you had a drug or alcohol problem in the past?

THE DEFENDANT:  Yes, I have.

THE COURT:  How long ago? I mean, you know, let's say – let me ask it this way.  Have you had any treatment for a drug or alcohol problem?

THE DEFENDANT:  No, I have not.

THE COURT:  All right. And when is the last time that you used any drugs or alcohol?

THE DEFENDANT:  2015.

THE COURT:  Huh?

THE DEFENDANT:  The beginning of this year, 2015.

THE COURT:  All right. And is that the date of your arrest or about the date of your arrest?

THE DEFENDANT:  On or about, around that time.

(Id. at 10 ¶ 18 to 11 ¶ 17.)

Then the Court proceeded by explaining the charges against him:

THE COURT:  Do you understand that you are charged in this case with the following offenses?  And before you answer that, you've received a copy of the indictment?

THE DEFENDANT:  Yes, I have.

THE COURT:  And you've read it?

THE DEFENDANT:  Yes, I have.

THE COURT: All right. . . .  Counts 1 to 32 charge you with a violation of what is known [as] the Title 21 U.S.C. § 841(a)(1) and Title 18 U.S.C. § 2.  Now in Count 1 it says . . . .  that the Controlled Substances Act governs the manufacture,

distribution, and dispensing of controlled substances in the United States.  And there are five controlled substance schedules, 1 to 5.  And I'm not going to read every word of this, but I just want to make sure you understand what's in the indictment.

Then paragraph 2 on page 1 says that oxycodone is a narcotic analgesic and that is similar to morphine and is a Schedule 2 controlled substance.
And then if you go over to the next page, it says that oxycodone is used in pain relief drugs in varying strengths.  And it gives the strengths.  And it gives the other drugs that . . . contain oxycodone.  And that's call[ed] acetaminophen.

And then paragraph 3 says that Dr. B[u]rch was a licensed physician in the Commonwealth of Pennsylvania.  And he has a medical license and Drug Enforcement Administration registration number.  And then it goes on to talk about the conspiracy.
. . .
And the conspiracy is from April 11, 2011 to September 29, 2012.  And I'm looking at page 2 of the indictment.  And it says that you conspired and agreed with Khalia Landers and Monica Harrison and others to . . . attempt to knowingly and intentionally distribute a mixture and substance containing a detectible amount of oxycodone, a Schedule 2 controlled substance, in violation of Title 21 U.S.C. § 841(a)(1).  So the object of the conspiracy was to distribute this controlled substance.

And then it lists what's called the manner and means by which the conspiracy was . . . carried out.  And you've read all this, right?

THE DEFENDANT:  Yes, I have.

THE COURT:  All right.  And oh, for example, it says on paragraph 10 let's say, after collecting the pills from pseudo[-]patients, Defendant Lamar Fields sold the pills on the streets of Philadelphia.  Do you see that?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  And I'm not going to read every word of it, but that's distribution.  And then it goes . . . to list on pages 5 to page 13 . . . 126 overt acts.  There has to be overt acts.  Well, the Government has charged overt acts in furtherance of the conspiracy.

Do you understand, Mr. Fields?

THE DEFENDANT:  Yes, I do.

THE COURT: All right.  Now for example, let's look at overt act number 3 on page 5.  It says the defendant, Lamar Fields, and others known and unknown to the Grand

Jury obtained the oxycodone tablets in dosages and quantities described below, through the use of forged prescriptions from Monica Harrison and . . . at the pharmacies listed below, each constituting a separate act.  And it lists all of these overt acts in this [chart].  And it gives the overt act number, the date, who the pseudo[-]patient was, and the drug type, and quantity and dosage—and the quantity, and location of the pharmacy where the forged prescription was presented.  You see all that?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  So that's what you're charged with in Count [1], conspiracy to distribute these items.  And again, a conspiracy is an agreement amongst two or more people to do an act—another act illegally.  You understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Now in Counts 2 through 32,[30] you're charged with actual distribution not conspiracy. . . .  And it says on or about the dates listed below, in Philadelphia, in the Eastern District of Pennsylvania, you knowingly and intentionally distributed and aided and abetted in the distribution of the pills noted below.  Each pill of which is a mixture and substance containing a detectable amount of oxycodone, a Schedule 2 controlled substance obtained from the pharmacies listed below, and each distribution consisting a separate count.  And again, there's a [chart].  It gives the count, the date of the distribution, the drug type dosage, the quantity, and the location of the pharmacy.

And Title 21 U.S.C. § 841(a)(1) is the distribution charge, you know, knowingly and intentionally distributes a controlled substance is . . . could be guilty of that kind of charge.  And again, it's just an accusation, the indictment.  It's not proof of anything.  This is just what you're charged with.

And then you see. . . .  it says Title 18 U.S.C. § 2?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  That's the aiding and abetting section.  And what aiding and abetting is, if you procure or help or assist somebody else, aid and abet somebody else to commit a federal offense, and you have the same object in your mind as that person who's committing . . . the federal offense, when you aid or help or assist them, or aid and abet them, then under federal law, you're equally guilty of that crime as the person who actually did it.  Do you understand?

---

[30]  At the time of the colloquy, the Indictment had not been superseded.  (See Doc. No. 134.)  However, because only the number of charges and not their substance was changed, this discussion is applicable to Counts 2 through 7 of the Superseding Indictment.  (See id.)

THE DEFENDANT:  Yes.

THE COURT:  Now that's what aiding and abetting is.  Now you look at . . . the next series of counts, counts 33 to 63,[31] again, this charges you with, on or about each of the dates in the chart below, with knowingly and intentionally acquiring and aiding and abetting the acquisition of oxycodone, a Schedule 2 controlled substance, by misrepresentation, fraud, forgery, deception, and subterfuge, that is, you presented and aided and abetted the presentation of fraudulent prescriptions for 10 milligram and 30 milligram oxycodone tablets in the quantity specified below, which were created without the knowledge and permission of the physician to whom the options were attributed and signed forgeries of the physician's signature, with each acquisition constituting a separate count.  And in the chart, it gives the count, the date of the distribution, the drug type, dosage, quantity, and the location of the pharmacy.  And this goes all the way to . . . page 20, which . . . the last count is 63.

And violation of 843 is . . . whoever acquires a controlled substance through misrepresentation, fraud, forgery, deception, and subterfuge, and does so knowingly and intentionally, would be in violation of the law.  Do you understand?

THE DEFENDANT:  Yes, I do.
. . .
THE COURT:  All right.  So these are the charges.  This is what you're charged with in this case.  Do you have any question about what you're charged with?

THE DEFENDANT:  No, I do not.

THE COURT: All right.  You understand the nature of these charges?

THE DEFENDANT:  Yes, I do.

(Doc. No. 285 at 12 ¶ 19 to 19 ¶ 1) (cleaned up).  After explaining the charges, the Court explained

the possible punishments he faced if found guilty:

THE COURT:  All right.  And on Count 1, which is the conspiracy count, you face . . . . a maximum penalty of 20 years' imprisonment, a mandatory term of three years' supervised release, a $1 million fine, and $100 special assessment.  Do you understand?

THE DEFENDANT:  Yes, I do.

---

[31]  This discussion is still applicable to Counts 8 through 13 of the Superseding Indictment.  (See Doc. No. 134.)

THE COURT: All right. On Counts 2 to 32, on each count, you would face a maximum of 20 years' imprisonment, a mandatory term of three years' supervised release, a $1 million fine, and a $100 special assessment. Do you understand?

THE DEFENDANT: Yes.

THE COURT: On Counts 33 to 64, [on] each count, . . . if you were convicted, you would face four years' imprisonment, a mandatory term of . . . three years' supervised release, a $250,000 fine, and a $100 special assessment. . . . The total statutory sentence that you would face is 764 years' imprisonment with a three-year term of supervised release, a $39,750,000 [fine] and a $6300 special assessment. Do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: All right. Now, again, do you understand that if you are found guilty on more than one of these crimes the Court can order that the sentences be served consecutively, and that is one after another. Do you understand?

THE DEFENDANT: Yes, I do.

THE COURT: All right. . . . [I]n federal court we have sentencing guidelines that a Court has to consider. . . . [O]ne of the factors we consider, if a person is found guilty—and I just want you to understand that these sentencing guidelines are only advisory. They're not mandatory. They're just one factor I have to consider. Are you aware of the presence of sentencing guidelines?

THE DEFENDANT: Yes, I am.

THE COURT: All right. I want you to understand that . . . these advisory sentencing guidelines may have an [e]ffect on your sentence if you're found guilty. Do you understand?

THE DEFENDANT: Yes, I do.

(Id. at 19 ¶ 2 to 20 ¶ 20.) Finally, the Court advised Defendant of the technical difficulties involved

with and the repercussions of representing himself:

THE COURT: Do you understand that if you represent yourself, you're on your own? Do you understand?

THE DEFENDANT: Yes.

THE COURT: I cannot tell you or even advise you how you should try your case. You have to do that all on your own. You understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  And even though you're representing yourself, we have, in the federal court, what's called Federal Rules of Evidence.  There are Federal Rules of Criminal Procedure.  Even in this court, we have what we call Local Rules of Criminal Procedure.  And are you familiar with the Federal Rules of Evidence?

THE DEFENDANT:  Yes, I am.

THE COURT:  What about the Federal Rules of Civil -- Criminal Procedure?  I'm sorry.

THE DEFENDANT:  I'm fairly familiar with each.

THE COURT:  All right.  Now even when you represent yourself, you're -- you have to follow these rules.  These rules apply to everybody whether you're represented by counsel or not represented by counsel.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And do you understand that the rules of evidence govern what evidence may or may not be introduced at trial, and that in representing yourself, you must abide by these very technical rules, and that they will not be relaxed for your benefit?  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Now, again, I ask you if you're familiar with the rules of criminal procedure.  But I want you to understand that those rules govern the way a criminal action is tried in federal court and that you are bound by those rules, and they will not be relaxed for your benefit.  Do you understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Now I'm going to advise you that, in my opinion, a trained lawyer would defend you far better than you can defend yourself.  I think it would [be] unwise of you to try to represent yourself.  You're not familiar with the law to the extent that a trained lawyer would be.  And the same with court procedure.  You're not familiar with court procedure to the extent of a trained lawyer.  And the same is true with the rules of evidence.  And I strongly urge you to try to -- not try to represent yourself.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  I'll say that again.  I strongly urge you to not try to represent

yourself.  Knowing what I just said, do you still want to represent yourself?

THE DEFENDANT:  I do, but I do not object to a standby-counsel.

THE COURT:  All right.  We'll get to that in one second, standby-counsel.  But in light of the penalty you might suffer if you are found guilty, and in light of the difficulties in representing yourself, you still desire to represent yourself and to give up your right to be represented by a lawyer?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  Is your decision voluntary?

THE DEFENDANT:  Yes, it is.

(Id. at 20 ¶ 21 to 23 ¶ 4.)  The Court then proceeded to address the possible defenses and the general risks associated with Defendant's request to proceed pro se.

THE COURT:  All right.  You know, I can't -- if the case goes to trial, I can't predict what defenses you might have.  How . . . you may try your case, that would be strictly up to you.  But a lawyer may see some defenses that you might have that you may miss.  You understand?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And in trying the case, a lawyer may pursue one strategy which might be in your best interest, that you may not see in representing yourself. You understand?

THE DEFENDANT:  Yes, I do.

THE COURT:  All right.  You know, I'm supposed to advise you of the general risks involved and ensure you're competent to stand trial.  But it's hard for a Court to, you know, tell you what your potential defenses are in a case.  Obviously, the Government, in every criminal case, is required to prove your guilt of each and every element of the offenses with your charge beyond a reasonable doubt. Sometimes defendants rely on defenses that the Government just hasn't prove[n] their case.  Sometimes there may be other defenses that a defendant raises.  But these are all things that I want to advise you of and make sure you understand what you're doing.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  Do you have any questions you want to ask me about your waiver of your right to counsel and your right to proceed pro se?

THE DEFENDANT:  No, I do not.

(Id. at 23 ¶ 5 to 24 ¶ 7.)  Then, the Court asked whether Assistant United States Attorney Nicole

Phillips, counsel for the Government, had "any other questions . . . that you might ask that we

haven't gone over?"  (Id. at 23 ¶¶ 8-10.)  The following exchange took place:

> MS. PHILLIPS:  I don't have any other questions, Your Honor.  I just have a suggestion, if I may.
>
> THE COURT:  Yes.
>
> MS. PHILLIPS:  Sometimes -- of course, I don't know what the [D]efendant's letter said.  And I, of course, recognize that he has already filed some pro se pretrial motions.  From reviewing those motions, Your Honor, I do agree that the [D]efendant could probably benefit from the advice of counsel in order to file motions that would have more merit.
>
> Never the -- so my point is, given that the Defendant has said that he's not opposed to the appointment of standby-counsel maybe the issue is just a conflict between  a personality conflict, or whatever it may be, with Mr. Abaza, with all due respect to Mr. Abaza, because I do believe that Mr. Abaza has done all that he can to adequately and zealously advocate for Mr. Fields at this time, this far in the process. So I would maybe suggest the Court to consider the appoint -- maybe the solution could be the appointment of new counsel that could maybe develop a better relationship with Mr. Fields, help him to understand some of the nuances that the Court has discussed, and then give Mr. Fields that opportunity, and hold this under advisement for that opportunity.  And then after that, if Mr. Fields still decides that he wants to represent himself and that person be standby-counsel, that the Court could revisit it at that point.
>
> THE COURT:  Well, I appreciate the Government's suggestion.  And Mr. Fields appears to me to be a very intelligent individual who knows what he's doing, and he wants to represent himself.  I will appoint standby-counsel from our Criminal Justice Act list.  And if, at any time, Mr. Fields decides that he wants counsel to represent him, he can notify the Court and we can have a status hearing, and he can change his mind.  But right now, he has made it clear to me that he wants to represent himself.
>
> And I assume you want different standby-counsel other than present counsel in court today?
>
> THE DEFENDANT:  I do.

THE COURT:  All right.  So we'll leave it at that, Ms. Phillips.  I'm just looking at this opinion I referred to before.  And the judge, in that case, even advised the defendant that your -- there might [be] potential problems obtaining evidence and locating witnesses as an incarcerated defendant.  Do you understand?

THE DEFENDANT:  Yes, I do.

(Id. at 24 ¶ 11 to 26 ¶ 4.)  Based on Defendant's responses to the questions asked, the Court found that he knowingly and voluntarily waived his right to counsel, permitted him to represent himself, and appointed standby-counsel to aid Defendant.  (See id. at 26 ¶¶ 6-8, 27 ¶¶ 14-15.)

At the beginning of the colloquy hearing, when the Court asked Defendant if he would like a different lawyer, Defendant unequivocally stated he "would like to proceed pro se."  (Id. at 4 ¶ 20.)  The Court asked Defendant again if he "want[s] to represent [himself]," to which Defendant replied: "Yes, I do."  (Id. at ¶¶ 18-22.)  In addition, the Court addressed all of the subjects covered by the model questions set forth in Peppers.  See Jones, 452 F.3d at 234.  The Court's colloquy with Defendant confirmed that he "knowingly and intelligently waive[d] his right to counsel" because it was evident he understood "'the nature of the charges, the statutory offenses included within them, and the range of allowable punishments thereunder.'"  Taylor, 21 F.4th at 103 (quoting Booker, 684 F.3d at 425-26).

Moreover, as stated supra, the Court is not required to inform Defendant that he cannot file ineffective assistance of counsel claims against standby-counsel.  See Hoffman, 2023 WL 1775654, at *2 n.2 (holding that its decision affirming the Court's denial of the defendant's § 2255 petition "should [not] be construed as . . . opining that an ineffective assistance of counsel claim can be brought against standby-counsel") (citing Morrison, 153 F.3d at 55); see also Tilley, 326 F. App'x at 97 (holding that pro se defendant is prohibited from litigating the quality of his own defense and that there is "no constitutional right to standby-counsel, let alone a right to have standby-counsel raise objections on" a defendant's behalf).

In addition, regarding Defendant's argument that "the Court did not ask any follow-up questions to determine the full extent of his understanding [of the Federal Rules of Evidence and of Criminal Procedure], and whether he knew that those rules would prohibit him from simply telling the jury his story" (Doc. No. 564 at 20), the Court need not "assess his legal knowledge or training to determine his ability to represent himself well."  Peppers, 302 F.3d at 137; see also Faretta, 422 U.S. at 835-36 ("We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire.  For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.").

Accordingly, for all these reasons, Defendant's request for a new trial based on his alleged unknowing waiver of his right to counsel will be denied.

### D.      Motion to Suppress

On December 5, 2017, the Court issued an Opinion and Order denying a Motion to Suppress Evidence filed by Defendant in which he sought to suppress evidence sourced from a March 29, 2013 traffic stop of a rental vehicle he was driving (Doc. No. 149).  (Doc. Nos. 255 at 1; 256 at 1.)  After determining that Defendant was an unauthorized driver, officers seized the rental vehicle and did an inventory search.  (Doc. No. 255 at 4-5.)  The inventory search uncovered over $9,400 in cash and new designer clothing with the sales tags attached to them.   (Id.) Defendant voluntarily accompanied officers to the police station, where he gave officers consent to search a motel room where he was staying.   During that search, the police found his identification card and Dr. Burch's prescription pads.  (See id. at 7-11.)  Defendant filed a Motion to Suppress all items seized, and, after an evidentiary hearing, the Court denied his Motion in an Opinion and Order.  (See Doc. Nos. 255, 256.)

In Defendant's Second Amended Post-Trial Omnibus Motion, he again requests reconsideration of the Court's denial of his Motion to Suppress.  (See Doc. No. 564 at 24.)[32] Specifically, he argues that the Philadelphia Police Department ("PPD") officers who stopped and arrested him unlawfully impounded the vehicle and violated a PPD Directive[33] dated January 23, 2013 governing inventory searches (the "January 2013 Directive").  (See Doc. No. 564 at 26.)  He claims the January 23, 2013 Directive is evidence he newly discovered after the Court denied his

---

[32]  In an Opinion and Order dated August 31, 2021, the Court denied a Motion for Reconsideration, affirming the denial of the Motion to Suppress.  (See Doc. Nos. 433, 434.)

[33]  Under Pennsylvania law:

> (1) If a person operates a motor vehicle or combination on a highway or trafficway of this Commonwealth while the person's operating privilege is suspended, revoked, canceled, recalled or disqualified or where the person is unlicensed, as verified by an appropriate law enforcement officer in cooperation with the department, the law enforcement officer shall immobilize the vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and
>
> stored by the appropriate towing and storage agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified.
>
> (2) If a motor vehicle or combination for which there is no valid registration or for which the registration is suspended, as verified by an appropriate law enforcement officer, is operated on a highway or trafficway of this Commonwealth, the law enforcement officer shall immobilize the motor vehicle or combination or, in the interest of public safety, direct that the vehicle be towed and stored by the appropriate towing and storing agent pursuant to subsection (c), and the appropriate judicial authority shall be so notified.

See 75 Pa. Stat. and Cons. Stat. Ann. § 6309.2.

The subject of the January 2013 Directive is the "Police Towing of Vehicles."  The purpose of the Directive is "[t]o define and distinguish the responsibilities of the Philadelphia Police Department's Tow Squad" and it defines the procedure for officers seeking to tow a vehicle.  The Directive itself does not have language to the effect that if the lessee of a motor vehicle gives permission to another to drive the vehicle, the police may not take custody of the vehicle and do an inventory search.  In any event, the police had no knowledge on March 29, 2013 that Defendant drove the leased vehicle with the permission of Naimah Fuller, the lessee of the vehicle, as described more fully infra.

Motion to Suppress in the Opinion and Order dated December 5, 2017 (Doc. Nos. 255, 256).  (See

Doc. No. 564 at 26.)  He also appears to argue that the Court committed the following error of law:

> The Supreme Court [in Byrd v. United States, 138 S. Ct. 1518 (2018)] ultimately
> ruled that [a person driving a rental car but who is not listed on the rental agreement]
> did have an expectation of privacy in the vehicle.  Consequently, the vehicle cannot
> be searched absent probable cause.
>
> Based on the Supreme Court's ruling, the Defendant sought reconsideration of his
> motion to suppress, . . . but was denied.
>
> The Court based its denial [of his Motion to Suppress] on the fact that it had
> previously given the Defendant standing to challenge the search and stated that "the
> Supreme Court's decision in Byrd did not change the Court's prior decision and
> does not give the Defendant footing to challenge the denial of his motion to
> suppress." . . .
>
> What the Court fails to acknowledge is why the Supreme Court ruled that a person
> driving a rental car but not listed as an authorized driver on the rental agreement
> has a reasonable expectation of privacy.

(Id. at 24.)

"The standard . . . to prevail on a motion for reconsideration is high . . . ."  Berry v. Jacobs

IMC, LLC, 99 F. App'x 405, 410 (3d Cir. 2004).  Motions for reconsideration "are granted for

compelling reasons . . . not for addressing arguments that a party should have raised earlier" and

"they do not empower litigants . . . to raise their arguments piece by piece."  United States v.

Dupree, 617 F.3d 724, 732-33 (3d Cir. 2010) (internal quotation marks omitted).  This high

standard is rooted in judicial economy:

> Because of the interest in finality, at least at the district court level, motions for
> reconsideration should be granted sparingly; the parties are not free to re-litigate
> issues the court has already decided.  . . .  [A] motion for reconsideration is not
> properly grounded in a request for a district court to rethink a decision it has already
> made, rightly or wrongly . . . .

Williams v. Pittsburgh, 32 F. Supp. 2d 236, 238 (W.D. Pa. 1998) (internal citations omitted).

"The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact

or to present newly discovered evidence." Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 251 (3d Cir. 2010) (internal quotation marks omitted) (quoting Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999)). Thus, a proper motion for reconsideration "must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." Wiest v. Lynch, 710 F.3d 121, 128 (3d Cir. 2013) (internal quotation marks omitted) (quoting Lazaridis v. Wehmer, 591 F.3d 666, 669 (3d Cir. 2010)). New evidence is evidence "that was not available when the court issued its order." Gibson v. State Farm Mut. Auto. Ins. Co., 994 F.3d 182, 190 (3d Cir. 2021) (citing Lazaridis, 591 F.3d at 669).

Moreover, "[a] motion for reconsideration 'addresses only factual and legal matters that the Court may have overlooked. It is improper on a motion for reconsideration to ask the Court to rethink what it had already thought through—rightly or wrongly.'" In re Blood Reagents Antitrust Litig., 756 F. Supp. 2d 637, 640 (E.D. Pa. 2010) (quoting Glendon Energy Co. v. Borough of Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993)). Therefore, "[m]ere dissatisfaction with the Court's ruling . . . is not a proper basis for reconsideration." Progressive Cas. Ins. Co. v. PNC Bank, N.A., 73 F. Supp. 2d 485, 487 (E.D. Pa. 1999).

In addition, under Federal Rule of Criminal Procedure 33, a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. In United States v. Napolitan, the Third Circuit explained when a court may grant a motion for a new trial under Rule 33 based on newly discovered evidence:

> The defendant must (1) identify newly discovered evidence; (2) allege facts from which his diligence can be inferred; (3) demonstrate the evidence is not merely cumulative or impeaching; (4) show the evidence is material to the issues involved; and (5) show the result is such that, if introduced at trial, it would probably produce an acquittal.

69

762 F.3d 297, 305 (3d Cir. 2014) (quoting United States v. Kelly, 539 F.3d 172, 181-82 (3d Cir. 2008)).  Newly discovered evidence is "evidence . . . discovered since the trial."  United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006) (internal quotation marks and citation omitted).  "Although the decision to grant or deny a motion for a new trial lies within the discretion of the district court, the movant has a 'heavy burden' of proving each of these requirements."  Napolitan, 762 F.3d at 305 (internal quotation marks omitted) (quoting Kelly, 539 F.3d at 181-82) (citation omitted).  "If just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail."  Id. (internal quotation marks and citation omitted) (quoting Kelly, 539 F.3d at 181-82) (citation omitted).

Here, Defendant's request once again for reconsideration of the denial of the Motion to Suppress fails for several reasons.  First, Defendant's argument that the Court ignored Byrd contradicts what the Court stated in its August 31, 2021 Opinion.  Because Byrd governs whether a driver not listed on a vehicle's rental agreement has an expectation of privacy in the rental vehicle he is driving and the Court denied Defendant's Motion "on a ground unrelated to the fact that he was not listed on the car's rental agreement"—namely, that the police properly conducted an inventory search—Byrd did not change the Court's analysis.  (Doc. No. 433 at 48-49.)

In United States v. Montalvo-Flores, the Third Circuit held that a defendant had an expectation of privacy in a rental car that he had permission to use.  United States v. Montalvo-Flores, 81 F.4th 339, 346 (3d Cir. 2023).  Here, Defendant's Motion to Suppress was decided on the merits as if he did have an expectation of privacy.  As the Court stated in its August 31, 2021 Opinion: "[T]he Court denied Defendant's Motion because it determined the inventory search of the rental car was lawful, not because Defendant lacked standing to challenge the inventory search."  (Doc. No. 433 at 49.)

Police officers are permitted to conduct inventory searches of lawfully seized vehicles without a warrant.  United States v. Mundy, 621 F.3d 283, 287 (3d Cir. 2010) (citing Colorado v. Bertine, 479 U.S. 367, 371 (1987)).  Three objectives are served when conducting an inventory search: "(i) the protection of the owner's property while it remains in police custody; (ii) the protection of the police against claims or disputes over lost or stolen property; and (iii) the protection of the police from potential danger."  Id. (citing South Dakota v. Opperman, 428 U.S. 364, 368 (1976)).  A caveat to this directive, however, is that the search must be conducted in accordance with some established standard or routine consistent with a purpose that is non-investigative.  Mundy, 621 F.3d at 288 (3d Cir. 2010) (citing United States v. Salmon, 944 F.2d 1106 at 1120-21 (3d Cir. 1991) (citations omitted)).  This ensures that officers are "not [ ] allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of a crime."  Id. (brackets in original) (citing Florida v. Wells, 495 U.S. 1, 4 (1990)).  The Court held that the inventory search was lawful and the items recovered from that search would not be suppressed because:

> The officers did the inventory search not only to ensure that Defendant would not accuse them later on of theft or tampering with his property, but also to protect themselves in case they uncovered any weapons or dangerous items.  Based on the officers' testimony, it is clear that at the time of the search and seizure of the Ford Taurus, there were established procedures within the Philadelphia Police Department on when and how to conduct inventory searches.  The officers acted in accordance with these procedures and did not exceed their authority when they conducted the inventory search.  Thus, the inventory search was lawful and items recovered from that search will not be suppressed.

(Doc. No. 433 at 49.)

Moreover, the Court assumed that Defendant had standing under the Fourth Amendment to challenge the officers' search of the rental vehicle: "Although the Court did not say directly that Defendant had standing, because the Court considered the Motion on its merits, it is evident that the Court found sub silentio that Defendant had standing.  Thus, Byrd was followed."  (Id. at 48.)

71

Second, under either the standard for a motion for reconsideration or the Rule 33 standard for newly discovered evidence, Defendant's newfound reliance on the January 2013 Police Directive does not warrant reconsideration of the denial of his Motion to Suppress or a change in the outcome.  Defendant avers that the January 2013 Directive "is new evidence that [he] was able to acquire since the last hearing that [he] was not able to obtain then."  (Doc. No. 522 at 102 ¶¶ 13-15.)  He explains he was unable to timely acquire it because "during the suppression hearings back in 2015, . . . Mr. Ongay [his counsel]. . . was only able to obtain . . . Philadelphia Police Department directives for the years . . . that was [sic] after the traffic stop."  (Id. at 103 ¶¶ 12-17.)  And after he "fired Mr. Ongay and was appointed Matthew Lee [standby-counsel], [they] tried to find these same documents for the year of the traffic stop.  Now, Mr. Lee had difficulties finding the directives because the number of directives have changed from after 2013."  (Id. at 103 ¶ 22 to 104 ¶ 1.)

The Government responded to Defendant's arguments on the January 23, 2013 PPD Directive on inventory searches:

> [T]he defendant has not shown any -- that he's gone through diligent efforts to obtain this information or that it was somehow unavailable to him at the time of the hearing.  This is different than some of these other post-trial motions.  This was a motion we had a full-blown hearing on, where we called witnesses.  The defendant had an opportunity to call witnesses.

(Id. at 109 ¶ 25 to 110 ¶ 6.)  Defendant states in reply that he was diligent in finding the PPD Directive:

> Now, as far as due diligence, I was getting to due diligence when Your Honor started asking me about the supplemental brief.  So, as I was saying, during the time of the original suppression hearing, when Mr. Ongay sought the police department directives, he received the directives for the year of the hearing, 2017.  The Government objected to that evidence, stating that, "Because the traffic stop didn't occur then -- because the traffic stop occurred in 2013, those directives are irrelevant."  I didn't object to that.

> Since I fired my attorney and got Mr. Lee to acquire these records, he had trouble finding these records because the directive -- the police changed the numbers of the directives.  [T]he police department directives for inventory searches for towing a vehicle is Directive 3 now.  But at the suppression hearing years later, they changed the directives to 15-2.  So when [Mr. Lee] was searching for the directives for 2013, he was searching for 15-2.  He had to do an extensive investigation to find the proper directives that was relevant to towing the vehicles and the [seizing] of vehicles, which was -- which show diligence.  I have -- my attorney is here to attest to the fact of how diligent he went through to acquire these records.

(Id. at 111 ¶ 21 to 112 ¶ 17.)

But while Defendant asserts that the January 2013 Directive is newly discovered evidence, he has not shown that it was unavailable to him at the time or he was diligent in searching for it back in 2015.  On August 14, 2017, Defendant filed a Motion to Suppress in which he argued for suppression of the evidence sourced from the March 29, 2013 traffic stop of the rental vehicle he was driving.  (Doc. No. 149.)  Hearings on the Motion were held on October 6, 16, and 30, 2017. (Doc. Nos. 181, 187, 192.)  At the October 16, 2017 hearing, Defendant called PPD Officer Michael Haas to testify and presented him with a copy of a Directive dated June 12, 2015 pertaining to inventory searches.  (See Doc. No. 207 at 94 ¶¶ 5-23.)  Defendant correctly notes that the Government objected to the Directive's relevance since the Directive post-dated the traffic stop by two years.  (See id. at 94 ¶¶ 9-12.)  The Court permitted Defendant to continue asking questions and said the Government could raise the discrepancy of the date on cross-examination.  (Id. at 94 ¶¶ 13-14.)

However, nothing on the record at the October 6, 16, and 30, 2017 suppression hearings, or on the record at the February 7 to 10, 2023 post-trial motion hearing, or in the filings in this case "allege facts from which his diligence can be inferred."  Napolitan, 762 F.3d at 305.  The January 2013 Directive is not newly discovered evidence because it was available prior to the filing of the Motion to Suppress and at the three hearings on the Motion held on October 6, 16,

and 30, 2017.  Defendant never asked for it at any hearing and he cannot now blame his then standby-counsel for not finding it.  He is representing himself.

Moreover, Defendant has not demonstrated that he made any effort to contact the PPD in order to locate the Directive that was in effect at the time of the traffic stop.  Defendant could have subpoenaed witnesses who are responsible for maintaining the PPD's Directives or who helped update them.  In sum, Defendant has not shown that he engaged in diligent efforts to uncover the existence of the January 2013 Directive prior to the October 2017 hearings on the Motion to Suppress.   Simply put, it was available and is not newly discovered evidence.

Next, Defendant argues that he was given permission to use the rental car by Naimah Fuller, who leased the car.  Fuller testified at the post-trial evidentiary hearing held on February 7, 2023 and confirmed this fact.  Because Defendant was an authorized driver, he argues the police had no authority to seize the vehicle or do an inventory search.  The police did not have this information on March 29, 2013 after the traffic stop.  The information about Fuller permitting Defendant to drive the rental car was not brought out at the suppression hearing in October, 2017, and is not newly discovered evidence because it was available for Defendant to present at the hearing.   He has not shown otherwise.   For these reasons, no new evidence warrants reconsideration of the Court's denial of Defendant's Motion to Suppress.

### E.    Reasonable Doubt Instruction

Defendant next argues that the Court gave both a proper and an improper jury instruction on the Government's burden of proof.  (See Doc. No. 564 at 29-33.)  When the Court instructed the jury before opening arguments, it stated that "[p]roof beyond a reasonable doubt does not mean proof beyond all possible doubt or to a mathematical certainty."  (See Doc. No. 267 at 21 ¶¶ 5-7.) When the Court defined reasonable doubt when instructing the jury on the law near the end of trial,

the Court inadvertently said: "Proof beyond a reasonable doubt does not mean proof beyond all possible doubt, but to a mathematical certainty."  (Doc. No. 272 at 88 ¶¶ 11-12) (emphasis added). Defendant argues the instructions prevented the jury from understanding the proper standard for proof beyond a reasonable doubt.  (See Doc. No. 564 at 30-32.)  Based on this jury instruction, Defendant seeks a new trial.  (See id. at 33.)[34]

To show that jury instructions violated a defendant's due process rights under the Fifth Amendment to the United States Constitution, a defendant "must demonstrate both (1) that the instruction contained some ambiguity, inconsistency, or deficiency, and (2) that there was a reasonable likelihood that the jury applied the instruction in a way that relieved the [Government] of its burden of proving every element of the crime beyond a reasonable doubt."  Williams v. Beard, 637 F.3d 195, 223 (3d Cir. 2011) (quoting Waddington v. Sarausad, 555 U.S. 179, 190-91 (2009)) (citation omitted).  "[T]he Constitution does not require that any particular form of words be used in advising the jury of the [G]overnment's burden of proof."  Victor v. Nebraska, 511 U.S. 1, 5 (1994).  "The inquiry is not, then, whether a particular word or phrase is used, but rather, when taken as a whole, the instructions [must] correctly convey[y] the concept of reasonable doubt to the jury."  Laird v. Horn, 159 F. Supp. 2d 58, 92 (E.D. Pa. 2001) (alterations in original) (quotation marks and citation omitted).  In other words, the instruction must "impress[] upon the jury the need to reach the subjective state of near certitude of guilt . . . ."  Victor, 511 U.S. at 2.

Here, the disparity between the instruction to the jury that proof beyond a reasonable doubt is or is not proof to a mathematical certainty is harmless because there is no likelihood that the jury applied the standard in a way that relieved the Government of its burden to prove beyond a reasonable doubt that Defendant committed each and every element of the charged offenses.

---

[34]  The Court has verified the word "but" was said.

Contrary to Defendant's argument, the Court's inadvertent instruction to the jury that in order to convict Defendant of the charged offenses it must be satisfied by proof to a mathematical certainty placed a higher burden on the Government than proof beyond a reasonable doubt.  (See Doc. No. 272 at 88 ¶¶ 11-12.)   And, "when taken as a whole," the remaining instructions "correctly conve[yed] the concept of reasonable doubt to the jury."  Laird, 159 F. Supp. 2d at 92 (quotation marks and citation omitted).  As the Court went on to instruct:

> A reasonable doubt is a fair doubt based on reason, logic, commonsense or experience.  It is a doubt that an ordinary reasonable person has after carefully weighing all of the evidence and is a doubt of the sort that would cause him or her to hesitate to act in matters of importance in his or her own life.  It may arise from the evidence or from the lack of evidence or from the nature of the evidence.

(Doc. No. 272 at 88 at ¶¶ 14-21.)  Given the above instruction, and taking them as a whole, there is no "reasonable likelihood that the jury applied the [challenged] instruction in a way that relieved the [Government] of its burden of proving every element of the crime beyond a reasonable doubt." Williams, 637 F.3d at 233 (quotation marks and citation omitted).

Moreover, Defendant's reliance on United States v. Hernandez, 176 F.3d 719 (3d Cir. 1999) is misplaced.  In Hernandez, the district court gave the jury instructions both before opening arguments and after closing arguments.  See id. at 729-30.  Before opening arguments, the district court defined "proof beyond a reasonable doubt" as follows: "There is no specific definition.  I'm sorry to tell you, but there are none.  It's what you in your own heart and your own soul and your own spirit and your own judgment is proof beyond a reasonable doubt."  Id. at 729.  Then, after closing arguments, the court provided the following definition:

> A reasonable doubt is doubt based on reason and common sense.  A reasonable doubt is such a doubt as would cause you to hesitate to act in matters of great importance in your own lives.  A reasonable doubt may arise from a lack of evidence.  It is doubt based on reason, logic, common sense and experience.  Reasonable doubt is not vague or hypothetical doubt.  It is not speculative, imaginary qualms or misgivings.  It is not just an excuse by a juror to avoid the

performance of an unpleasant duty.  It is not the normal sympathy which one human being may hold for another.

Id. at 730.

The Third Circuit in Hernandez reversed the defendant's conviction and held that, notwithstanding the proper jury instruction given by the district court at the end of trial, the initial instruction "allows each juror to judge the evidence by a visceral standard unique to that juror rather than an objective heightened standard of proof applicable to each juror.  It allows juror to convict based upon their individual 'gut feeling.'"  Id. at 731.  Rather, "although a juror must subjectively believe that a defendant has been proven guilty, that subjective belief must be based upon a reasoned, objective evaluation of the evidence, and a proper understanding of the quantum of proof necessary to establish guilt to a 'near certitude.'"  Id. at 732.

Here, the Court's jury instructions did not contain language similar to the language that led to the reversal of the conviction in Holland.  In Holland v. United States, the United States Supreme Court held that the "Government must still prove every element of the offense beyond a reasonable doubt though not to a mathematical certainty."  348 U.S. 121, 138 (1954).  Thus, as suggested by the Supreme Court in Holland, proof to a "mathematical certainty" is a higher burden of proof than "proof beyond a reasonable doubt."  Accordingly, an instruction that raises the Government's burden of proof to convict is not the type of instruction the court in Hernandez considered to be "constitutionally infirm."  176 F.3d at 735.  Rather, the Court's instructions here ensured that the jury held the Government to its burden of proof to convict Defendant only with near certitude.

For the above reasons, a new trial is not warranted based upon the challenged jury instruction.

### F.    Statute of Limitations

Defendant also argues that this Court should reconsider its denial of a Motion to Dismiss

77

the Superseding Indictment he filed before trial, in which he argued a violation of the statute of limitations. (See Doc. No. 564 at 34.) In particular, he contends that the Superseding Indictment broadened or substantially amended the original Indictment because it "relied on different evidence." (See id.) For this reason, it had to be filed within the five-year statute of limitations. Defendant asserts that because the Superseding Indictment was filed beyond the statute of limitations, the remedy is dismissal of Counts Eight and Nine of the Superseding Indictment, which contained offenses on which he was found guilty by the jury. (See id. at 37.) Counts Eight and Nine in the Superseding Indictment charged Defendant with knowingly and intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge.[35] (Doc. No. 134 at 11.)

The Third Circuit has held that when the Government obtains a superseding indictment, the date when an original indictment was filed is controlling for statute of limitation purposes if the superseding indictment does not materially broaden or substantially amend the charges from the first indictment. See United States v. Oliva, 46 F.3d 320, 324 (3d Cir. 1995) (citing United States v. Friedman, 649 F.2d 199, 204 (3d Cir. 1981)). On November 9, 2017, the Court issued an eight-page Opinion and denied Defendant's Motion to Dismiss, holding Defendant's Superseding Indictment was not barred by the relevant statute of limitations:

> Most importantly, the statutory violations in the counts challenged in the Superseding Indictment (2 to 13) are the same as the statutory violations in the original Indictment. They obviously contain the same elements that must be proved beyond a reasonable doubt by the Government in order to obtain a conviction. Moreover, the charges on each of the substantive counts in the Superseding Indictment do not expose Defendant to a greater sentence. By significantly reducing the number of violations, his sentencing exposure actually has been reduced.

---

[35] Defendant does not claim that the original Indictment was filed in violation of the statute of limitations.

Moreover, Counts 2 to 13 of the Superseding Indictment allege that Defendant distributed Endocet or oxycodone and acquired Endocet or oxycodone by fraud between June 4, 2011 and November 2, 2011, at pharmacy locations in Philadelphia, Pennsylvania.  The comparable Counts in the original Indictment allege the same offenses, on the same dates, with the same type of drug, acquired at pharmacies in the same city.  Once again, Endocet is a form of oxycodone.  They also used the same language to describe the manner in which the offenses were committed.  For all these reasons, the charges contained in the Superseding Indictment did not materially broaden nor substantially amend the original charges.

Defendant has had notice of the allegations in the Superseding Indictment and the underlying evidence for a considerable period of time.  He is aware of the activities the Government is charging him with and has had plenty of time to prepare a defense.

(Doc. No. 202 at 7.)[36]

In his instant Motion, Defendant does not present any change in law or clear error by the Court.  Rather, he asserts that new evidence warrants reconsideration of the denial of his Motion to Dismiss for violation of the statute of limitations.  Specifically, he claims that the Government presented to the grand jury, that returned the original Indictment, photographs of prescriptions filled at "Ramon Pharmacy" although the grand jury charged that Defendant filled the prescriptions at "Lehigh Pharmacy."  (Doc. No. 564 at 35.)  Defendant contends the Government "resubmitted the matter before a subsequent grand jury 'so the evidence can match the charges.'"  (Id.)  From there, Defendant asserts that the Government "then introduced the proper prescriptions, filled at Lehigh Pharmacy, to the subsequent grand jury, and the grand jury charged as such . . . Subsequently, the superseding grand jury charged the Defendant for filling fraudulent Dr. Burch

---

[36]  In footnote 37 of the Second Amended Post-Trial Omnibus Motion (Doc. No. 564 at 34, n. 37), Defendant seems to state that he is challenging, apparently on statute of limitation grounds, Count One, not Counts Eight and Nine, although he goes on to challenge Counts Eight and Nine.  The Count One conspiracy charge in the Superseding Indictment covers the same charge as alleged in Count One of the original Indictment.  The same argument as to why there was no violation of the statute of limitations on Counts Eight and Nine of the Superseding Indictment would apply to Count One of the same Indictment.

prescriptions at Lehigh Pharmacy relying upon '<u>different evidence</u>.'"  (<u>Id.</u> at 35-36.)

However, Defendant's argument is without merit because (1) the proper focus of a statute of limitations challenge to a superseding indictment is on the charges contained in them and (2) federal courts consistently have refused to look to grand jury testimony to interpret the text of an indictment.

First, as stated by the court in <u>Oliva, supra</u>, whether the date the superseding indictment was filed controls for purposes of the statute of limitations depends upon whether the superseding indictment "materially broaden[ed] or substantially amend[ed] the <u>charges</u> in the first."  46 F.3d at 324 (citing <u>Friedman</u>, 649 F.2d at 203-04.  As described at length in the November 9, 2017 Opinion, "the charges contained in the Superseding Indictment did not materially broaden nor substantially amend the original charges."  (Doc. No. 202 at 7.)  Defendant has not identified any charges that were broadened or amended by the language in the Superseding Indictment.

Second, Defendant's request that the Court consider grand jury testimony is neither relevant to a determination of whether the charges in an indictment were amended or broadened nor permissible given the autonomy, protection, and respect owed federal grand juries.  In <u>United States v. Fallon</u>, the Third Circuit explained: "We can also find no basis for looking to anything other than the text of the indictment itself to determine its meaning.  Doing so would undermine the rationale for constructive amendment challenges, to guard jealously the grand jury's charging role. . . .  We must limit ourselves to the text of the indictment when construing its meaning."  61 F.4th 95, 112-13 (3d Cir. 2023).

Although the Third Circuit in <u>Fallon</u> considered whether the indictment in that case was constructively amended, which is an argument Defendant advances and the Court will address <u>infra</u>, the Court's holding regarding the grand jury's charging role and acknowledging judicial

non-interference in such matters ring true here.  The Supreme Court has long recognized the "long-established policy that maintains the secrecy of the grand jury proceedings in the federal courts." United States v. Procter, 356 U.S. 677, 681-82 (1958) (citations omitted).  Thus, the Court need not parse through transcripts of grand jury proceedings to determine whether the text of the Superseding Indictment broadened or substantially amended the charges in the original Indictment. Accordingly, Defendant's Motion for Reconsideration of the Court's denial of his earlier Motion to Dismiss the Superseding Indictment on statute of limitations grounds will be denied.

### G.    Motion for Judgment of Acquittal on Count One

Defendant next argues that he is entitled to a judgment of acquittal on Count One of the Superseding Indictment because insufficient evidence supports his conspiracy conviction.  (Doc. No. 564 at 39-40.)  In Count One, Defendant was charged with conspiracy to knowingly and intentionally distribute oxycodone.  (Doc. No. 134 at 1.)  "The essential elements of conspiracy are '(1) a shared unity of purpose, (2) an intent to achieve a common goal, and (3) an agreement to work together toward the goal.'"  United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006) (internal quotation marks omitted) (quoting United States v. Mastrangelo, 172 F.3d 288, 292 (3d Cir. 1999)).

Defendant argues the Government failed to prove beyond a reasonable doubt the first and third elements of the conspiracy charge: a unity of purpose and an agreement.  (Doc. No. 564 at 40-41.)  He then identifies two cases decided by the Third Circuit, United States v. Gibbs, 190 F.3d 188 (3d Cir. 1999) and United States v. Pressler, 256 F.3d 144 (3d Cir. 2001), and concludes that "much of the discussion in Gibbs is simply inapposite."  (Id. at 39.)  In Gibbs, the Court upheld a conspiracy conviction of Antjuan Sydnor, a defendant who claimed he merely bought drugs from an alleged co-conspirator, Terrence Gibbs, rather than being a participant in a larger drug

conspiracy. The Court held in <u>Gibbs</u> that a "reasonable jury could have concluded that Sydnor knew that he was dealing with a larger drug operation when he purchased drugs from Gibbs." <u>Gibbs</u>, 190 F. 3d 188 at 202. Defendant then identifies in <u>Pressler</u> facts he believes the Third Circuit held "are necessary to establish the underlying agreement to distribute":

> These facts include: steering business to another in exchange for a discount on the purchases, pooling of efforts, sharing profits, sharing package materials, consulting on distribution prices, serving as lookout for one another, providing physical protection for each other, supplying drugs on credit, having a stake in the other's venture, and discussing businesses in code. None of which are present in this matter.

(Doc. No. 564 at 40.)[37]

Under Federal Rule of Criminal Procedure 29, a defendant may file a motion for judgment of acquittal based on insufficient evidence presented at trial. <u>See</u> Fed. R. Crim. P. 29(c). On a motion for judgment on acquittal under Rule 29, the court must decide whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" based on the evidence presented at trial. <u>United States v. Caraballo-Rodriguez</u>, 726 F.3d 418, 431 (3d Cir. 2013) (<u>en banc</u>) (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979)); <u>see also</u> <u>United States v. Tyler</u>, 956 F.3d 116, 122 (3d Cir. 2020). The court must view the evidence in a light most favorable to the prosecution and must deny the motion "if there is substantial evidence . . . to uphold the jury's decision." <u>Caraballo-Rodriguez</u>, 726 F.3d at 430 (quoting <u>United States v. Gambone</u>, 314 F.3d 163, 170 (3d Cir. 2003)). This standard is highly deferential and dictates that it is not the court's task to "act as the thirteenth juror," weigh credibility, assign weight to evidence, or "substitute [its] judgment for that of the jury." <u>Id.</u> (citations omitted). The decision to overturn

---

[37] The factual categories outlined in <u>Pressler</u> supported the conviction in that case for conspiracy to distribute a controlled substance. They are not the only way to prove a conspiracy charge which, in this case, is well supported by the evidence presented at trial.

a conviction based on insufficient evidence may only be made "where the prosecution's failure is clear," United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005) (quoting United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002) (citations omitted)), or where the verdict "fall[s] below the threshold of bare rationality," Tyler, 956 F.3d at 122-23 (quoting Caraballo-Rodriguez, 726 F.3d at 431).

Here, viewing the evidence in the light most favorable to the Government, sufficient evidence was presented at trial to support the conviction on the Count One conspiracy charge in the Superseding Indictment.   The Government presented substantial evidence to support Defendant's conspiracy conviction.  Each pseudo-patient who testified said they agreed to acquire a controlled substance for Defendant.  (See Doc. No. 270 at 132 ¶¶ 9-13.)  The Government also presented pharmacy records with each fraudulent prescription filled, phone records showing Defendant's contacts with the pseudo-patients and Dr. Burch employees, a stack of Dr. Burch prescriptions found in Defendant's hotel room, and a false prescription containing Defendant's fingerprint.  (See id. at 131 ¶¶ 14-16, 132 ¶¶ 16-23.)  Furthermore, Defendant confessed to DEA Special Agent Gobin that he worked with others to obtain fraudulent prescriptions from Dr. Burch, recruited pseudo-patients, obtained oxycodone pills, and distributed the pills.  (See id. at 133 ¶¶ 1-5.)  Additionally, Monica Harrison and Khalia Landers testified about Harrison filling out fraudulent prescriptions, selling them to Defendant, and communicating with him prior to pharmacy verification calls, which was all in furtherance of Defendant obtaining the oxycodone. (See Doc. No. 267 at 170 ¶ 3 to 192 ¶ 11.)

Moreover, Khalia Landers's testimony at trial establishes she knew that Defendant sold the pills obtained by both the pseudo-patients and himself to clients who wanted a particular prescription drug.  (See Doc. No. 268 at 149 ¶ 22 to 150 ¶ 5.)  Landers testified that she was in the

car when Defendant would sell the fraudulently obtained prescriptions to different people at different locations.  (See id. at 171 ¶ 21 to 174 ¶ 20.)  Landers also testified that "he would sell a lot at a time" and that she knew the money obtained from the sales was used to pay for "cars, the bills, the rent, movies, dinner, stuff like that."  (Id. at 174 ¶¶ 11-20, 175 ¶¶ 16-17.)  She also stated that Defendant promised her that he would help her "get [her] kids back and move into a bigger house" if she promised to "help[] him in this scheme."  (Id. at 178 ¶ 21 to 179 ¶ 6.)  Viewing the evidence in the light most favorable to the prosecution, it shows beyond peradventure that Defendant and his conspirators entered into an agreement to distribute oxycodone and had a unity of purpose in carrying out the conspiracy.  Consequently, the motion for judgment of acquittal on Count One will be denied.

### H.    Motion for Judgment of Acquittal on Counts Eight and Nine

Defendant also argues he is entitled to a judgment of acquittal on Counts Eight and Nine of the Superseding Indictment.  (See Doc. No. 564 at 45-47.)  In Count Eight, Defendant was charged with obtaining by fraud or forgery Endocet from the Lehigh Pharmacy on June 4, 2011. (Doc. No. 134 at 11.)  In Count Nine, he was charged with obtaining by fraud or forgery oxycodone from the Lehigh Pharmacy on July 1, 2011.  (Id.)  He argues that there is insufficient evidence supporting his conviction because a "closer look at the I.D." brought into Lehigh Pharmacy to fill a prescription "clearly does not match the signature on the pharmacy records."  (Id. at 46.)  He also claims that a "closer look at the pharmacy records will show that a third-party filled the prescriptions."  (Id. at 47.)

The Government presented substantial evidence in support of Defendant's acquisition convictions under Counts Eight and Nine of the Superseding Indictment such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See

Caraballo-Rodriguez, 726 F.3d at 431.  To show Defendant acquired oxycodone by fraud, the Government presented evidence including the pertinent pharmacies' prescription records of the prescriptions filled on the dates and at the times when Defendant filled the prescriptions.  (See Doc. No. 270 at 130 ¶ 22 to 131 ¶ 1.)  The prescriptions and the pharmacy records contained Defendant's name, address, and phone number.  (See id. at 131 ¶¶ 1-6.)  Moreover, Khalia Landers testified that she saw Defendant fill out prescriptions in his own name.  (See Doc. No. 268 at 171 ¶¶ 6-20.)

In addition, for both Counts Eight and Nine, the jury viewed his photo identification card produced at Lehigh Pharmacy as well as the pharmacy logs.  Therefore, the jury was in the best position to decide whether the photo ID was Defendant's.  Also, pharmacist Paul Scota explained that whenever a third party comes with another's prescription, the third party must provide to the pharmacist their own ID as well as the patient's ID.

Counts Eight and Nine also charge Defendant with aiding and abetting the acquisition of oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge.  Whether or not Defendant entered the pharmacy himself, the jury found beyond a reasonable doubt that he at least aided and abetted others in acquiring oxycodone from Lehigh Pharmacy under his name.

For all these reasons, Defendant's Motion for Judgment of Acquittal on Counts Eight and Nine of the Superseding Indictment will be denied.

## I.      Constructive Amendment

Next, Defendant claims the Government constructively amended the Superseding Indictment and for this reason a new trial should be held on the Count One conspiracy charge.  The Third Circuit Court of Appeals recently discussed an indictment's sufficiency in the context of a constructive amendment:

An indictment is facially sufficient when it not only states the elements of the offense, but also "sufficiently appraises the defendant of what he must be prepared to meet, and . . . allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution." United States v. Stevenson, 832 F.3d 412, 423 (3d Cir. 2016) (citation omitted); see Fed. R. Crim. P. 7(c)(1) ("The indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."). It is constructively amended, however, when it fails to provide that fair notice because the trial "broaden[s] the possible bases for conviction from that which appeared in the indictment." United States v. McKee, 506 F.3d 225, 229 (3d Cir. 2007) (citation omitted).

United States v. Harra, 985 F.3d 196, 221 (3d Cir. 2021) (alteration in original). Courts consider

the following in determining whether an indictment has been constructively amended:

An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged. An indictment can be constructively amended through evidence, arguments, or the district court's jury instructions, if they effectively amend the indictment by broadening the possible bases for conviction from that which appeared in the indictment. When considering a claim of constructive amendment, the key inquiry is whether the defendant was convicted of the same conduct for which he was indicted. If a defendant is convicted of the same offense that was charged in the indictment, there is no constructive amendment.

United States v. Vosburgh, 602 F.3d 512, 532 (3d Cir. 2010) (quotation marks and citations

omitted). Finally, in evaluating an indictment for constructive amendment, "notice need not be

ideal, only fair . . . ." Harra, 985 F.3d at 222.

Defendant claims the Superseding Indictment was constructively amended in two ways.[38]

---

[38] Defendant also argues under the heading "Constructive Amendment" that the "proof of facts at [his] trial are different than those charged in [his] indictment." (Doc. No. 564 at 48.) "[T]he line between a constructive amendment and a variance is at times difficult to draw." United States v. Daraio, 445 F.3d 253, 261 (3d Cir. 2006) (quotation marks omitted) (quoting United States v. Adamson, 291 F.3d 606, 615 (9th Cir. 2002)). "There is a variance 'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially

First, he argues the Government constructively amended the Superseding Indictment "by introducing 12 additional co-conspirators than [sic] charged by the grand jury," thus "broaden[ing] the Defendant's possible bases for conviction from 2 to 14, allowing the jury 12 additional bases to find the Defendant guilty of conspiracy to distribute."  (Doc. No. 564 at 48.)  Second, he asserts that "the trial evidence proved a different offense" than he was charged with violating in the Superseding Indictment.  (Id. at 52.)  For reasons discussed below, however, the Superseding Indictment was not constructively amended.

Before turning to Defendant's arguments, the charges against him and his convictions bear repeating.  Defendant was convicted on Count One of conspiring to knowingly and intentionally distribute oxycodone and on Counts Eight and Nine of intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, or subterfuge (the "acquisition charges").  (See Doc. No. 250 at 1-2.)  The jury acquitted Defendant on four acquisition charges, but none of the acquittals on the acquisition charges call into question Defendant's convictions for the offenses in the other three Counts.  (See id. at 2-3.)  The acquisition charges covered six occasions when Defendant personally served as his own pseudo-patient and filled a prescription in his own name.  (See id.; Doc. No. 374 at 4-6.)  The jury's decision that Defendant did not fill prescriptions in his own name on four occasions stands separate from their finding that he twice filled prescriptions in his own name or conspired to fill those and other

---

different from those alleged in the indictment.'"  Id. (quoting United States v. Castro, 776 F.2d 1118, 1121 (3d Cir. 1985)).

Defendant's argument here "that the trial evidence proved a different offense" appears to be one arguing variance rather than constructive amendment.  (Doc. No. 564 at 52.)  Nonetheless, the Court will treat his claim as alleging both and will discuss his claim based on variance under the heading in his Omnibus Post-Trial Motion titled "Variance."  (See id. at 53-59.)  His argument on variance is in Section III.J, infra.

prescriptions to obtain pills for distribution.

Defendant's first argument is that the introduction at trial of twelve additional co-conspirators expanded the scope of the Superseding Indictment. This argument is without merit because the testimony of co-conspirators did not "broaden the possible bases for conviction from that which appeared in the indictment." Harra, 985 F.3d at 229 (quotation marks omitted) (quoting McKee, 506 F.3d at 229). The Superseding Indictment charged Defendant with "conspir[ing] and agree[ing] with [Landers] and [Harrison], both charged elsewhere, and others known and unknown to the grand jury, to knowingly and intentionally distribute" oxycodone. (Doc. No. 134 at 2.) Therefore, it was within the scope of the conspiracy and in furtherance of it for the Government to present pseudo-patients who testified that they filled prescriptions for Defendant and other conspirators who had critical roles in the conspiracy.

Defendant's second argument is that evidence was introduced at trial that was not referred to in the Indictment. For this reason, a different offense than charged in Count One was proved. The introduction at trial of evidence not specifically referred to in an Indictment was addressed by the Third Circuit in United States v. Fallon, 61 F.4th 95 (3d Cir. 2023). There, the court noted:

> The indictment claimed that [the appellants] told clients that their negotiated fees were "all inclusive," but in reality they charged additional hidden fees. These hidden fees were implemented through changes to [a] computer code made by the company's information technology department, and "[a]mong those programs" was the "adjustment" scheme that reduced the amount due to a client by a certain percentage, with [the appellants' company] keeping that percentage.

Id. at 111 (footnotes omitted). The appellants argued that "because the indictment charged only the adjustment scheme, the Government's references during summation to other hidden fees that could form the basis of these mail fraud counts constructively amended the indictment." Id. at 112. The Third Circuit rejected the appellants' arguments because "the indictment . . . charged 'hidden fees' schemes, one of which was the adjustment program" and, therefore, "the

Government's references to other hidden fee schemes did not expand the scope of the indictment." Id. at 113. Moreover, the court rejected the appellants' attempt to look at the testimony of the grand jury to interpret the indictment. See id. at 112 ("We can also find no basis for looking to anything other than the text of the indictment itself to determine its meaning. Doing so would undermine the rationale for constructive amendment challenges, to guard jealously the grand jury's charging role.").

Here, as noted above, Defendant was charged in Count One of the Superseding Indictment with conspiring with Landers, Harrison, and "others known and unknown to the grand jury" to "knowingly and intentionally distribute" oxycodone. (Doc. No. 134 at 2.) The Superseding Indictment's plain language thus identified the existence of other individuals with whom Defendant conspired to distribute oxycodone. They did not have to be expressly named in the Superseding Indictment. Consequently, the Government's introduction at trial of evidence that Defendant conspired with twelve other individuals not named in the Superseding Indictment "did not expand the scope of the indictment." Fallon, 61 F.4th at 113. Rather, Defendant was convicted of the same offense with which he was charged. Vosburgh, 602 F.3d at 532. In addition, Defendant's argument that the grand jury was presented only with evidence of two co-conspirators was rejected in Fallon. See 61 F.4th at 112 ("Appellants offer no basis for looking behind the indictment's text in order to interpret it. Relying on two cases from one of our sister circuits, they argue that, by looking through the indictment to the testimony before the grand jury, we may determine that the Government only charged the adjustment scheme. But neither case supports interpreting the text of an indictment by looking to grand jury testimony."). Furthermore, Defendant agreed at the February 7 to 10, 2023 hearing that the Government is not required to name in an indictment every co-conspirator. (See Doc. No. 522 at 175.)

Thus, for all these reasons, the Superseding Indictment was not constructively amended by the Government's introduction of evidence that Defendant conspired with twelve individuals not specifically named in the Superseding Indictment.  Accordingly, Defendant is not entitled to a new trial on Count One of the Superseding Indictment.

### J.  Variance

Defendant argues next that there was a variance between the conspiracy charge in the Superseding Indictment and the facts presented at trial.  (See Doc. No. 564 at 53-59.)  In his Motion, he claims the Superseding Indictment charged him with an overarching conspiracy to obtain oxycodone by fraud, but the trial evidence proved multiple conspiracies: (1) one conspiracy where Defendant worked with Harrison and his sister Marquita Fields to fill prescriptions with pseudo-patients; and (2) a second conspiracy where Defendant made his own prescriptions and filled them with separate pseudo-patients.  (See id. at 57-59.)

As noted in n. 38, supra, Defendant's second argument under the heading "Constructive Amendment" is one arguing variance.  He asserts that he was convicted on the basis of facts "that are different than those charged in [the Superseding Indictment]." (Doc. No. 564 at 52.) Specifically, he claims the following:

> The grand jury "specifically" charged the following: that the Defendant would have Monica Harrison steal Dr. Burch prescriptions, fill them out completely, he would pay [her] a fee for preparing and supplying the prescriptions, and [she] would verify the prescriptions.

> The [G]overnment's evidence at trial described the conspiracy in a different manner as follows:  that [Marquita Fields] would steal Dr. Burch prescriptions; that [Harrison] would fill out the body of the prescription and that Ramera Williams would sign the Dr.'s signature, that the Defendant paid [Harrison, Marquita Fields, and Williams] for preparing, supplying, and verifying the prescriptions; that [Marquita Fields] would verify prescriptions; that when the above individuals decided to stop their alleged activity, the Defendant recruited an unknown person who worked at Dr. Burch's office to verify the prescriptions.

90

(Id. at 50-51.)

Defendant also separately argues that there was a variance between the conspiracy charge in the Superseding Indictment and the evidence adduced at trial because the trial evidence showed the Government proved the existence of multiple hub-and-spoke conspiracies unconnected by a "common, unified scheme between the spokes." (Doc. No. 564 at 59.) Defendant therefore seeks a judgment of acquittal on Count One of the Superseding Indictment. (See id. at 60.) However, for reasons discussed infra, Defendant's arguments on variance are without merit.

"The Fifth Amendment requires that a defendant be tried only for crimes for which he has been indicted." United States v. Scarfo, 41 F.4th 136, 193 (3d Cir. 2022) (citing Stirone v. United States, 361 U.S. 212, 217 (1960)). "There is a variance 'where the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" Daraio, 445 F.3d at 261 (quoting Castro, 776 F.2d at 1121). A defendant alleging variance also must establish prejudice from the variance. See id. at 262. Therefore, "[t]o demonstrate prejudice from a variance, a defendant 'must show (1) that there was a variance between the indictment and the proof adduced at trial and (2) that the variance prejudiced some substantial right.'" Id. (quoting United States v. Balter, 91 F.3d 427, 441 (3d Cir. 1996)). The court in Daraio explained when a variance does not prejudice some substantial right:

> "A variance does not prejudice a defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, [or] (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense." United States v. Schoenhut, 576 F.2d 1010, 1021-22 (3d Cir. 1978).

Id.

In United States v. Allinson, the Third Circuit explained that "[w]here an indictment charges a single conspiracy but the evidence at trial proves only multiple, separate conspiracies, a

91

variance occurs."  27 F.4th 913, 922 (3d Cir. 2022).  "When faced with a variance argument, we must first decide 'whether there was sufficient evidence from which the jury could have concluded that the Government proved the single conspiracy alleged in the indictment.'"  Id. (quoting United States v. Kelly, 892 F.2d 255, 258 (3d Cir. 1989)).  The court continued:

> To assess whether a single conspiracy, rather than multiple conspiracies, existed, we look for sufficient evidence of: (1) a common goal among the conspirators; (2) a common scheme wherein "the activities of one group . . . were 'necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture'"; and (3) overlap in the dealings of the conspiracy's participants.  Kelly, 892 F.2d at 259 (quoting United States v. DeVarona, 872 F.2d 114, 118-19 (5th Cir. 1989)).

27 F.4th 913, 922 (3d Cir. 2022).  Importantly, a single conspiracy does not necessarily transform itself into numerous conspiracies because of a change in personnel or the presence of sub-schemes within the conspiracy.  See United States v. Kelly, 892 F.2d 255, 258-59 (3d Cir. 1989).

Here, no variance occurred between the conspiracy charges set forth in the Superseding Indictment and the evidence offered at trial.  The Government presented substantial evidence showing the existence of a single conspiracy to distribute oxycodone.

Each pseudo-patient who testified said they agreed to acquire a controlled substance for Defendant.  (See Doc. No. 270 at 132 ¶¶ 9-13.)  Defendant also acquired controlled substances by being a pseudo-patient himself.  The Government also presented pharmacy records showing each fraudulent prescription filled, phone records showing Defendant's contacts with the pseudo-patients and Dr. Burch employees, a stack of Dr. Burch prescriptions found in Defendant's hotel room, and a false prescription containing Defendant's fingerprint.  (See id. at 131 ¶¶ 14-16, 132 ¶¶ 16-23.)  Defendant confessed to DEA Special Agent Gobin that he worked with others to obtain fraudulent Dr. Burch prescriptions, recruited pseudo-patients, obtained oxycodone pills, and distributed the pills.  (See Doc. No. 270 at 133 ¶¶ 1-5.)

Moreover, Khalia Landers's testimony at trial establishes she knew that Defendant sold the pills obtained by both the pseudo-patients and himself to sell them to clients who wanted a particular prescription drug.  (See Doc. No. 268 at 149 ¶ 22 to 150 ¶ 5.)  Landers further testified that she was in the car when Defendant would sell the fraudulently obtained prescriptions to different people at different locations.  (See id. at 171 ¶ 21 to 174 ¶ 20.)  Landers also testified that "he would sell a lot at a time" and that she knew the money obtained from the sales was used to pay for "cars, the bills, the rent, movies, dinner, stuff like that."  (Id. at 174 ¶¶ 11-20, 175 ¶¶ 16-17.)

Moreover, part of the conspiracy was how Defendant obtained Dr. Burch's prescriptions in the first place.  This was testified to by Monica Harrison who verified the legitimacy of the prescription when a call was received from a pharmacy.  Thus, the evidence presented at trial showed the existence of a single conspiracy and the roles of the conspirators in furtherance of it. The conspirators had a common goal and each conspirator was necessary to the overall success of the venture.  While the large number of conspirators may not have known each other, there was overlap in the activities of conspirators with each other.  Finally, Defendant's own conduct as a pseudo-patient who acquired drugs was within and in furtherance of this single conspiracy.

In addition, Defendant's argument that there was a variance because the indictment alleged a hub-and-spokes conspiracy but the evidence produced at trial showed there were many hub-and-spokes conspiracies unconnected by a common goal also is without merit.  As  discussed  supra, the Government presented evidence at trial showing a single, overarching enterprise rather than smaller, independent conspiracies.  Defendant was at the head of the conspiracy.  The overall scheme was that Defendant obtained fake prescriptions from Dr. Burch, recruited pseudo-patients, which included himself, gave them fake prescriptions, drove them to pharmacies to fill the fake

prescriptions, and paid them after they returned with the filled prescriptions. Again, the fact that Defendant used different methods, recruited pseudo-patients, or engaged in sub-schemes to personally obtain fake prescriptions does not change the fact that there was a single conspiracy united by a common scheme and common goal. Conspirators such as pseudo-patients and others who may have been at the spoke need not know each other, but all acted in furtherance of the single conspiracy proved at trial.

Finally, Defendant has not shown that he was prejudiced or surprised by the alleged variance. The Superseding Indictment provided information on his obtaining and creating fraudulent prescriptions and using numerous pseudo-patients to fill them. (See Doc. Nos. 134 at 4 ¶¶ 8, 10; 374 at 24.) Defendant did not object to the Government's opening arguments or claim surprise during the testimony of co-conspirators. (See Doc. No. 374 at 24.) All the testimony was consistent with the charges in the Superseding Indictment and no prejudice has been shown. Moreover, Defendant's conclusory assertions that he was prejudiced, misled, and surprised by the alleged variance because it prevented him from developing a different defense strategy is insufficient to establish prejudice resulting from a variance. See Vosburgh, 602 F.3d at 536 n.24 ("[The defendant] claims that he was surprised at trial, but he never explains what he would have done differently had he been accurately apprised of the charges against him."). Consequently, Defendant is not entitled to a judgment of acquittal on Count One of the Superseding Indictment.

### K.    Newly Discovered Evidence

Next, Defendant argues that five pieces of newly discovered evidence require that he be given a new trial: (1) Khalia Landers's perjury at trial regarding Gena Baity's involvement in the scheme; (2) Khalia Landers's perjury at trial regarding her own involvement in the scheme; (3) her mental health conditions and their "criteria" and effects on her brain; (4) her medications to

94

treat those conditions and their adverse effects; and (5) her allegedly false allegations "about the Defendant's involvement with Shinease Lee, Keyanna Holland, and Alonzo Allison in the filling of fraudulent Dr. Burch prescriptions." (Doc. No. 564 at 60-61, 67.) He asserts that if he had this evidence at trial, he would have been able to impeach Landers's credibility and, since she "was the [G]overnment's main witness," the evidence "raises serious implications regarding the truth and veracity of her testimony." (Id. at 66.)

Because the crux of the newly discovered evidence argument centers on Landers, it is necessary to describe her involvement with Defendant and her own criminal conduct. Landers and Defendant have been married since August 2011. (Doc. No. 268 at 144.) They remained married through Defendant's trial and her testimony at his post-trial hearing. In addition to being Defendant's wife, Landers was a co-conspirator with Defendant in the scheme to acquire controlled substances. After she was charged with her involvement in the scheme, Landers entered into a plea agreement with the Government. Pursuant to that agreement, she agreed to testify when called upon in return for a recommendation for a lesser sentence than the applicable Sentencing Guidelines. As noted in her plea agreement, she "agree[d] to provide all information concerning her knowledge of, and participation in, the conspiracy to fill fraudulent prescriptions" and "to provide truthful, complete, and accurate information and testimony." See Crim. No. 14-354, Doc. No. 20 at 2.

On November 30, 2017 and December 1, 2017, Landers testified as a Government witness against Defendant at his trial. At that point, based upon her trial testimony, it was obvious that they had a falling out as husband and wife.[39] Her testimony was clear and precise in terms of what

---

[39] Her testimony about the incident that contributed to the breakdown of their relationship is set forth infra.

she did, what she saw, and what Defendant did as co-conspirators during the conspiracy.  She described how Defendant recruited individuals to pose as pseudo-patients, the process that allowed pseudo-patients to fill fraudulent prescriptions for oxycodone pills, and her involvement posing as one of the pseudo-patients.  She described how he sold the pills once they were acquired.   During her trial testimony, Landers showed no signs of impairment or confusion.

In addition, she described the confrontation that occurred when she told Defendant that she wanted out of the conspiracy.  She testified that he got angry, threatened to kill her, and physically assaulted her.  (Doc. No. 268 at 177.)  As a result of Defendant's action toward her, Landers received a protection from abuse order from a court.  (Id.)  She testified in detail:

Q.  [SOLTIS:]  Now, ma'am did there come a time when you decided you wanted out of the scheme?

A.  [LANDERS:]  Um-hum.

Q.  Is that a yes?

A.  Yes. Yes.
…
Q.  It's okay.  And did you tell Lamar this?

A.  Yes.

Q.  And how did he respond?

A.  He was angry. He ended up taking my driver's license and said he was going to get somebody else to start doing it, which he did. And -- well, I don't even know if he did, cause I didn't really see my name like as being -- as like for the prescriptions that he being filled around the time, if I said I wasn't, so I don't really know what he did with my non-driver's license, but I know he was angry and said he was going to get somebody to start filling it. And we would like fight and stuff like that.

Q.  Did he threaten you?

A.  Yeah.

Q.  What did he say to you?

A.  He said he was going to kill me and if he couldn't have me, nobody could have me.

Q.  Did he hit you?

A.  Yeah. Yes.

Q.  More than once?

A.  Yes.

Q.  And what did you do?

A.  I ended up getting a PFA [Protection From Abuse] order, I ended up changing my locks, I got him off my deed. One day I told him when I came back that he had to be gone -- him and his stuff had to be gone. And that was that. That was all like around January.

(Doc. No. 268 at 176-77.)

Landers next testified at her brother's trial.  Her brother, Jamar Cook, was charged with being a pseudo-patient, acquiring illicit pills for Defendant.  Prior to her testimony at Cook's trial, she told the Government that her brother had filled several fraudulent prescriptions and that she had observed him exit pharmacies with oxycodone tablets.  At her brother's trial, she contradicted her statements given to the Government and testified that her brother never filled any prescriptions successfully and never left a pharmacy with oxycodone pills.  See Crim. No. 14-354, Doc. No. 17 at 24-25.  Her false testimony went as follows:

Q.  [the Government:] Did Lamar – what, if anything, did Lamar [Fields] give to Jamar [Cook] before he went into the pharmacy?

A.  [Landers:] He gave him some – some money for the medicine.

Q.  Okay.

A.  That's it. And the prescription.

Q.  Okay. And was the prescription – and you were there? You saw this?
…
Q.  Okay. When he handed him the prescription, was it already filled out?

A. Yes.

Q. Did you see these prescriptions?

A. Yes.
…
Q. Okay. And then you said [Jamar Cook] went into the pharmacy?

A. Um-hmm, yes.
…
Q. And what happened once he came out?

A. He couldn't fill them.

Q. Okay. Did that happen in every instance?

A. Yes.
…
Q. Okay. And about how many pharmacies did this happen?

A. That day I remember going to, like, four or five pharmacies or three or four pharmacies, and it just seemed like every time we went inside the pharmacy, he couldn't fill the prescription.
…
Q. So it's your testimony today that your brother, Jamar Cook, never got any pills?

A. Yes.

See Crim. No. 14-354, Doc. No. 17 at 23-25.)   Subsequently, Landers was charged in a

Superseding Indictment for her involvement in Defendant's scheme, tax-related offenses, and

making a false declaration before a court.   See Crim. No. 14-354, Doc. No. 17.   The Superseding

Information charged that her testimony:

> was false in that, in or about May 2011, [Landers] had in fact, recruited [Jamar Cook] to fill, aided and abetted him in the filling of fraudulent prescriptions for Oxycodone tablets.   She accompanied Cook on trips to fill the fraudulent prescriptions and observed Cook enter the pharmacies with the fraudulent prescriptions and observed him exit the pharmacies with Oxycodone tablets. [Landers] observed Cook turn over those tablets to [Lamar Fields] who paid Cook for obtaining the pills with the fraudulent prescriptions for the purpose of resale on the streets.

(Id. at 25.)  On March 13, 2015, Landers pled guilty to making the false declaration.  See Crim.

No. 14-354, Doc. Nos. 20, 21.)

Undoubtedly, Landers had in the past dealt with mental challenges.  However, those

challenges were revealed to Defendant before his trial in the notes of Agent Smith.  In the notes,

given to Defendant before trial, Agent Smith noted that Landers:

> [R]eported suffering from panic attacks, post-traumatic stress syndrome, and bi-
> polar disorder, in part stemming from Fields' abuse. K.L also reported receiving
> mental health treatment and taking anxiety medication, which she said did not affect
> her comprehension.

(Doc. No. 552 at 32.)

Despite having these notes, Defendant never questioned her at trial about her mental health,

her treatment, or the effects of the medication.  Moreover, her testimony at the post-trial hearing

that she hid such information from him during their marriage furthers the finding that her testimony

is not credible.

Moreover, although Landers's testified at Defendant's trial that she had a separation order

against him, as time passed through the Covid-19 era, Defendant reestablished a relationship with

her.  Now in her post-trial testimony, to help him, she has dramatically inflated the level of her

mental challenges.  Unfortunately for her, as was true with her prior false testimony at her brother's

trial, the records contradict her claims.

Landers now disputes several records regarding her mental health.  She claims that, in her

September 3, 2015 Pre-Sentence Report, U.S. Probation Officer Darien Prioleau failed to include

information about the medications she takes for her mental health challenges and that she suffered

from memory loss, confusion, hallucinations, and psychosis.  Likewise, she disputes the

sufficiency of the information on her mental health written by DEA Agent Smith in his notes

during her November 21, 2017 pre-trial interview.  She also disputes the information contained in

99

Dr. Summerton's November 3, 2018 psychological evaluation of her.  She once again claims that Dr. Summerton failed to report that she suffered from psychosis and was taking medication that affected her comprehension and memory.  Contrary to Landers's current claims, Dr. Summerton's detailed report stated, "Ms. Landers was coherent, relevant, and fluent in her speech," she "denied significant difficulties with her memory and denied that she had any deficits which might impair her daily functioning," and "[t]here were no memory problems observed during the evaluation." (Doc. No. 534-2 at 8.)  In sum, Landers testified that every prior evaluation of her mental health excluded an accurate accounting of her medications and that she suffers from confusion, psychosis, and memory loss.  Her desire to help Defendant at the post-trial hearing by giving him material for a newly discovered evidence claim, despite its contradictions, is palpable.

To say her testimony on behalf of Defendant should be disregarded would be an understatement.  It was so contradictory of prior testimony that, after consulting with her counsel, she invoked her Fifth Amendment privilege and ended her testimony.  So, when Defendant, as her husband, claims that he learned after trial about the extent of her mental health challenges, the effect on her of the medicine she was taking, and her false allegations about others being involved with Defendant as newly discovered evidence, he is relying upon testimony that cannot be believed by a trier of fact presiding at the post-trial hearing.

To reiterate, the five requirements to grant a new trial on the basis of newly discovered evidence are:

> (a) the evidence must be in fact newly discovered, i.e., discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Quiles, 618 F.3d 383, 388-89 (3d Cir. 2010) (quoting United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000)) (citation omitted).  However, "newly discovered evidence that is merely impeaching is unlikely to reveal that there has been a miscarriage of justice."  Id. at 392. Rather, "[t]here must be something more, i.e., a factual link between the heart of the witness's testimony at trial and the new evidence.  This link must suggest that the defendant was convicted wrongly."  Id. (citing Saada, 212 F.3d at 216).

Stated differently, there must be an "exculpatory connection" between the new evidence and the evidence at trial.  Saada, 212 F.3d at 216.  Courts faced with requests for a new trial "solely on the basis of new impeachment evidence . . . should carefully examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence."  Quiles, 618 F.3d at 392.  New trials should not be granted where "the new evidence greatly undermined [the witness's] credibility," but the exculpatory connection between that evidence and the witness's trial testimony is "too tenuous."  Id. at 393.[40]  In addition, regarding perjured testimony, to receive a new trial on this ground, a defendant must show that:

---

[40] As noted by Defendant, the court in Quiles cited cases where the exculpatory connection between the newly discovered evidence and a witness's testimony at trial was strong enough to warrant a new trial:

> In each of the cases that we have described, the courts focused on what we believe was the correct question:  was there a strong exculpatory connection between the newly discovered evidence and the facts that were presented at trial or did the newly discovered evidence strongly demonstrate that critical evidence at the trial against the defendant was very likely to have been false?  Of course, these standards must be applied strictly and are not easily satisfied.  In Lipowski, the new evidence strongly suggested that the conviction was based on fabricated evidence.  In Taglia, the new evidence showed that a key witness routinely committed perjury when testifying as an informant, and because the witness had testified in that capacity at

(1) the testimony given by a material witness was false; (2) without the testimony the jury might have reached a different outcome; and (3) the party seeking a new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know the falsity of it until after the trial.

United States v. Onque, 169 F. Supp. 3d 555, 581 (D.N.J. 2015), aff'd, 665 F. App'x 189 (3d Cir. 2016) (citing United States v. Meyers, 484 F.2d 113, 116 (3d Cir.1973) and United States v. Massac, 867 F.2d 174, 178 (3d Cir.1989)).

### 1.    Landers's Alleged Perjury about Gena Baity Is Not Newly Discovered Evidence

Regarding Defendant's contention that Landers "perjured herself before the jury about Gena Baity filling fraudulent prescriptions for Defendant," he argues that Baity's interview with private investigators at least two years after trial that she did not fill prescriptions for Defendant is newly discovered evidence.  (Doc. No. 564 at 61.)[41]  Defendant has not met his heavy burden because this alleged new fact would not alter the outcome of his trial which is the fifth element of the newly discovered evidence test.  As discussed extensively supra, Landers's testimony was corroborated by numerous pharmacy records, Defendant's confession, and testimony from DEA Special Agent Smith, Dr. Burch, six pseudo-patients, and Monica Harrison.  (See Doc. No. 267 at 142 ¶ 2 to 143 ¶ 4, 185 ¶¶ 12-15, 188 ¶ 25 to 189 ¶ 12; see also Doc. No. 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23; 22 ¶¶ 3-12, 23; 23 ¶¶ 1, 2-4, 9-12; 25 ¶ 12; 30 ¶¶ 10-11, 24; 36 ¶¶ 11-15; 53 ¶ 10 to

---

the defendants' trials, there was great reason to doubt the validity of the convictions. And in Davis, the new evidence showed that the primary witness was a "crooked cop" who had been caught tampering with (in fact, stealing) evidence.

618 F.3d at 393.

[41] The Government stipulated that Gena Baity would testify in accordance with statements she made in a Declaration which was that she did not fill prescriptions for Defendant.  (Doc. No. 521 at 33-34.)

62 ¶ 8; 71 ¶ 20 to 81 ¶ 16; 105 ¶ 21 to 116 ¶ 20; <u>see also</u> Doc. No. 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15, 145 ¶¶ 15-18; <u>see also</u> Doc. No. 270 at 24 ¶¶ 2-25; <u>see also</u> Doc. No. 374 at 2.) Each pseudo-patient who testified said they agreed to acquire a controlled substance for Defendant. (<u>See</u> Doc. No. 270 at 132 ¶¶ 9-13.)  The Government also presented pharmacy records showing the filling of each fraudulent prescription, phone records showing Defendant's contacts with the pseudo-patients and Dr. Burch employees, a stack of Dr. Burch prescriptions found in Defendant's hotel room, and a false prescription containing Defendant's fingerprint.  (<u>See id.</u> at 131 ¶¶ 14-16, 132 ¶¶ 16-23.)  Furthermore, Defendant confessed to DEA Special Agent Gobin that he worked with others to obtain fraudulent Dr. Burch prescriptions, recruited pseudo-patients, acquired oxycodone pills, and distributed them.  (<u>See id.</u> at 133 ¶¶ 1-5.)  Additionally, Monica Harrison and Khalia Landers testified about Harrison filling out fraudulent prescriptions, selling them to Defendant, and communicating with him prior to pharmacy verification calls, which was all in furtherance of Defendant obtaining the oxycodone.  (<u>See</u> Doc. No. 267 at 170 ¶ 3 to 192 ¶ 11.) The fact that Landers at trial included Baity as one of Defendant's pseudo-patients could have been what she remembered at the time given the number of persons Defendant was attempting to recruit. In any event, given the volume of testimony incriminating Defendant, Baity's testimony would probably not produce an acquittal of him at trial.

### 2. Landers's Alleged Perjury at Trial Regarding Her Involvement in the Conspiracy, Her Mental Health Conditions, and Her Medications Are Not Newly Discovered Evidence

Defendant further contends that Landers's testimony at the February 7, 2023 post-trial motion hearing shows that she committed perjury at his trial and is newly discovered evidence.[42]

---

[42] Defendant also argues that Landers perjured herself at trial when she said that she was present when Terrance Carter, Keiana Phillips, Shante Watson, and Jamar Cook filled fraudulent

He contends that because she was a critical witness against him at his trial, her perjury probably would produce an acquittal. As noted, she testified at the post-trial hearing that during Defendant's trial she was suffering from mental health disorders and side effects from medications treating those disorders that caused confusion and memory loss. However, Landers's testimony at the February 7, 2023 post-trial motion hearing was not at all credible and does not support Defendant's claim that it was newly discovered.

"At a suppression or evidentiary hearing, 'credibility determinations are uniquely the province of the [judge].'" United States v. Miller, No. 04-636, 2005 WL 758246, at *2 (E.D. Pa. Apr. 1, 2005) (quoting Gov't of the V.I. v. Gereau, 502 F.2d 914, 921 (3d Cir. 1974)). Moreover, "credibility determinations may be influenced by factors such as a witness' demeanor, [her] tone of voice and other matters not subject to appellate scrutiny." Id.

Landers's alleged memory loss, confusion, and psychosis, and medications that cause side effects such as memory loss and confusion was entirely unmentioned prior to Defendant's trial, Landers's guilty plea on March 13, 2015, and her sentencing hearing on March 18, 2019. See United States v. Landers, No. 14-354, Doc. Nos. 59, 73. Landers had available to her prior to Defendant's trial her September 3, 2015 Pre-Sentence Report. Moreover, Landers's diagnoses of anxiety, bipolar disorder, and posttraumatic stress disorder ("PTSD") also were noted in DEA Special Agent Smith's rough notes of his interview of Landers, which were given to Defendant by

---

prescriptions for Defendant. He contends that after trial Landers claimed instead that she was at work or school during these events. This, however, is not new evidence. Defendant cross-examined Landers at his trial on this topic and even recalled her during his case-in-chief to explore it further. (Doc. No. 268 at 194 ¶ 17 to 195 ¶ 3; Doc. No. 271 at 84 ¶ 3 to 93 ¶ 7.) Defendant argued this evidence to the jury in his closing argument. (Doc. No. 272 at 51) ("You also heard her testify as I was trying to get out more facts that she was, in fact, in school from 9:00 to 3:00 and at work from 3:00 to 11:00 on most of the dates in the Indictment. Thereby further establishing a foundation of the other lies she's testified to.").

the Government prior to his trial.

But, as described above, her testimony at Defendant's post-trial hearing on February 7, 2023 is not the first time Landers's gave testimony that casts doubt on her credibility. On June 12, 2013, Landers's brother Jamar Cook was charged with eighteen (18) counts each of (1) knowingly and intentionally distributing, and aiding and abetting the distribution of, oxycodone and (2) knowingly and intentionally acquiring, and aiding and abetting the acquisition of, oxycodone by misrepresentation, fraud, forgery, deception, and subterfuge. See United States v. Cook, No. 13-298, Doc. No. 1 at 1-3.

To restate, before Jamar Cook's trial, Landers met with DEA Special Agent Smith several times and provided him information on her brother's participation in the offenses charged. During those meetings, she told the Government that she recruited her brother to pose as a pseudo-patient. Landers also told the Government during these meetings that Defendant, Landers, and Jamar Cook drove to several pharmacies. Before entering the pharmacy, Jamar Cook was given by Defendant fraudulent prescriptions and enough money to have the prescriptions filled. On several occasions, Jamar Cook exited the pharmacy with the fraudulently obtained oxycodone, and Defendant paid him $100 in cash for filling the prescriptions.

On February 4, 2014, during Jamar Cook's trial, Landers was called by the Government to testify. Contrary to the information she provided during her meetings with the Government, she testified that Jamar Cook never exited a pharmacy with any filled oxycodone prescriptions. See United States v. Cook, No. 13-298, Doc. No. 81 at 198. Assistant United States Attorney Nicole Phillips asked Landers what she told Agent Smith during her meetings, to which Landers said: "I told him that he went in the pharmacies and he filled the prescriptions and he came out with the medication and gave it to Lamar, but I only did that because I'm scared to death of my husband."

Id. at 199.

On July 9, 2014, Landers was indicted by a grand jury for her involvement in Defendant's scheme. See United States v. Landers, No. 14-354, Doc. No. 1. On March 12, 2015, a Superseding Information was filed against her, adding as an additional charge knowingly making, while under oath in a judicial proceeding, false declarations, in violation of 18 U.S.C. § 1623. Id., Doc. No. 17 at 23-24. On March 13, 2015, Landers pled guilty to all fifty-four (54) counts in the Superseding Information. Id., Doc. No. 20.

Landers now asserts that the conditions she suffers and the medications she takes cause confusion, memory loss, and psychosis and informed her probation officer and the prosecution team of the same before Defendant's trial. Unfortunately for Defendant, her testimony is not credible and, as set forth earlier, is contradicted in a number of ways.

Most importantly too, Landers was able to fluidly recall events in detail during Defendant's trial. She described Defendant's scheme, his and her participation in it, and the participation of others with particularity. During Defendant's trial, there was no evidence that she was confused, suffering from memory loss, or psychosis. In short, Landers cannot be credited with being truthful given her history of testifying falsely and having no documented issues with memory loss or an inability to comprehend. For all these reasons, the Court finds that the testimony provided by Khalia Landers on February 7, 2023 at the post-trial motion hearing is not credible and cannot be relied upon to support Defendant's claims of newly discovered evidence.

Given the above, Defendant's first three arguments that Landers's (1) perjured herself at trial, (2) had mental health conditions, and (3) was on medications to treat her mental health conditions that had adverse side effects are newly discovered evidence are without merit. He has not provided evidence that is believable or newly discovered given his relationship with Landers

and the notes he had available from Agent Smith.  Thus, these claims about newly discovered evidence fail.

### 3.     Landers's Alleged False Testimony about Individuals Filling Prescriptions for Defendant Is Not Newly Discovered Evidence

Defendant's fourth contention that Landers's false allegations that Shinease Lee, Keyanna Holland, and Alonzo Allison filled prescriptions for him also is without merit.  Apparently, she had informed the Government during interviews before trial about their involvement with Defendant.  These three individuals did not testify at trial, and Khalia Landers did not testify at trial that they filled prescriptions for Defendant.

As stated above, there was substantial evidence showing Defendant engaged in a scheme to fill fraudulent prescriptions.  Therefore, given the volume of evidence against him at trial, impeaching Landers's credibility with her prior statements about these three persons would not produce an acquittal.  Moreover, the Government did not rely on their involvement to prove the case against Defendant and no showing has been made that the agents would even know that her statements about the three persons may be false.   For these reasons, Defendant is not entitled to a new trial based on this argument.

### L.     **Brady** Issues

Defendant claims the Government committed a number of <u>Brady</u> violations.  First, he asserts that the Government did not provide him with immunity agreements which he contends must have been entered into between the Government and several pseudo-witnesses who were not indicted nor included as part of the charged conspiracy.  (<u>See</u> Doc. No. 564 at 68.)  Second, Defendant claims the Government presented Shante Watson at trial as a witness and she gave testimony the Government should have known was false and contributed to Defendant's guilty verdict.  (<u>See</u> <u>id.</u> at 70-72.)

Third, he asserts again that the Government "was aware of [Landers's] mental health conditions at the time of [his] request for <u>Brady</u> material, but deliberately chose not to provide it to the Defendant." (<u>Id.</u> at 75.)  Fourth, Defendant argues that the Government did not provide him with certain evidence involving fourteen named individuals, namely: (1) reports of interviews with Drug Enforcement Administration ("DEA") agents; (2) proffer interviews with the Government; (3) and transcripts of grand jury testimony.  (<u>See id.</u> at 84-86.)

Defendant requests a new trial as a remedy for each <u>Brady</u> violation and dismissal of the Superseding Indictment with prejudice for the second, third, and fourth <u>Brady</u> violations.  Each of the four arguments will be addressed below separately.

The Government is required to disclose to a criminal defendant evidence that is favorable to the accused and "material either to guilt or punishment." <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963); <u>United States v. Bagley</u>, 473 U.S. 667, 674 (1985).  Included in the Government's required disclosures is any evidence that can be used to impeach testifying witnesses.  <u>See</u> <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  Evidence is material either to guilt or punishment if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682 (opinion of Blackmun, J.); <u>id.</u> at 685 (White, J., concurring in part and concurring in judgment); <u>see</u> <u>also</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 433-34 (1995) (rephrasing the inquiry as whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); <u>Landano v. Rafferty</u>, 856 F.2d 569, 574 (3d Cir. 1988) (concluding there is no <u>Brady</u> violation where "there is no reasonable probability that an acquittal would have resulted had the evidence been made available to the defense").

Moreover, a new trial is not warranted even where the Government did not disclose to the

defendant <u>Brady</u> material if the Government's "evidence is strong enough to sustain confidence in the verdict." <u>Lesko v. Sec'y Pa. Dep't of Corr.</u>, 34 F.4th 211, 231 (3d Cir. 2022) (internal quotation marks omitted) (quoting <u>Smith v. Cain</u>, 565 U.S. 73, 76 (2012)).  And the "mere possibility" that an undisclosed item may have affected the outcome of the trial does not establish materiality.  <u>See</u> <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976).

Despite the Government's disclosure required under <u>Brady</u> and its progeny, there are significant limitations on what actions the Government must take.  Importantly, "[t]here is no general constitutional right to discovery in a criminal case, and <u>Brady</u> did not create one . . . ." <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977).  Because <u>Brady</u> is a disclosure—and not a discovery—rule, absent a defendant's showing that <u>Brady</u> material has not been disclosed, "the prosecutor's decision on disclosure is final.  [A] [d]efen[dant] . . . has no constitutional right to conduct his own search of the [Government]'s files to argue relevance." <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 59-60 (1987).

Although <u>Brady</u> places an affirmative obligation on prosecutors to learn of favorable evidence known by others working on the Government's behalf in the case, there is no "duty . . . to learn of information possessed by other Government agencies that have no involvement in the investigation or prosecution at issue."  <u>United States v. Merlino</u>, 349 F.3d 144, 154 (3d Cir. 2003) (citing <u>United States v. Morris</u>, 80 F.3d 1151, 1169 (7th Cir. 1996)).  It also is a "well-established principle that the Government is not obliged under <u>Brady</u> to furnish a defendant with information he already has or, with reasonable diligence, he can obtain himself."  <u>United States v. Pelullo</u>, 399 F.3d 197, 202 (3d Cir. 2005) (quotation marks and citation omitted); <u>see</u> <u>also</u> <u>United States v.</u> <u>Tadros</u>, 310 F.3d 999, 1005 (7th Cir. 2002) ("<u>Brady</u> . . . does not require the [G]overnment to act as a private investigator and valet for the defendant, gathering evidence and delivering it to

opposing counsel.").

As a general rule, to establish a <u>Brady</u> violation under the Due Process Clause of the Fifth Amendment to the United States Constitution, a defendant must show:

> (1) that the Government suppressed evidence; (2) that the evidence was favorable to [the defendant] either because it was exculpatory or impeaching; and (3) that the evidence was material to guilt or punishment, meaning that there is a reasonable probability that, had the evidence been disclosed to [the defendant], the result of the proceeding would have been different.

<u>United States v. Fallon</u>, 61 F.4th 95, 122 (3d Cir. 2023) (citation omitted).  For reasons discussed below, Defendant has not shown that any <u>Brady</u> violations occurred because the alleged withholdings either did not occur or the documents were not material to his guilt or punishment. The Court will address each of Defendant's four <u>Brady</u> claims <u>seriatim</u>.

### 1.   Immunity Agreements

First, Defendant argues that the Government failed to provide him with evidence that several witnesses who testified at trial were offered immunity from prosecution by the Government.  (Doc. No. 564 at 68.)  Defendant identifies the witnesses as Alana Russell, Shante Watson, Keleana Harvey, Ramera Williams, Rasheeda Marcus, Ali Herring, Mario Mazzioti, Ronald Knopman, and Marquita Fields.  (<u>Id.</u>)  As support for his contention, he opines that "[w]hether the agreement not to prosecute for their cooperation was express or implied, formal or informal, these individuals were given some form of immunity for their cooperation."  (<u>Id.</u>) Defendants makes this claim because "[t]he moment the [G]overnment chose not to prosecute these individuals for their cooperation constituted an immunity from prosecution."  (<u>Id.</u>) Defendant does not cite any case, however, that stands for the proposition that an immunity agreement arises from the exercise of prosecutorial discretion not to prosecute an individual.

Defendant was free to explore any perceived witness biases on cross-examination,

including whether a witness had an immunity agreement with the Government.  He chose not to

do so at trial.[43]  (See Doc. Nos. 268 at 62 ¶ 16 to 66 ¶ 10, 81 ¶ 21 to 97 ¶ 1, 116 ¶ 25 to 118 ¶ 10;

269 at 88 ¶¶ 3-19, 111 ¶ 22 to 114 ¶ 6.)  In short, no evidence has been presented to suggest the

Government made or withheld immunity agreements with other witnesses.  Defendant's

speculation that witnesses received immunity agreements does not rise to the level of a Brady

violation.

### 2.    Perjury

Second, Defendant claims that in violation of Brady the Government used, and failed to

correct, testimony from Shante Watson it should have known was false.  (See Doc. No. 564 at 70-

71.)  In particular, Defendant argues that Watson committed perjury when she identified a

prescription as one she filled.  (Id. at 70.)  At trial, she testified as follows:

BY THE GOVERNMENT:

Q.  Okay. I'm also going to show you what's been marked Government Exhibit
50A. And do you recognize this prescription?

---

[43] Defendant's inaction here distinguishes his claim from the one alleged by the defendant in
Haskell v. Superintendent Greene SCI, 866 F.3d 139 (3d Cir. 2017), a case Defendant relied on
both at the February 7 to 10, 2023 post-trial hearing and in his present Post-Trial Omnibus
Motion.  (See Doc. Nos. 523 at 70; 564 at 69.)

In Haskell, the defendant's attorney asked on cross-examination whether a Government witness,
who was facing charges in an unrelated matter, was expecting a benefit in her pending criminal
matter in exchange for testifying against the defendant.  866 F.3d at 141, 144.  She said no.  Id.
at 144.  On re-direct examination, the prosecution "attempted to dispel the notion that [the
witness] had agreed to cooperate in order to receive some benefit in her own criminal matters."
Id.  On re-cross examination, defense counsel again asked the witness whether she was
expecting a benefit from testifying, to which she again said "No, sir."  Id.  In its closing
argument, the prosecution "ridiculed the idea that [the witness] would benefit from her
testimony and vouched for her credibility."  Id. at 144-45.

As a result of this line of questioning and the Commonwealth's failure to correct the testimony
it knew was false, the Third Circuit held that there was "a reasonable likelihood that [the] false
testimony could have affected the judgment of the jury."  Id. at 152.  The defendant's habeas
petition was granted, and the case was remanded for further proceedings.  Id.

A.  Yes.

Q.  Okay. And how do you recognize that prescription?

A.  That's the prescription that I would take inside the pharmacy.

Q.  Okay. Is this one of the prescriptions that you were provided by [Defendant]? Do you recognize this as that?

A.  Yes.

(Doc. No. 268 at 80.)  Defendant argues that Watson committed perjury because she did not fill this prescription and the Government "knew or should have known that [Watson] committed perjury but failed to correct it."  (Id. at 71.)

The Government represented it turned over all Brady materials for their witnesses. Regarding Watson, Defendant does not identify any materials related to Watson that the Government withheld.  In fact, Defendant explicitly states in his Amended Post-Trial Omnibus Motion that he "is not addressing that the Government withheld anything."  (Doc. No. 564 at 70 n. 83.)  If Defendant believed Watson provided false testimony, he was free to explore any inconsistencies during cross-examination, which he did not do.  (See Doc. No. 268 at 68-69.)  And the fact that Defendant has discovered after trial what he contends are impeaching material to show she testified falsely at trial does not automatically mean that the Government knew her testimony was false.  The jury observed Watson's testimony and had copies of all pharmacy records to review in reaching its verdict.  It was within the jury's purview to assess Watson's credibility and testimony and decide whether to believe what she said.

In any event, given the substantial amount of evidence introduced against Defendant, the result of his trial would not have been different even if her testimony was false.  Moreover, as stated many times supra, because the Government's "evidence is strong enough to sustain

confidence in the verdict," the impeachment value of any allegedly false testimony of Watson at issue here is not material.  Lesko, 34 F.4th at 231 (internal quotation marks omitted) (quoting Smith v. Cain, 565 U.S. 73, 76 (2012)).  Thus, Defendant has failed to show a Brady violation regarding Shante Watson.

### 3.      Khalia Landers's Mental Health Conditions

Third, Defendant argues again that the Government violated its Brady obligations by suppressing information about Landers's mental health conditions contained in her September 3, 2015 Pre-Sentence Report ("PSR") prepared by U.S. Probation Officer Prioleau.  (See Doc. No. 564 at 73-74.)  According to Defendant, Landers "informed [him] that her mental health conditions are discussed in her PSR."  (Id. at 74.)  He claims the Government knew of her mental health conditions when he requested Brady material and that its decision not to turn over the September 3, 2015 PSR entitles him to a new trial.  (See id. at 75, 78.)  He argues that had he been given the mental health portion of Landers' September 3, 2015 PSR he would have been able to investigate Landers's mental health conditions and impeach her credibility as a witness at trial.  (Id. at 77-78.)

Defendant's argument, however, is without merit because the Government disclosed to Defendant before trial Agent Smith's rough notes detailing Landers's mental health conditions.  In his notes Smith states: Landers "reported suffering from panic attacks, post-traumatic stress syndrome, and bi-polar disorder, in part stemming from Fields' abuse. K.L also reported receiving mental health treatment and taking anxiety medication, which she said did not affect her comprehension."  (Doc. No. 552 at 32.)  As noted, Defendant did not use the notes at his trial during his direct or cross-examination of Landers or question her about her mental conditions or her medications.  In addition, the mental health conditions listed in the notes are the same ones referenced in U.S. Probation Officer Prioleau's September 2015 PSR of Landers.

On February 10, 2023, during the hearing on the post-trial motions, the Court gave Defendant "the mental health section of [the September 3, 2015 Pre-Sentence Report]." (Doc. No. 524 at 5.)  This is the only Pre-Sentence Report that is relevant because it was the only Report on Landers prepared before she testified at Defendant's trial.  Paragraph 93, the mental health section of the September 3, 2015 Pre-Sentence Report states that she was diagnosed with bipolar disorder and depression and that she is prescribed Wellbutrin to treat bipolar disorder.[44]  (Doc. No. 539-3 at 20.)  Aside from Paragraph 93, there is no other information about Landers's mental health conditions contained in the September 3, 2015 Pre-Sentence Report.  Defendant had access to the Mental Health Section of Landers's September 3, 2015 PSR before he filed the instant Second Post-Trial Omnibus Motion (Doc. No. 564).

As discussed at length <u>supra</u>, at Defendant's trial, Landers testified about her filling prescriptions for Defendant, her recommending pseudo-patients to Defendant, Defendant's methods of filling the fraudulent prescriptions with pseudo-patients, his distribution of the pills, and Defendant's physical and verbal abuse toward her when she told him she wished to stop participating in his scheme.  (<u>See</u> Doc. No. 268 at 140 ¶ 4, 122 ¶ 13 to 124 ¶ 5.)  Her testimony described many events in detail and there was no reason to believe at trial that she was confused or failed to recall what occurred.  Moreover, there was no evidence that her mental conditions affected the accuracy or truthfulness of her testimony.  In fact, as noted several times, Defendant did not cross-examine her on her mental health conditions described in Agent Smith's notes which he had at the time.  He never even asked her if she was taking medication.  Finally, Landers has been convicted of making false statements under oath at her brother's trial, changed her testimony

---

[44] Landers had no objection to Defendant being given access to this section of the Report.  (Doc. No. 524 at 6-7.)

numerous times, and her claims about her mental state at Defendant's trial about five (5) years

earlier are not credible.

### 4.     Alleged False Testimony by Khalia Landers and Monica Harrison

Finally, Defendant claims that the Government violated its obligations under Brady when

Khalia Landers and Monica Harrison identified persons in photographs shown to them by DEA

agents during proffer interviews as individuals who filled prescriptions or verified prescriptions

for him.  (Doc. No. 564 at 84.)  Specifically, Defendant asserts the following:

> During proffer interviews with the Government [Landers] and [Harrison] were
> shown a photobook containing one hundred and sixty-four photographs and were
> asked to identify whom filled and/or verified fraudulent Dr. Burch prescriptions for
> the Defendant.
>
> [Harrison] and [Landers] identified the following individuals:  Shinease Lee (S.L.),
> Keyanna Holland (K.H.), Alonzo Allison (A.A.), Joyce McMillan, Gloria
> Matthews, Sharon Robinson, Cinqueta Slater, Kelly Wright, Stephanie Lyons,
> Evelyn Flowers, Elizabeth Rich, Raymond Russell, William and Norman Davis,
> Wayne Whitley, and Joyce Johnson (J.J.).
>
> The Government failed to provide the Defendant with evidence that would
> contradict, and is inconsistent with, [Harrison]'s and [Landers]'s above-mentioned
> statement about the Defendant's involvement with the above-mentioned
> individuals.
>
> This evidence consists of, but is not limited to, the following:  S.L.'s proffer
> interview; J.J.'s proffer interview; K.H.'s interview with prosecutors, and DEA
> agents, and grand jury testimony; Erica White's (E.W.) interviews with
> prosecutors, and DEA agents, and grand jury testimony; Cornelin Christian (C.C.)
> interviews with prosecutors, and DEA agents, and grand jury testimony; and Asha
> Webbs, Gregory Scales, Derrick Suggs, and Commarty Ferguson's interviews with
> prosecutors, and DEA agents, and/or grand jury testimony.

(Id. at 84-85.)  Defendant claims that the Government's withholding of these materials prejudiced

him because he could have used it to impeach Landers's and Harrison's "credibility and/or

reliability as a witness before the jury" by showing that they provided "false allegations about the

Defendant's involvement in the filling of fraudulent Dr. Burch prescriptions with the above-

mentioned individuals."  (<u>Id.</u> at 86-87.)

For example, at the hearing on his Post-Trial Motions, Defendant called as a witness Keyanna Holland, who did not testify at his trial and who was identified as "K.H." by Defendant. The following exchange occurred during Holland's direct-examination by Defendant:

> Q.  [Defendant:] Do you recall Monica Harrison?
>
> A.  [Keyanna Holland:] Yes.
>
> Q.  What is your relationship with Monica Harrison?
>
> A.  That's my cousin.
>
> Q.  Did you ever fill prescriptions for me?
>
> A.  No.  I don't even know you.
>
> Q.  During the time you worked at Dr. Burch's office, did you -- were you aware of any investigation about false prescriptions being filled?
>
> A.  Not until after Monica was arrested.
>
> Q.  Did you partake in a Grand Jury investigate -- excuse me.  Did you partake in any interviews with the Government involving fake prescriptions being filled in Dr. Burch's name?
>
> A.  Yes.
>
> Q.  Did you participate in a Grand Jury investigation?
>
> A.  No.
>
> Q.  Excuse me.  Sorry about that.  Did you participate in a Grand Jury testimony?
>
> A.  I don't –
>
> Q.  Did you testify –
>
> A.  -- think so.
>
> Q.  -- in front of the Grand Jury?
>
> A.  No, I didn't testify for anybody.

Q.  But during this interview, did you mention to the Government that I -- that I filled prescriptions for you?

A.  No.  I don't know you.

(Doc. No. 521 at 31-32.)  As noted, the Government stipulated that another witness, Gena Baitey, whom Defendant wanted to call to testify at the Post-Trial Motion hearing, would testify consistent with statements she attested to in a Declaration.  (Id. at 33-34.)  Her Declaration states that she did not fill prescriptions for Defendant.

The Government had provided Defendant before trial with "reports of interviews and proffers" with Harrison and Landers, and he chose not to cross-examine them at trial about any perceived inconsistent statements or misidentifications they made.  (Doc. No. 374 at 12; see also Doc. Nos. 267 at 192 ¶ 17 to 214 ¶ 12; 268 at 182 ¶ 4 to 233 ¶ 23; 269 at 39 ¶ 20 to 63 ¶ 1.)  From these interviews and proffers, he knew which persons they said acquired controlled substances for him.  He also knew from his own conduct who had obtained the controlled substances for him and whether Harrison and Landers were correct in providing the names of pseudo-patients who acquired the pills for him.  Yet, he chose not to question Harrison and Landers about their alleged inaccuracies.

Further, Defendant requested post-trial information on people not called to testify at his trial.  (See Doc. Nos. 310 at 4-5; 537 at 1-2; 546 at 3-4.)  Specifically, in denying Defendant's Motion to Compel the Government to produce information on people not called to testify at his trial, the Court stated as follows:

> Finally, Defendant has not made a showing that any of the requested documents are material to his guilt nor has he provided a legal basis for the considerable amount of his post-conviction discovery requests in this case.  Defendant received a vast amount of documents throughout his trial, including Jencks and Giglio material, and had the opportunity to cross-examine the Government's witnesses in depth at his trial.

(Doc. No. 310 at 5.)

More recently, after the Court initially denied Defendant's Motion to Compel the Government to provide him with grand jury testimony and witness proffer interviews with DEA agents, the Court changed course and ordered the Government to produce any and all such documents.  (See Doc. Nos. 533, 537.)  The Government responded to the Order by providing Defendant with documents.  (See Doc. No. 534.)  Defendant filed a Motion for Reconsideration.  (See Doc. No. 541.)  In the June 13, 2023 Order denying his Motion for Reconsideration, the Court stated:

> First, Defendant's contentions about the admissibility of Brady material presuppose that the documents he seeks exist.  He has made conclusory assertions that such documents exist and that, therefore, he would be able to use those documents.  However, the Government has represented that it has searched its records and, aside from the three individuals[45] identified in [Assistant United States Attorney Jerome M.] Maiatico's February 16, 2023 letter as having been interviewed by DEA agents, there are no records of any of the fourteen (14) named individuals providing grand jury testimony or otherwise mentioning Defendant's name in reports of interview.  (See Doc. Nos. 534-1, 534-3.)
> . . .
> "[D]efendant's mere speculation that Brady material might be present is insufficient to permit perusal of Government files."  [United States v.] Ramos, 27 F.3d 65,] 71 [(3d Cir. 1993)] (citing United States v. Am. Radiator & Standard Sanitary Corp. 433 F.2d 174, 202 (3d Cir. 1970)).

(Doc. No. 546 at 3-4.)

Furthermore, the earlier discussion above on the considerable amount of evidence presented at trial incriminating Defendant in this case also applies here.  Any testimony given by Landers and Harrison was corroborated by, inter alia, Defendant's confession that he received prescriptions from Harrison and his involvement in the conspiracy, the testimony from six pseudo-

---

[45] The three individuals are Shinease Lee, Keyanna Holland, and Alonzo Allison.  They did not testify at Defendant's trial.

patients, two DEA Special Agents, one of whom testified about the pharmacy records for the false prescriptions, and by Dr. Burch.  (See Doc. Nos. 267 at 142 ¶ 2 to 143 ¶ 4, 145 ¶¶ 15-18, 146 ¶ 20 to 148 ¶ 22; 268 at 21 ¶¶ 10-11, 16-17, 19, 22-23, 22 ¶¶ 5-10, 12, 23, 23 ¶¶ 1, 2-4, 9-12, 25 ¶ 12, 30 ¶¶ 10-11, 24, 36 ¶¶ 11-15, 53 ¶ 10 to 62 ¶ 8, 71 ¶ 20 to 81 ¶ 16, 105 ¶ 21 to 116 ¶ 20, 121 ¶ 24 to 122 ¶ 4, 122 ¶ 13 to 124 ¶ 5; 269 at 80 ¶ 22 to 87 ¶ 22, 97 ¶ 22 to 111 ¶ 15; 270 at 24 ¶¶ 2-25, 35 ¶ 25 to 37 ¶ 10, 42 ¶ 17 to 58 ¶ 1.)  Thus, given that the evidence in this case was "strong enough to sustain confidence in the verdict," there was no Brady violation relating to what Defendant describes as "false testimony of Landers and Harrison."

In sum, Defendant's request for a new trial based on the Government's four alleged Brady violations will be denied.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Second Amended Omnibus Post-Trial Motions (Doc. No. 564) will be denied.  An appropriate Order follows.